UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CONGREGATION RABBINICAL COLLEGE        :
OF TARTIKOV, INC., et. al.,            :
                                       :
                    Plaintiffs,        :      CIVIL NO. 07:CV 6304 (KMK)
V.                                     :
                                       :
VILLAGE OF POMONA, NY, et. al.,        :
                                       :
                    Defendants.        :

## AFFIDAVIT OF DORIS F. ULMAN

STATE OF NEW YORK        )
                         )      ss: POMONA
COUNTY OF ROCKLAND       )

DORIS F. ULMAN, being duly sworn, deposes and says:

1.      I am an attorney admitted to practice law in the State of New York. I am the duly

appointed Village Attorney for the Village of Pomona (the "Village"). I have served the Village

in this capacity since July 2003.

2.      In addition to Pomona, since 1988 I have been Village Attorney for the Village of

Grand View-On-Hudson and, since 1983 Deputy Village Attorney for the Village of Wesley

Hills. From 1986 to 1991 I was Assistant Village Attorney for Chestnut Ridge and from 1992 to

2012 I was the Village Attorney for Chestnut Ridge. I was Village Attorney for the Village of

New Square from 1990 to 1996, and then from 2000 to 2010. From 1984 to 1990 I was

Assistant Village Attorney for New Hempstead, then Village Attorney until 2003. I was Village

Attorney for South Nyack from 1986 to 2000. I have done Special Counsel work for the Village

of Suffern and the Village of West Haverstraw. I have also been Village Attorney for the Village

of Spring Valley.  I am currently and since its inception Counsel to the Rockland County

Conference of Mayors and also since its inception to the Rockland County Village Clerks and

Finance Officers Association.  I was a founding member and first Counsel to the Rockland

Municipal Planning Federation.  From 1961 to 1965 I was Assistant Counsel for the NYC Board

of Statutory Consolidation.  In this regard I, with others, rewrote the NYC Administrative Code

to conform it to the new 1961 NYC Charter.

3.      In serving as Village Attorney for Pomona, I have personal knowledge regarding

the records and affairs of the Village, its Code, the laws of the State of New York and the laws of

surrounding municipalities.  My knowledge of the laws of the State of New York and

surrounding municipalities is also based on my 47 years of practice as a municipal attorney as

well as my extensive work for the other villages mentioned above.

4.      For the Court's edification, in addition to being deposed personally in this case, I

was the person who testified as the Village's representative pursuant to FRCP 30(b)(6) as well as

the Village's Board of Trustees' (the "Board") representative pursuant to FRCP 30(b)(6).

5.      The Village was formed in 1967.  Since its formation, the Village has always

limited land use to single-family residences on one-acre zoned property, zoning commonly

known as R-40.  **See Defendants' Ex 1000, p 3.**  Since I have been Village Attorney, it has been

the policy of the Board to preserve a non-commercial residential single family neighborhood

with minimum lot sizes of 40,000 square feet in order to retain the rural nature of the Village.  I

note that since the Village abuts a fairly large commercial area, as Village Attorney I can say that

it has always been the administration's goal of maintaining its single family, semi-rural

character.

6. The Village first adopted its zoning laws, currently contained in Chapter 130 of the Village Code, in 1968. The purpose of the laws was and remains to preserve and enhance the rural residential character of the Village.

7. The zoning laws reflect the Village's long-time goal of remaining a low-density residential community.

8. Subsequent to the establishment of the Village Code in 1968, in 1974, a comprehensive plan for the Village, entitled "Development Policies Plan" was prepared. **See Defendants' Ex 1000, p 1.**

9. In 1997, an addendum to the Development Policies Plan, entitled "Village of Pomona Master Plan Update" was prepared. This is Defendants' Exhibit 1000. Among other things, the Master Plan Update shows that from 1974 to 1997, the population of the Village grew by at least 46%, and the amount of developed area in the Village increased by 42%. **See Defendants' Ex 1000, pp. 1, 3.**

10. When the Village updated its Master Plan in 1997, it stated that the "policy to maintain the low-density residential character of the Village should remain unchanged. . . . Care should be taken that future development is designed so as to preserve open space and important natural features." **See Defendants' Ex 1000 p 17.**

11. As I have said, the entire Village, including the 100 acre Tartikov property (the "Property"), is designated as an R-40 District, which requires a minimum of 40,000 square feet per lot (approximately one acre) for the development of single-family residences. **See Defendants' Ex 1000, p 3.**

3

12.     Single-family residences, public utilities rights-of-way, libraries and museums, public parks and playgrounds, and agricultural pursuits are all permitted uses as-of-right in the Village.

13.     The construction of educational institutions (with attendant dormitories), houses of worship and other stated uses are permitted by special use permit, some of which are under the jurisdiction of the Board of Trustees and others under the jurisdiction of the Zoning Board of Appeals. **See Pomona Village Code, Plaintiffs' Ex. 150.**

14.     Houses of worship have been approved by the Village as special permit uses after review to minimize the adverse effects of non-residential uses on the adjacent single family residential neighborhoods. **See Pomona Village Code, Plaintiffs' Ex. 150.**

15.     The Zoning Board of Appeals has authority to grant use or area variances to a property owner. **See Defendants' Ex 1009.** A property owner may also petition to amend the zoning law or apply for a zone change should its use not be listed as a permitted use or be suitable for a variance. **See Pomona Village Code, Plaintiffs' Ex. 150.**

16.     Throughout my tenure as Village counsel, the Village has consistently opposed high-intensity development. The Village opposed the Urban Forest Corporation mulch plant in 2002 and the Minisceongo Park project (originally a multi-family housing project, then changed to a Walmart shopping center) in the Town of Haverstraw, Patrick Farm downzoning to multi-family, the Town of Ramapo Comprehensive Plan and multi-family adult student housing in the Town of Ramapo.

17.     As the Court is aware, there are 4 local laws at issue in this case: Local Law 1 of 2001, Local 5 of 2004, Local Law 1 of 2007 and Local Law 5 of 2007. I will refer to these as the "Subject Laws". **See Defendants' Exs 1010, 1011, 1012 and 1013, respectively.**

4

18.     Before I discuss each of the laws, I think it is important to understand the process the Village follows in enacting a Local Law.

A Local Law can be initiated by a member of the Board of Trustees, the full Board, the Planning Board or by the Village Attorney. It can also be initiated at the suggestion of a Village resident.

Notwithstanding the above, the official and formal process starts by the Board asking the Village Attorney to draft a law (i.e. the Board tells the Village Attorney what it wants). The Village Attorney's draft is sent to the Board members to review in order to determine if that's what they want in the law. Unless it's very clear, there is further discussion of the draft language at a workshop or by oral or written communication to the Village Attorney. After that, if the Board decides it wants to consider the Law it has a formal meeting to schedule a public hearing. Generally the Village follows this procedure unless there's some kind of emergency. Public hearings on Local Laws are generally held at the second meeting of the month.

Next the proposed Law is advertised in the official newspaper. I prepare the public hearing notice, which is a notice of the date, time, and place of the public hearing, together with the title of the proposed Law and a brief description of it. In some cases, where it is a detailed law, we might publish the entire proposed Law in the newspaper. Text of the proposed Law is also made available to the public at Village Hall and on the Village website the same day it is posted in the newspaper.

At the public hearing the public is asked to comment on the Law. Sometimes, if there is a lot of discussion and if some good ideas come in from the public the Board may hold the hearing open until the next meeting. If not, the public hearing is closed. Generally the Board

5

makes a decision after the public hearing is closed.  However, if there are changes to the Law new revisions have to be circulated to Board members at least five days before it's adopted.

Once the Law is adopted it's filed with the New York State Secretary of State.  If it is an amendment to the Zoning Law it must also be published in the official newspaper indicating when the Law was adopted.  Prior to the public hearing, if it is an amendment to the Zoning Law, before the Board can make a decision, a copy of the proposed local law must be sent to the Rockland County Planning Department and the Clerks of all adjacent municipalities for comment.  If the Law refers to a specific property, like a zone change, then you would only send it to the outside agencies if the subject property is within 500 feet of a County road, stream, park, State park, State road, the Palisades Interstate Park Commission.  Local Laws that don't amend the Zoning Law don't have that extra step.

The other thing that that must be determined before making a decision is whether the proposed Law falls under SEQRA and whether or not it needs an exemptive action or if it needs a negative declaration.  That, again, is done prior to adoption.

19.     The genesis of the Subject Laws, and many other Village laws, began in the late 1990s.  Specifically, in December 1999, Mark Healey of the planning firm Frederick P. Clark Associates Inc. ("FPC") (FPC was the Village's planner at the time) reviewed the zoning provisions of the Village Code in conjunction with an informal presentation by Yeshiva Spring Valley ("YSV") to the Village Planning Board.  At the time, YSV was considering building a school in the Village on the Property.  Although I was not Village Attorney at that time, I have read minutes of meetings, memoranda and other documents relating to Local Law No. 1 of 2001.

20.     On January 24, 2000, Mr. Healey issued a memorandum to the Village's Mayor and Board in which he stated, among other things, that the Village's standards for schools is "rather scant" and inadequate. **See Defendants' Ex 1015, p 1.**

21.     In his memorandum, Mr. Healey proposed a series of comprehensive and coordinated zoning amendments aimed at addressing the following issues: 1) modification of the lot area requirement for educational institutions; 2) restrictions on the maximum building coverage and maximum impervious surface coverage; 3) modification to the Village's off-street parking requirements for educational institutions; 4) modification of the zoning regulations to include signage requirements; and 5) amendment of the Village zoning to make educational institutions a special permit use, rather than as-of-right. **See Defendants' Ex 1015, pp 1-2.**

22.     On January 22, 2001, the Board of Trustees held a public hearing (a "regular meeting") regarding proposed Local Law 1 of 2001. **See Defendants' Ex 1010, p 6.**

23.     On January 22, 2001, the Board of Trustees adopted Local Law 1 of 2001. **See Defendants' Ex 1010, p. 6.**

24.     Local Law 1 of 2001 was enacted because: 1) the Board of Trustees wanted to have educational institutions as special permit uses rather than as of right; and 2) to set standards to reduce the impact of non-residential use on adjacent residential neighborhoods and properties. **See Defendants' Ex 1010.**

25.     Prior to Local Law 1 of 2001, educational institutions were permitted as-of-right throughout the Village. **See Defendants' Ex 1015, p 2.** The Law did not remove schools as a permitted use. The reason why the Law was enacted was because the Board wanted to have educational institutions as special permit uses rather than as a right, and to set up standards by which density and impacts on adjoining properties would be regulated. Educational uses are

7

much more intense uses than single-family dwelling uses, and they are permitted within the single-family zones, so it is important to insure that the non-residential use does not have a negative impact on the adjoining properties.

26.     Local Law 1 of 2001 amended § 130-4 of the Village Code by adding the definition of "Educational Institution," which was defined as "any school or other organization or institution conducting a regularly scheduled comprehensive curriculum of academic and/or alternative vocational instruction similar to that furnished by kindergartens, primary or secondary schools and operating under the Education Law of New York State, and licensed by the State of New York." **See Defendants' Ex 1010, p 2.**

27.     Local Law 1 of 2001 further amended § 130-10 of the Village Code by adding provisions to make Educational Institutions subject to special permit approval by the Board of Trustees and site plan approval by the planning board. **See Defendants' Ex 1010, p 3.**

28.     Local Law 1 of 2001 also added requirements and standards for granting a special use permit for an educational institution, including minimum net lot area, maximum development intensity, road frontage and access, setbacks and screening, parking, noise and exterior lightning, and public water and sewer. **See Defendants' Ex 1010, pp 3-5.**

29.     At the time Local Law 1 of 2001 was enacted, no application had been filed by YSV. **See paragraph 32.**

30.     Although, as I have stated, Mr. Healey's suggestion to amend the Village Code with regard to the standards for schools was first voiced during a discussion related to YSV, YSV was never told that they would have to wait to file their application pending the adoption of a new law.

8

31.     Had YSV filed an application and had a site plan approved prior to the enactment of Local 1 of 2001, the previous law, not Local Law 1 of 2001, would have applied to YSV's application.

32.     The first communication to the Planning Board by Yeshiva Spring Valley was a Narrative in November 1999 for a primary and preschool. **See Defendants' Ex 1022.** The first application submitted to the Planning Board was in 2001 for a 26 lot subdivision. **See Defendants' Ex 1055.** Public hearings were held by the Planning Board monthly until Yeshiva Spring Valley requested that the hearings be adjourned without date.

33.     Despite filing an application, YSV did not submit the environmental studies required for New York State Environmental Quality Review Act ("SEQRA") review. YSV applied for a 25-lot single-family residential development and a Yeshiva on the 26th lot, rather than the primary school and preschool it had previously considered building. **See Defendants' Ex 1055.**

34.     As I have said, I was appointed Village Attorney in 2003. During the course of my work it became evident that certain existing Local Laws needed revision, particularly where there were deficiencies or inaccuracies in the content of the laws. Review of existing laws is always a work in progress.

35.     I recommended to the Board that certain amendments be made to the existing Village Code. This recommendation resulted in the drafting (all the drafting was done by me) and enactment of 9 local laws in 2003, 8 local laws in 2004, and 5 local laws in 2005.

36.     One of these laws is Local Law 5 of 2004, which is one of the Subject Laws. **See Defendants' Ex 1011.**

37.     Local Law Number 5 of 2004, which amended the definition of educational institutions, added provisions for dormitories, and amended minimum lot areas, frontage and access requirements and setbacks. **See Defendants' Ex 1011.**

38.     Prior to the enactment of this law, dormitories were not permitted in the Village.

39.     One reason why I drafted and recommended this law is that it would give an applicant the ability to build a school, but build a school that could house its students on campus. Many Yeshivas in Rockland County have dormitories on site and at this time I was not sure what YSV wanted to build in Pomona. If they wanted a dormitory with their school our law would be in place to permit it.

40.     To summarize, the purpose of Local Law 5 of 2004 was to address the following issues and to make the existing law less restrictive:

   a)  removing the half-acre requirement for each student so that the minimum lot area required for an educational institution was substantially reduced to 10 acres net lot area;

   b)  As mentioned, addition of a provision allowing dormitories, as prior to 2004 dormitories were not permitted as accessory uses to schools in the Village of Pomona;

   c)  Clarifying the definition of "educational institution" and removing the definition of school so that there was only one definition relating to the same use; and

   d)  Removing the requirement that an educational institution be located on a state or county road.

**See Defendants' Ex 1011.**

41.     This proposed law, as well as potential revisions to other Village laws, were discussed by the Board of Trustees in the summer of 2004.

42.     Following the Board's discussion of this and other proposed laws, on September 7, 2004, I provided the Board with a formal memorandum regarding the proposed amendments

to the zoning law in relation to schools. **See Defendants' Ex 1016.** The memorandum proposed a series of amendments to the zoning law in relation to schools and dormitories aimed at addressing the issues I have previously discussed.

43.     On September 27, 2004, the Board held a public hearing regarding proposed Local Law 5 of 2004.  Only one Village resident spoke at the hearing regarding the proposed Law. **See Defendants' Ex 1043, p 3.**

44.     On September 27, 2004, the Board of Trustees adopted Local Law 5 of 2004. **See Defendants' Ex 1043, p 3.**

45.     The definition of "dormitory" included the provision: "Single-family, two-family and/or multifamily dwelling units other than as described above shall not be considered to be dormitories or part of dormitories." **See Defendants' Ex 1011, p 1.**

46.     Like Pomona, the laws in Chestnut Ridge, Ramapo and Orangetown and many other municipalities do not permit kitchens in dormitories. **See Defendants' Exs 1017 and 1018.**

47.     The definition of "dormitory" contained in Local Law 5 of 2004 was modeled after the Town of Ramapo's definition and is nearly identical. **See Defendants' Ex 1017, p 2.** Like Pomona, it is also similar to the definition of dormitory used by the Village of Chestnut Ridge. **See Defendants' Ex 1018.** Chestnut Ridge's school law limits dormitories to a single building. **See Defendants' Ex 1018.** At that time, in drafting the Law, I was the Village Attorney for Chestnut Ridge.  I knew the definition of dormitory there, which I had not prepared but which was in the original zoning law adopted by the Board of Trustees of Chestnut Ridge in 1987, which was taken, again, almost word for word, from the Town of Ramapo.

48.     The dormitory portion of Local Law 5 of 2004 was the result of research I performed regarding, at the time, recent case law developments in New York State. These case law developments included decisions referenced in the cases: *Congregation Mischknois Lavier Yakov Inc. v. Board of Trustees of Village of Airmont*, *Diocese of Rochester v. Planning Board of the Village of Brighton*, and *Cornell University v. Bagnardi*. In my opinion, the *Bagnardi* case indicated that dormitories could not be prohibited in relation to an educational use and highlighted the special status afforded to educational institutions in land use cases and set forth the factors to be considered by local governments when reviewing applications for such uses.

49.     My review of these cases made me realize that the then-existing Village Code, which required an educational institution to have a minimum net lot area of ten acres plus a half-acre per student, had to be changed. I believed that the "per student" requirement in the then existing Code provision would not be permitted under *Bagnardi* because student population is not considered to be a zoning or land use issue. Given my conclusions on these issues, I recommended to the Board that the law be changed to comply with these case requirements. This change was important to the Village because, among other things, it prevented the entire educational institution requirement from being declared unconstitutional.

50.     The definition of "educational institution" was also amended to require that educational institutions be "accredited by the New York State Education Department or similar recognized accrediting agency." **See Defendants' Ex 1011, p 1.**

51.     The reason why I added the accreditation provision was to impose a restriction on the use of organizations that might call themselves schools but which were not subject to the special status outlined in New York case law. Specifically, the New York Court of Appeals created "special status" for the purpose of requiring municipalities to permit educational

institutions and houses of worship anywhere within their municipality. The special status prevents them from being prohibited and also, in the course of its review, a municipality is required to give these institutions a more liberal review than a residential or commercial project would get.

52.    In addition to the reasons for Local Law 5 of 2004 that I have discussed, I drafted this law and recommended it to the Village Board because I also believed there were inconsistencies and vagueness issues in the existing Village Code that Local Law 5 of 2004 would fix. Specifically, the existing definition of "school" required that an educational land use be approved by the New York State Board of Regents or the New York State Education Department. **See Defendants' Ex 1010, p 2.** Conversely, the definition of "educational institution" required that it be duly licensed by the State of New York. The accreditation requirement in the new law I drafted replaced the previous licensing requirement and the requirement that approval by the New York State Board of Regents or New York State Education Department. I believed that this change would make it easier for applicants, as well as Village officials, to understand these requirements.

53.    As Village Counsel, I continued, on a regular basis, to review the Village laws and make recommendations to the Board when I believed the laws could be improved, in particular where I believed there were deficiencies or inaccuracies in any of the existing laws. In this regard, one of the Subject Laws is Local Law Number 1 of 2007. I drafted that law. The reason for that law was to address errors, inconsistencies and vagueness issues in relation to the previously enacted educational institution and dormitory laws.

54.    To be more specific, I believed there were errors, as well as inconsistencies and vagueness in the then existing Code, including:

a)    the need to make it clear that a dormitory use is an accessory use to a principal educational use;

b)    the 2001 law referenced "net lot area" requirements that had been incorrectly carried forward during the 2004 amendment as "lot area," inadvertently omitting the word "net"; and

c)    the definition of dormitory contained the language "a building that is operated by a school," whereas the definition of school had been previously deleted and replaced with "educational institution."

55.    After drafting Local Law 1 of 2007, I presented it to the Board.  On December 18, 2006, the Board held a public hearing on the proposed Law.  **See Defendants' Ex 1041.**

56.    At the hearing, an attorney for Tartikov, Paul Savad, was present and asked the Board to continue the hearing to the next Board meeting, alleging that the proposed Law had not been properly posted on the Village website.  **See Defendants' Ex 1041, p 4.**  The Board granted Mr. Savad's request and adjourned the public hearing to the next Board meeting, which was January 22, 2007.  **See Defendants' Ex 1041, p 5.**

57.    In January 2007, I learned about the proposed college from reading an article in the Rockland Journal News.

58.    The January 22, 2007 public hearing regarding proposed Local Law 1 of 2007, which I attended, was attended by many members of the public.  The hearing was held after the information regarding Tartikov's proposed development had appeared in the news.  Most of the public comments were about the issue of high density housing, rather than the proposed Law.  At the hearing, then Mayor Herbert Marshall urged the audience not to discuss the housing project reported by the Journal News, since it was not before the Board, and to limit their remarks to the proposed law.

59.    Despite the admonition by Mayor Marshall, most of the comments from the public concerned the high density housing proposed for the rabbinical college.

14

60.     Although they had never previously done so, Tartikov or its representatives had a videographer videotape and a court reporter transcribe this Village public hearing.

61.     On January 22, 2007, the Board of Trustees adopted Local Law 1 of 2007.

62.     Local Law 1 of 2007 states in relevant part: "A dormitory building shall not occupy more than 20% of the total square footage of all buildings on the lot." **See Defendants' Ex 1012, p 2.**

63.     The word "net" was also added as to the minimum net lot area standards required of an educational institution.

64.     Additionally, the definition of dormitory readopted the words "educational institution" replacing the word "school" and adding "accessory to a principal school use." **See Defendants' Ex 1012, p 1.** These corrections were necessary because I had inadvertently omitted them in the prior Local Law No. 5 of 2004.  As previously stated, constant review of existing laws is always a work in progress.

65.     The fourth and final Subject Law is Local Law 5 of 2007, the Wetlands law. **See Defendants' Ex 1013.**

66.     I drafted this law and recommended it to the Board.

67.     The part of this Law that plaintiffs challenge states that: "(A) Except as provided in § 126-4 below, it shall be unlawful to conduct, directly or indirectly, any of the following activities upon any wetland, water body or watercourse or within 100 feet of the boundary of any wetland, water body or watercourse <u>unless a permit is issued therefor by the Board of Trustees or the Planning Board, as the case may be</u>"… "<u>The aforesaid one-hundred-foot buffer in which regulated activities are not permitted to take place shall not apply to lots that are improved with single-family residences.</u>" **See Defendants' Ex 1013, p 3.**

68.     I researched and drafted this law because the Board was concerned about wetlands in the Village that were not regulated by the State or the federal government. I took the 100 foot buffer requirement in the proposed Law from the New York State Environmental Conservation Law, which requires a permit from the NYDEC for any proposed disturbance of land within 100 feet of any NYDEC regulated wetlands. **See Defendants' Ex 1092.**

69.     The law was also enacted because both I and the Board believed it would protect the health, safety, and welfare of Village residents.

70.     While the Property is legally subject to this, the Law was not prepared or enacted with the Property in mind. I can say this because, as I have stated, I drafted the law and when I drafted it, I had no knowledge of what, if any, wetlands were on the Property.

71.     In drafting this law, in addition to reviewing the buffer provisions contained in the NYDEC law, I consulted a wetlands study prepared for Westchester County, NY. I also reviewed the wetlands laws of the villages of Chestnut Ridge, New Hempstead, and South Nyack.

72.     As evidenced by the above, this law was not drafted "in a vacuum". The Village was a member of the Rockland County Storm-Water Management Consortium. As members of the Consortium, both I and the Village's engineer, P.J. Corless, regularly attended the Consortium's monthly meetings.

73.     While the research I conducted as well as the Board's concerns for the need of a wetlands, there were additional events that make it clear that the Village had to enact this legislation. Certain recent events showed that we needed to control and protect the Village's wetlands. Hurricanes Floyd and Irene and super storm Sandy all affected the Village with severe flooding conditions that caused a good deal of damage.

74.     On January 22, 2007, the Board of Trustees held the first public hearing regarding proposed Local Law 5 of 2007.

75.     On April 23, 2007, the Board of Trustees adopted Local Law 5 of 2007. **See Defendants' Ex 1013, p 1.**

76.     Throughout this case, in their submissions, plaintiffs make allegations that the Subject Laws are not necessary because many of the uses that one applying for a special permit seeks can be addressed during the application process, a process that, depending on the type of use proposed, may involve a SEQRA review.

77.     For example, plaintiffs have suggested that the size of the proposed college could be addressed at the application stage and therefore, there is no need for the educational institution provisions that are contained in 3 out of the 4 Subject Laws. This is not entirely true. For example, the Village does not have the ability to control the size of an educational institution through the special permit application process unless the zoning law has a limitation (as the Village Local Laws do). A municipality that allows a use as of right cannot restrict that use unless the local law authorizes the restriction. The SEQRA process only permits mitigation of substantial environmental impacts. It cannot restrict the size of a building if there is not already a law in place restricting the building size. Therefore, regarding the requirement contained in Local Law 1 of 2007 that limits dormitories to not more than 20% of total square footage, without that law in place, unless the applicant either proposes that specific percentage or agrees to it, the Village has no ability to place a 20% limitation on dormitory size or any limitation on dormitory size.

78.     Plaintiffs' have made allegations about efforts they made to discuss the proposed rabbinical college with Village officials.

17

79.     As I have stated, in January 2007, I learned about the proposed college from reading an article in the Rockland Journal News.  The article appeared in the paper about 2 weeks before the January 22, 2007 public hearing on Local Law 1 of 2007.

80.     On May 9, 2007, Paul Savad, Tartikov's counsel, called me to discuss the project. It was an informal discussion.  Mr. Savad called me to talk about permitted uses in the Village and whether or not Tartikov would need to obtain variances.  However, even though I asked, Mr. Savad would not provide me with any specific information regarding the project.  During the conversation, I asked him what the rabbinical college was.  Again, as I said, he did not give me any specific information.  There was no discussion of what buildings would be part of the project or how many students there would be.  Since he was calling it a "college" I assumed it was an institution of higher education.  Mr. Savad told me that there would be an educational use and a series of apartments to be used by students.  Based on his description at the time it sounded like a fairly large housing project with an accessory type of educational institution, similar to the adult student housing in the Town of Ramapo.  He asked me to confirm that since the "college" could not be accredited, it would be almost impossible for them to be granted a use variance.  I agreed but suggested that they apply for a zone change.  The reason a use variance was not appropriate is because State law requires an applicant who applies for a use variance to prove that there is no other economic use for the property and this would be impossible for plaintiff to prove.  It was my opinion that an application for a zone change or zoning law amendment was an alternative. Mr. Savad told me it would be a rabbinical college to train rabbis to become judges and that it was not accredited, but again, despite my request, Mr. Savad did not provide any more details regarding the size, number of students, number of buildings, what the buildings would be for, whether there would be labs, classroom, auditoriums, etc.

81.     On March 26, 2007 I received a letter from him. **Defendants' Ex 1066.** The letter proposed that Mr. Savad, on behalf of Tartikov, meet with newly elected Mayor Sanderson and me "to discuss areas if [sic] mutual concerns and interests regarding the Tartikov property." Mr. Savad wanted to discuss ways to mitigate and minimize long term environmental impacts of the project. By letter dated April 25, 2007, Mr. Savad wrote Mayor Sanderson and the Trustees again requesting a meeting. **See Plaintiffs' Ex 106.**

82.     By letter of May 9, 2007, I responded to Mr. Savad's letter. **Defendants' Ex 1070.** In my letter, I advised Mr. Savad that "the Village of Pomona does not review projects or applications behind closed doors nor do we design projects for applicants. When your client submits an application it will be referred to and reviewed by the appropriate Board. We do not see any reason why your client's project should be reviewed differently from any other project that comes into the Village."

83.     On May 10, 2007, Mr. Savad wrote 2 letters to me. **Defendants' Exs 1063 and 1064.** One letter **(Ex 1064)** stated that his request was for a "Public Meeting," the second letter **(Ex 1063)** advised me that Mr. Savad had told his clients that the Village does not hold ad hoc meetings prior to taking formal applications and that the only application his client could make was for a zone change.

84.     On May 14, 2007 I responded by letter to Mr. Savad **(Defendants' Ex. 1062)**, stating that his initial letter did not suggest that a "public meeting" was being requested. I also confirmed a telephone conversation I had with him during which we agreed that his clients' first step would be to apply for a zone change.

85.     Subsequent to this letter, Mr. Savad sent a letter dated June 22, 2017 to Mayor Sanderson **Defendants' Ex 1051**. In the letter Mr. Savad asked that the Mayor "grant an exemption" to allow Tartikov to build its college.

86.     On July 3, 2007, **(Defendants' Ex. 1052)** Mayor Sanderson wrote a letter responding to Mr. Savad's June 22 letter. Mayor Sanderson told Mr. Savad that to grant Tartikov an exemption from the Village's zoning laws " would be discriminatory and violative of Federal and State Constitutions."

87.     Plaintiffs have made accusations that the Village had no justification in not agreeing to meet with Mr. Savad to discuss the proposed college. I note that in addition to the letters Mr. Savad sent to me and to Mayor Sanderson during this time period, Mr. Savad also attended several Board meetings, requesting that he be able to meet with the Board. As I stated in my response to Mr. Savad's March 26, 2007 letter, the Board does not meet with persons or entities who have not first filed a formal application. Neither Mr. Savad nor anyone from Tartikov ever came to any member of the Board or to me with an application, or anything even resembling an application. Despite the Village's repeated requests, Tartikov refused to submit an application. Instead, it wanted a blanket exemption from the Village's zoning laws. Plaintiffs allege that the Village has an informal procedure called TAC (Technical Advisory Committee) and that plaintiffs were not invited to attend a TAC meeting. As the name suggests, TAC is an advisory arm of the Village Planning Board. The TAC consists of the Village Engineer, the Village Planner, the Village Building Inspector and the Village Attorney. TAC's primary function is to review applications to the Planning Board for completeness, for compliance with law, for SEQRA compliance, to make sure the application is ready for Planning Board review and to advise the applicant on Village procedures. TAC does not help an applicant design a

project nor does it decide on the merits of an application. This is the job of the Planning Board. Mr. Savad is an experienced land use attorney. He is familiar with the TAC process. He has never asked to meet with the TAC. The reason is clear: he and I had discussed, on the telephone, everything that he would have discussed with TAC, i.e., that the unaccredited rabbinical college does not comply with the Village definition of educational institution and that procedurally he could apply for a zone change or an amendment to the zoning law.

88.    Plaintiffs' have made an allegation that there is some type of nefarious motive in work I performed in connection with the movement to form the Village of Ladentown. Therefore I will explain the work I did. In 2006 I was asked to work on the appeal in connection with a lawsuit concerning this proposed Village. Warren Berbit was the attorney for the group during the trial court and petition process. I had no involvement during that time. However, Mr. Berbit did not want to do the appeal. I was asked to do it and I agreed to do the work pro bono. The briefs were filed in either late 2006 or early 2007. No officials from the Village of Pomona were involved in any way. That is the only work I ever did regarding the Ladentown movement. I never volunteered any time for that movement. I handled a single appeal at one specific point in time. To my knowledge, as Village Attorney, the Village at no time ever took any action to support or oppose the Ladentown movement: no resolutions; no official or unofficial actions whatsoever. It is not unusual for me to do pro bono work. For example, I have represented Yedei Chesed (a Hasidic non-for-profit that provides after-school activities for developmentally disabled children) before the village board and the planning board in the Village of New Hempstead. The proposed project needed an amendment to the zoning law and application for site plan and special permit. I provided these services pro bono. I have provided pro bono

consultation and advice on land use issues to an organization in Spring Valley known as Hamaspik, another Hasidic organization.

89.     I would like to conclude my testimony by addressing plaintiffs' claims that the Subject Laws were enacted both out of religious animus against Orthodox and Hasidic Jews and for the purpose of preventing Tartikov from building its rabbinical college.

90.     As I have testified, I researched and drafted 3 of the 4 Subject Laws. I was involved in every meeting with the Board where these laws were discussed. Not once did I witness any comment or statement of any kind by any member of the Board that suggested to me that any of the 3 laws were being considered by the Board so as to block Tartikov's plans. In this regard, I wish to point out that Local 1 of 2001, was passed many years before Tartikov purchased the Property. Further, my research and preparation of Local Law 5 of 2004, and the passage of the law, all occurred before I or any Board members knew that Tartikov had bought the Property. As to religious animus, not once did I witness any comment or statement of any member of the Board that suggested to me that any of the 3 laws were in any way being influenced by, much less targeted against, Hasidic and/or Orthodox Jews.

91.     Finally, I would like to address the enactment of the Subject Laws as they relate to plaintiffs' allegations that the timing of when the Laws were enacted evidences that they were directed at Tartikov.

92.     I did not learn that Tartikov was the owner of the Property until November 2004. Local Law 1 of 2001 was obviously enacted several years before Tartikov came to own the Property. Local Law 5 of 2004 was enacted on September 27, 2004, three months *before* I learned of Tartikov's ownership of the Property. Local Law 1 of 2007 was enacted on January 22, 2007. While this law was obviously enacted after I learned that Tartikov owned the

Property, I drafted the law several months *before* I saw the January 2007 Journal News article that described what Tartikov intended to do with the Property.  Finally, with respect to Local Law 5 of 2007, while that law was enacted in April 2007 it is important to note that the Village had considered enacting a wetlands law as far back as 1998, **see Defendants' Ex 1086**, and that the law being proposed back in 1998 included the two sections at issue in this case:  1) the 100 foot buffer; and 2) the grandfathering of existing projects.  **See Defendants' Ex 1086, pp 10, 4, respectively.**  Plaintiffs suggest that the wetlands law was drafted specially to target them.  **Ex 1086** shows that this is simply not true.

_____
Doris F. Ulman, Esq.

Sworn to and subscribed before me
this 19th day of May, 2017

_____
Notary Public

Margaret L. Bracken
Notary Public-Connecticut
My Commission Expires
April 30, 2019