RC -- Hearing Transcript (05-20-09).txt

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------x
CONGREGATION RABBINICAL COLLEGE OF
TARTIKOV, INC., RABBI MORDECHAI BABAD,
RABBI WOLF BRIEF, RABBI HERMAN KAHANA,
RABBI MEIR MARGULIS, RABBI GERGELY
NEUMAN, RABBI AKIVA POLLACK, RABBI
KOLEL BELZ, RABBI MEILECH MENCZER,
RABBI JACOB HERSHKOWITZ, RABBI
CHAIM ROSENBERG, RABBI ARYEH ROYDE,

                     Plaintiffs,
          v.                        07 CV. 6304 (KMK)

VILLAGE OF POMONA, BOARD OF TRUSTEES
OF THE VILLAGE OF POMONA, RITA LOUIE,
IAN BANKS, ALMA SANDERS-ROMAN,
BRETT YAGEL, NICHOLAS SANDERSON

as Mayor,

                     Defendants.
--------------------------------------x
                     U.S. Courthouse
                     White Plains, N.Y.
                     May 20, 2009
                     3:00 p.m.


Before:   HON. KENNETH M. KARAS,
               United States District Judge

APPEARANCES

PAUL SAVAD & ASSOCIATES
BY:  PAUL SAVAD, Esq.
55 Old Turnpike Road, Suite 209
Nanuet, N.Y.  10954
Attorney for Plaintiffs

LENTZ STEPANOVICH & BERGETHON, PLC
BY:  JOHN G. STEPANOVICH, Esq.
448 Viking Drive, Suite 370
Virginia Beach, VA  23452
Attorneys for Plaintiffs


                                            2



STORZER & GREENE, PLLC
BY:  ROMAN P. STORZER, Esq.
1025 Connecticut Avenue, Northwest,
Suite 1000

RC -- Hearing Transcript (05-20-09).txt
Washington, D.C.  20036
Attorneys for Plaintiffs

ROBINSON & COLE, LLP
BY:  WILLIAM J. KELLEHER, III
1055 Washington Boulevard, 9th Floor
Stamford, CT  06901-2249
Attorneys for Defendants

DORIS F. ULMAN, Esq.
134 Camp Hill Road
Pomona, N.Y.  10970

BENJAMIN N. CARDOZO SCHOOL OF LAW
YESHIVA UNIVERSITY
BY:  MARCI A. HAMILTON, Esq.
Brookdale Center
55 Fifth Avenue
New York, N.Y.  10003
Attorneys for Defendants




Sue Ghorayeb,
Official Court Reporter

                                                     3


1          THE CLERK:  07 Civil 6304, Congregation Rabbinical

2  College of Tartikov v. the Village of Pomona.

3          Counsel, please state your appearances.

4          MR. STORZER:  Counsel for the plaintiffs, Roman

5  Storzer, Storzer & Greene.

6          THE COURT:  Good afternoon, Mr. Storzer.

7          MR. STORZER:  Good afternoon, Judge.
                          Page 2

RC -- Hearing Transcript (05-20-09).txt

8            MR. STEPANOVICH:  John Stepanovich, Your Honor.

9            THE COURT:  Good afternoon.

10           MR. SAVAD:  Paul Savad for plaintiffs.

11           THE COURT:  Good afternoon.

12           MS. HAMILTON:  Marci Hamilton for the defendants.

13           THE COURT:  Good afternoon.

14           MR. KELLEHER:  William Kelleher also for the

15  defendants.  Good afternoon, Your Honor.

16           MS. ULMAN:  Doris Ulman, attorney for the Village

17  of Pomona.

18           THE COURT:  All right.  Good afternoon.

19           Please have a seat everybody.

20           Well, two things.  One is, I want to tender an

21  apology for my having to postpone the last argument.  I

22  actually winded up with a virus the weekend before, which

23  prevented me from being prepared.  And I think, as you all

24  know, I don't do these unless I am prepared, because I know

25  you all are prepared.  But it's not something that I like to

              Sue Ghorayeb,  Official Court Reporter

                                                    4


1   do and I realize that I have upset the apple cart,

2   particularly for those who had to travel, so I do apologize

3   for that.

4            The second thing is, I want to thank counsel for

5   very well prepared submissions and very helpful submissions.

6   So I have read them and I have read the exhibits.  I have

7   read a ton of cases.  But I also don't have a little red

8   light that goes off after five minutes.  So, you know, we

9   don't have a super tight time limit, but we also want to

10  avoid repetition.  So, the defendants are movants, so I don't

Page 3

RC -- Hearing Transcript (05-20-09).txt

11   know how you all want to break this up, but you get to go

12   first.

13          MS. HAMILTON:  Okay.  All right.  Your Honor, I

14   will be arguing for the defendants in total.

15          THE COURT:  Okay.  All right.

16          MS. HAMILTON:  Well, let me just begin, Your Honor,

17   by saying that the project that's been proposed --

18          THE COURT:  You should stand up.

19          MS. HAMILTON:  You want me to stand --

20          THE COURT:  Yes.  It's better.

21          MS. HAMILTON:  -- even though this is pretty low?

22          THE COURT:  Well, yes.  We can move that over.

23          MS. HAMILTON:  This is fine.

24          THE COURT:  Okay.  All right.

25          MS. HAMILTON:  The project that's been proposed by

                    Sue Ghorayeb,  Official Court Reporter
                                                                5


 1   inference here, that we don't have any concrete notion of

 2   what's actually on the minds of the plaintiffs other than

 3   their Second Amended Complaint, which lists places of

 4   worship, schools, religious courts, libraries, and housing

 5   for families.

 6          Given the numbers that have been batted around,

 7   they are proposing essentially imposing Wake Forest

 8   University in Pomona without any kind of application process.

 9   And it's the position of the defendants that there is no

10   ripeness and certainly no futility argument until at least

11   one application has been filed.

12          THE COURT:  Okay.  What's the -- one of the things

13   I really want to get into the weeds on is, and I have been

                              Page 4

                    RC -- Hearing Transcript (05-20-09).txt
14   trying to get into it myself here, is what the application is

15   that you think plaintiffs need to have made here?

16            Because their argument is, is that, in effect, the

17   only fix is a legislative one and they don't think that the

18   law requires them to do that.

19            So, you know, if you can break it down between the

20   wetlands and some of the 130 definitions, and where in the

21   local law or Code that you think lays out the road map for

22   plaintiffs as to what they should have done here.

23            MS. HAMILTON:  Well, Your Honor, in our reply

24   brief, on Pages 6 through 8, we suggest what it is that they

25   could have done, and we divided it into the accreditation

            Sue Ghorayeb,  Official Court Reporter
                                                    6


1   issue and all of the other issues.

2            THE COURT:  Okay.  But the accreditation has

3   nothing to do with an application that they make to you.

4            I mean, basically, what you are saying to them is,

5   they got to be accredited, they got to be Wake Forest or they

6   can't have their college here.

7            MS. HAMILTON:  Well, but actually --

8            THE COURT:  But where did it -- where -- you know,

9   the application in terms of the futility case law assumes,

10  for example, you ask for a variance or something like that.

11           Is there any room in the Code that says, "we don't

12  have to be accredited, please exempt us from this

13  requirement"?

14           MS. HAMILTON:  Well, they could certainly apply for

15  a variance from the accreditation requirement and the text

16  amendment from, from that requirement.
                            Page 5

RC -- Hearing Transcript (05-20-09).txt

17          THE COURT:  Okay.  And where exactly in the local

18   law can they ask for a variance from the accreditation

19   requirement?

20          MS. HAMILTON:  I'm gonna have to ask Doris to --

21          THE COURT:  Okay.

22          MS. HAMILTON:  -- Ms. Ulman, to be specific about

23   these issues.

24          THE COURT:  Ms. Ulman, please.

25          MS. ULMAN:  Your Honor, there is a provision in

          Sue Ghorayeb,  Official Court Reporter

                                                          7


1    the -- there is a provision in the zoning law --

2           THE COURT:  What provision?

3           MS. ULMAN:  -- itself.  I would -- it's in Chapter

4    130 --

5           THE COURT:  Okay.

6           MS. ULMAN:  -- towards the end, that has a

7    provision for amendments to the law, which is the provision

8    that permits applications for zone changes, which is really

9    what the applicant should be applying for.

10          THE COURT:  Okay.  I mean, I see 130-28 deals with

11   the powers and duties of the Zoning Board of Appeals and then

12   it discusses in Sub D of that variances.

13          MS. ULMAN:  Your Honor, I am not suggesting

14   variances.

15          THE COURT:  Okay.

16          MS. ULMAN:  I am not suggesting the Zoning Board of

17   Appeals, because --

18          THE COURT:  Okay.  Tell me.  I really need the

19   specifics.  Tell me where in the ordinance.

RC -- Hearing Transcript (05-20-09).txt

20          MS. ULMAN:  Unfortunately, I don't have the local
21  law with me.
22          THE COURT:  I have got it right here.  If you want,
23  if you want to plow through it, it's yours.
24          MS. ULMAN:  Let me look at it.
25          But, in addition to that, Your Honor --

          Sue Ghorayeb,  Official Court Reporter
                                                        8


1          THE COURT:  Yes.
2          MS. ULMAN:  -- State law, in the Village Law of the
3  State of New York, Chapter 7, which deals with zoning and
4  building requirements, specifically permits applicants to
5  make applications to the local municipality for zone changes.
6  Those -- that is clearly stated and always has been permitted
7  not only in Pomona but throughout the State of New York.
8  Pomona does provide for it, as I have indicated, in one of
9  our chapters, and I would certainly like to look at it.
10          THE COURT:  Yes.  Yes.  Help yourself.
11          MS. HAMILTON:  Your Honor, if I may ask.  I mean
12  your questions are a little surprising, because they seem to
13  presume that futility could possibly be proven in this case.
14          When the Supreme Court came -- reversed the Second
15  Circuit --
16          THE COURT:  Whoa, whoa, whoa.  But my whole job is
17  to surprise you and to play devil's advocate.
18          MS. HAMILTON:  Well, that's fine.  That's fine.
19          THE COURT:  Okay.
20          MS. HAMILTON:  Go on.
21          THE COURT:  I mean, if I just came in here and
22  asked a bunch of softball leading questions, there is no
                            Page 7

RC -- Hearing Transcript (05-20-09).txt

23    point, plus it wouldn't be very much fun.

24              MS. HAMILTON:  Well, then, let me try.

25              THE COURT:  Well, I am assuming for the sake of

              Sue Ghorayeb,  Official Court Reporter
                                                      9


1     argument that, that futility -- I mean futility gets broken

2     down into one or two things.  Either that the local authority

3     doesn't have the authority to grant the request that a

4     plaintiff might make or they have dug in their heels, right?

5              And that's, that's right out of the Second Circuit

6     cases on this, starting with Murphy.  So --

7              MS. HAMILTON:  With all due respect, Your Honor,

8     there are no cases in which futility has been found in which

9     not a single application has been filed for anything.

10             The only cases in which futility has been found are

11    Ninth Circuit cases, there are four of them, and in every one

12    of them it's either an application or a third or a fourth

13    application has already been filed.

14             THE COURT:  Okay.

15             MS. HAMILTON:  So futility does not fly here.

16    There is no application, nothing.  It's hypothetical what we

17    are talking about.

18             THE COURT:  But -- I understand that.

19             MS. HAMILTON:  And it's impossible --

20             THE COURT:  Hang on, hang on, hang on, please.

21             MS. HAMILTON:  Okay.

22             THE COURT:  Murphy, I don't read Murphy to say that

23    futility only kicks in if you have made one application.

24             I read Murphy to say that while futility certainly

25    is a very, a very tough burden for a plaintiff to meet, that
                              Page 8

RC -- Hearing Transcript (05-20-09).txt

Sue Ghorayeb,  Official Court Reporter

10

1    there are two instances where even in the absence of one
2    application somebody could establish futility.  And as I
3    said, either a lack of authority by the local entity, the
4    municipality or whatever it is, or the defendants, the
5    municipal officials have dug in their heels.  And you know
6    plaintiffs rely on really both, but certainly no shortage of
7    allegations with respect to digging in of heels.
8              MS. HAMILTON:  Look, there are generalized claims,
9    but there is nothing that rises to the level of what's
10   required by the Supreme Court on Tuesday in the Iqbal case --
11             THE COURT:  Okay.
12             MS. HAMILTON:  -- which reversed the Second Circuit
13   and made it very clear that those kinds of generalized
14   plausibility claims are not enough, there must be facts, and
15   here there are none.  There is discussion about outsiders,
16   which is what the Iqbal decision rejected as a basis for
17   relief.
18             THE COURT:  Really?  You don't think that the Mayor
19   campaigning on a promise to basically stop the plaintiffs'
20   community and those who want to establish the college, you
21   don't think that those allegations aren't specific?
22             I mean, you know, the problem with Iqbal was, there
23   was, you know, according to the Supreme Court -- and it was
24   five to four -- not enough specific allegations as to
25   Attorney General Ashcroft and Director Mueller.

Sue Ghorayeb,  Official Court Reporter

11

RC -- Hearing Transcript (05-20-09).txt

1          MS. HAMILTON:  Well --

2          THE COURT:  That, you know, they are way up in the

3    food chain here.  Now, with all due respect to the Mayor,

4    there is not -- you know, the Attorney General oversees

5    80,000 employees, and so on and so forth.

6          This is a small town.  You have got a Mayor and a

7    couple of other folks running for office on a platform that

8    plaintiffs allege was explicitly directed with hostility

9    towards them, to make sure that they basically don't get to

10   do anything in the town, let alone this college.

11         MS. HAMILTON:  Well, with all due respect, there's

12   not a single statement --

13         THE COURT:  You didn't need to preface that,

14   and I --

15         MS. HAMILTON:  But there is not a single statement

16   in the Complaint about hostility toward the religion.  There

17   may have been hostility toward an incredibly intense use, but

18   that's very different.

19         THE COURT:  Intense use of -- really, that this is

20   all about real estate and not individuals?

21         MS. HAMILTON:  This is all about -- absolutely,

22   it's about intensity of use.

23         And may I quote from Iqbal?  What the court said

24   was that, "where a Complaint pleads facts that are merely

25   consistent with the defendant's liability, it stops short of

                Sue Ghorayeb,  Official Court Reporter
                                                          12


1    the line between possibility and plausibility of entitlement

2    to relief."

                              RC -- Hearing Transcript (05-20-09).txt
3          It's not enough to throw a few allegations out and

4     say, "oh, that would be consistent with discrimination."

5     They need to show intentional discrimination in some fact,

6     and the quotes that they have from the public actors in this

7     case are not discriminatory toward any religious group.

8          You have to -- the only way to rule in their favor

9     is to rule on their atmospherics and not their facts.

10          THE COURT:  Hang on.  And putting aside the history

11    of not only the Village's creation, and putting aside for a

12    moment the temporal proximity between the adoption of some of

13    these zoning requirements and when it is that the plan sort

14    of leaks out, because I recognize that that may not in and of

15    itself be enough, but those are all -- those so-called

16    atmospherics nonetheless provide context.  And, of course,

17    the Court is required at this stage of the proceedings to

18    assume the truth of all of the allegations in the Complaint.

19          You want -- where is the quote where "I have to be

20    careful what I say because my lawyers tell me"?

21          MS. HAMILTON:  In the, in the Second Amended

22    Complaint?

23          THE COURT:  Yes.  It's Paragraph 206.

24          MS. HAMILTON:  Yes.

25          THE COURT:  But there is other quotes too, but

              Sue Ghorayeb,  Official Court Reporter
                                                          13


1     206 -- hang on.  No, this isn't the one I was looking for.

2          MR. STEPANOVICH:  Your Honor, if I may, would it be

3     Paragraph 11 in Exhibit N, Laura Kraemer's affidavit?

4          THE COURT:  Yes.  I mean I was -- I'm going off of

5     the Complaint.

                                Page 11

RC -- Hearing Transcript (05-20-09).txt

6          MR. STEPANOVICH:  Oh.

7          THE COURT:  Because I mean, obviously -- here we

8   go.  All right.

9          So, this is the Mayor Marshall comment.  "Ladies

10  and gentlemen, let me say something.  We sitting at this

11  table have limitations that are placed on us as to what we

12  can say, and what we can't say, because our attorney tells us

13  what we can say and what we can't say.

14          "I can't say what I feel.  I can't.  If I agree

15  with you, I don't agree with you, I don't have that luxury of

16  being able to say that here.  All that I can say is that

17  every member of this Board works very, very hard to do what

18  is best for this community.  You have your issues.  Don't

19  assume because no one has gotten up and said, "wow, I agree

20  with you, oh boy;" don't assume that because we didn't do

21  that, that we don't agree."

22          And what's important about that statement is

23  because it's connected in the Complaint to other statements

24  that are made by people in the community who aren't talking

25  about intensity.  They are talking about their concern about

          Sue Ghorayeb,  Official Court Reporter
                                              14


1   a certain group of people being in their community.

2          MS. HAMILTON:  Your Honor, I would disagree with

3   that.  Which paragraph are you quoting from?

4          THE COURT:  166 of the Amended Complaint.

5          MS. HAMILTON:  166.  The specific quotes from the

6   community that --

7          THE COURT:  Well, 165 talks about community

8   opposition being displayed through public comment at the

                            Page 12

RC -- Hearing Transcript (05-20-09).txt

9   hearing regarding the dormitory legislation, that was mostly

10  targeted at Hasidic Jews in general and at the Rabbinical

11  College in particular.

12          MS. HAMILTON:  So, Your Honor, are you suggesting

13  that the Mayor's statement --

14          THE COURT:  It's not a question of what I'm

15  suggesting.  It's a question of what's alleged in the Amended

16  Complaint.

17          MS. HAMILTON:  Well, I understand that, but it

18  doesn't strike me as his agreement with those targeting the

19  Hasidic Jews, although, I know that's what they want everyone

20  to infer.  I mean, what I think --

21          THE COURT:  Really?  I mean, if it were really

22  about intensity, why would he be worried about lawyer's

23  advice?

24          What person -- what publicly elected official is

25  worried about what he or she might say about how "we don't

              Sue Ghorayeb,  Official Court Reporter
                                                        15


1   want Wake Forest in our town"?  Really?

2          I mean, I'm trying to imagine that scenario,

3   particularly in the context of people who are alleged,

4   according to the Amended Complaint, to have made comments

5   based on the race and religion of the people who are making

6   the -- who are about to make or are talking about making a

7   proposal to use the subject property for.

8          MS. HAMILTON:  No government official makes any

9   race or religious statements.

10          THE COURT:  No.  They are careful based on what

11  their lawyers have told them, not to make it explicit.  But

                          Page 13

RC -- Hearing Transcript (05-20-09).txt

12    what the Mayor is saying there is, "don't think just because
13    I don't -- I am not standing up and saying that I agree with
14    you that I don't agree with you."
15          And to the extent the allegation is that what's
16    being said here is directed at plaintiffs because of their
17    race and religion, I don't understand why you think, at least
18    for purposes of assuming what's alleged to be true in the
19    Complaint to be true, that that doesn't put into context,
20    when you tie in the history and temporal proximity in terms
21    of the adoption of these things, and people running on a
22    platform that they run on, that it doesn't get plaintiffs at
23    least, at least to second base, let alone first, which is all
24    they got to do, to say, "this is, this is motivated for --
25    based on improper reasons."

            Sue Ghorayeb,  Official Court Reporter
                                                          16


 1          MS. HAMILTON:  But the platform was not based on
 2    race or religion at all.  There was no statement with regard
 3    to race or religion.
 4          The platform was based on the largest property,
 5    which is what the Second Amended Complaint concedes, it's the
 6    largest piece of property in the community, and the attempt
 7    to bring in a very large intense project.  Now, this is a
 8    town with 2,700 people.  A project that's being proposed
 9    through the airwaves, not through any plan, of 4,500 people.
10    And towns all the time object to intensity.  They object to
11    Wal-Marts.  They object to large buildings.  They object
12    to -- developers routinely don't get what they ask for and
13    they routinely get slammed in the public process.
14          It's unthinkable.  Public officials don't --
                              Page 14

RC -- Hearing Transcript (05-20-09).txt

15          THE COURT:  I don't disagree with you.  I don't

16   disagree with you that that's what happens in some towns.

17          I am not interested in what happens in some towns.

18   I am interested in looking at the allegations in the Amended

19   Complaint, taking them as I must, as being true, and trying

20   to figure out how that plays into this.  But let's get, let's

21   get back to this, because it relates to futility.

22          To the extent that plaintiffs are alleging that

23   defendants have dug in their heels, which is the second piece

24   of futility recognized by, by Murphy, and then trying to

25   understand exactly the mechanics of this --

              Sue Ghorayeb,  Official Court Reporter
                                                      17


 1          I mean, like I said, I think it's very important

 2   for me to understand, because I am no expert in this area of

 3   the law at all.  I don't think there is any area I am an

 4   expert in, but I do my best.

 5          -- what it is you would want plaintiffs to do, to

 6   go to what entity, invoking what authority, and say, "here is

 7   the application we want them to make."

 8          MS. ULMAN:  Your Honor.

 9          THE COURT:  Please.

10          MS. ULMAN:  It's very clear in Article 11 of

11   Chapter 130 -- and I will give it back to you as soon as I

12   refer to it, if you would.

13          THE COURT:  Okay.

14          MS. ULMAN:  If you don't mind.

15          THE COURT:  Sure.  Go ahead.

16          MS. ULMAN:  In that chapter, it sets forth the

17   procedure for applying for an amendment to the zoning law,

RC -- Hearing Transcript (05-20-09).txt

18  including any amendment to a use or a district.

19          So that if the applicants wanted to change the law

20  with respect to the accreditation, for example, which is one

21  of their issues, they would petition the Board of Trustees,

22  go to a public hearing, and the Board would make a

23  determination, a SEQRA determination, which would be the

24  environmental portion of it --

25          THE COURT:  Right.  Yes.


                Sue Ghorayeb,  Official Court Reporter
                                                    18



1           MS. ULMAN:  -- and then a decision on the zone

2   change.  If they --

3           THE COURT:  Is that what it's called, though?

4           Is it a zone change or it's an amendment?

5           MS. ULMAN:  Yes, it's an amendment to the zoning

6   law.  We call it a zone change.

7           THE COURT:  Okay.

8           MS. ULMAN:  But it's -- it would be an amendment to

9   the law, which now does not permit unaccredited schools.

10          THE COURT:  Okay.  And --

11          MS. ULMAN:  We do permit dormitories on school

12  properties.  That is not the problem.

13          THE COURT:  No.  I understand that.  But the

14  definition of dormitory is one that restricts plaintiffs from

15  the type of dormitory that they want to have on the subject

16  property.  But just so I understand, this is different than a

17  variance?

18          MS. ULMAN:  Yes, it's not a variance.

19          THE COURT:  All right.  And what's the difference?

20          MS. ULMAN:  All right.  A variance under State law

                            Page 16

RC -- Hearing Transcript (05-20-09).txt

21  requires -- a use variance, which this would be, requires a

22  specific standard that this applicant cannot meet.  And that

23  major standard, which is set forth by the New York State

24  Court of Appeals, the primary standard is that you cannot get

25  a reasonable return on your investment without the variance,

Sue Ghorayeb,  Official Court Reporter

19


1   so -- and Mr. Savad and I have discussed this on the phone.

2              THE COURT:  Yes, but I think it's reflected in the

3   letters.

4              MS. ULMAN:  Right.

5              THE COURT:  He acknowledges he can't get a

6   variance.

7              MS. ULMAN:  Yes.  And he agrees and I agreed that

8   it would be wasteful for them to apply for a variance.

9   However, it is not wasteful for them to apply for a zone

10  change, because that's a completely different standard and

11  it's a completely different --

12             THE COURT:  What is the standard under Section 11

13  there of 130?

14             MS. ULMAN:  The standard under State law is

15  basically that zone changes are permitted if they are in the

16  public interest.  That is the criteria.

17             THE COURT:  And, in this instance, it's obviously

18  not a State government entity that makes that decision.  It

19  will be --

20             MS. ULMAN:  It will be the Village, the Village

21  government.

22             THE COURT:  -- the Village itself.

23             MS. ULMAN:  Yes.

Page 17

RC -- Hearing Transcript (05-20-09).txt

24          THE COURT:  And so it would decide whether it's in

25   the public interest or it would decide whether or not it's

              Sue Ghorayeb,  Official Court Reporter
                                                       20



 1   consistent with the interests protected by the zoning rules,

 2   the Code?

 3          MS. ULMAN:  The law is pretty clear, Your Honor,

 4   that the -- in order to grant a zone change, there must be --

 5   it must be in the public interest.

 6          THE COURT:  Okay.  Is that the only thing the

 7   plaintiffs can do here?

 8          MS. ULMAN:  If they want -- well, again, we still

 9   don't know exactly what they want.

10          THE COURT:  I understand that.

11          MS. ULMAN:  If they wanted --

12          THE COURT:  But let's assume, let's assume they

13   want the world.  What would they have to do to get the world?

14          MS. ULMAN:  If they wanted a college --

15          THE COURT:  Right.

16          MS. ULMAN:  -- with dormitories.

17          THE COURT:  Wake Forest.  We've got the analogy,

18   without the basketball team.

19          MS. ULMAN:  They might even get the basketball

20   team.

21          THE COURT:  Well --

22          MS. ULMAN:  But, in any event, if they came with a

23   college and dormitories that met the requirements of the law,

24   then all they have to do is apply for site plan approval to

25   our Planning Department.

              Sue Ghorayeb,  Official Court Reporter
                        Page 18

RC -- Hearing Transcript (05-20-09).txt
21

1           THE COURT:  When you say comply with, comply with

2   what?  You mean the accreditation piece of this?

3           MS. ULMAN:  Well, if they were complying with the

4   provisions of the zoning law relating to the accreditation

5   and --

6           THE COURT:  But what if -- but their point is they

7   can't get accredited.  And, so, can they come, can they

8   come --

9           MS. ULMAN:  Then the only other alternative is the

10  amendment to the zoning law to permit them to do what they

11  want to do.  They can apply for that to the Board of

12  Trustees --

13          THE COURT:  Okay.

14          MS. ULMAN:  -- and it's not a very difficult

15  procedure.

16          THE COURT:  But is that in effect a request for

17  them to change the law, or --

18          MS. ULMAN:  Yes, it is.  Because at the present

19  time the zoning law of the Village does not permit --

20          THE COURT:  Right.

21          MS. ULMAN:  -- presumably, does not permit what

22  they want to do.

23          THE COURT:  Okay.  Putting aside the accreditation,

24  let's assume accreditation wasn't an issue, then what will be

25  the other steps that plaintiffs can take here?

        Sue Ghorayeb,  Official Court Reporter
                                          22

1           MS. ULMAN:  If accreditation was not an issue, I
                    Page 19

RC -- Hearing Transcript (05-20-09).txt

2    believe --

3            THE COURT:  Could they go to special use?

4            MS. ULMAN:  They would go to site plan first with
5    the Planning Board --

6            THE COURT:  Uh-huh.

7            MS. ULMAN:  -- and then the special permit with the
8    Board of Trustees.

9            THE COURT:  The SUP as you all call it.

10           MS. ULMAN:  A permitted -- a special permit is a
11   permitted use subject to certain additional conditions based
12   on the intensity of the use.

13           THE COURT:  Okay.  Aside from accreditation here,
14   though, because there is a bunch of other pieces of law.  You
15   have got the wetlands piece of this.  I mean --

16           MS. ULMAN:  But I -- Your Honor, with all due
17   respect, I don't think the wetlands piece of it applies to
18   them at all.  They have got a very large piece of property.
19   They have plenty of room to build.

20           THE COURT:  Okay, okay.

21           MS. ULMAN:  I don't see the wetlands --

22           THE COURT:  All right.  So, but the definition of
23   dormitories, for example, could they get, could they get a
24   special use even though there is that definition in Section
25   130?

             Sue Ghorayeb,  Official Court Reporter
                                                      23


1            I forget which provision it is of 130.  But can
2    they, can they go and say, "here are the reasons why we want
3    to not be restricted by that definition"?

4            MS. ULMAN:  I don't know what portion of the
                         Page 20

RC -- Hearing Transcript (05-20-09).txt

5    dormitory law they object to.

6            THE COURT:  The part that says no kitchens and

7    multifamily, plus there is the space constriction in terms of

8    how much of the dorm space can take up of the land.

9            MS. ULMAN:  If they are asking for apartments --

10           THE COURT:  Yes.

11           MS. ULMAN:  -- as dormitories?

12           THE COURT:  Yes.

13           MS. ULMAN:  Then they need the --

14           THE COURT:  Amendment.

15           MS. ULMAN:  -- the amendment to the zoning law.

16           THE COURT:  Okay.  So, what it really comes down to

17   is the amendment.

18           MS. ULMAN:  Yes.  It's not too difficult.

19           THE COURT:  Okay.  And their argument -- well,

20   maybe we will go back, Ms. Hamilton, to you.

21           Okay.  Are you done with that?

22           MS. ULMAN:  Yes.

23           THE COURT:  That will be great.  Can you -- did you

24   leave it there, so I can put a Post-It on it?

25           MS. ULMAN:  Right there.


            Sue Ghorayeb,  Official Court Reporter
                                                    24



1            THE COURT:  Okay.  Because my little brain isn't

2    going to remember, so we have to use this Post-It.

3            MS. ULMAN:  Okay.

4            THE COURT:  All right.  So, Ms. Hamilton, there you

5    go.  So, the argument is, looking at this particular

6    provision, then you get an amendment.

7            MS. HAMILTON:  Right.
                        Page 21

RC -- Hearing Transcript (05-20-09).txt

8          THE COURT:  Short of that, I am not sure what it is

9   plaintiffs could have been done here.

10         MS. HAMILTON:  Well, I mean, that's a standard

11  operating procedure in land use plans.  It happens all the

12  time.

13         THE COURT:  Okay.  So you say that's enough.

14         MS. HAMILTON:  At the very least, they should do

15  that.  I mean, it has to be that the local government has to

16  see a plan before bringing in such an intense use.  I mean,

17  it's just very simple land use principles that are recognized

18  across the country.

19         As I said, there is not a single futility case

20  where there wasn't one application somewhere trying to ask

21  for something, so that everybody knew what they were talking

22  about.  I mean, we are hamstrung by trying to answer your

23  questions on procedure, because we don't know what they want.

24         We know what they thought what they want, but the

25  Amended Complaints are different in terms of whatever

        Sue Ghorayeb,  Official Court Reporter

                                                          25


1   concrete requirements they have.  They say they have spent a

2   tremendous amount of money, all sorts of experts, and the

3   only people who don't know anything about it are the

4   officials and the public.

5          So, one of the crucial aspects here is this is not

6   just about the Village officials and the Village and the

7   plaintiffs.  It's also about the public that has a right to

8   public hearings through any of the procedures that you have

9   just heard described.

10         THE COURT:  Mm-hmm.

RC -- Hearing Transcript (05-20-09).txt

11          MS. HAMILTON:  So, our position is simply one

12   application in some way that will give people some basis to

13   talk about it.  Now, you had earlier said --

14          THE COURT:  Now, just one quick thing, by the way,

15   and maybe you are not the right person to answer this.  But

16   is there a time limit?

17          I mean, can the Village just sit on this for three

18   years?  Or is it -- because there are some provisions in

19   here, for example, if you want a special use, there is -- I

20   forget.  It's basically 120-something days soup to nuts.

21          Is there a similar provision in here on amendments?

22          So, if they make a petition for amendment, and then

23   you guys say, "oh, we will put that to the bottom of the

24   pile.  We are going to first worry about, you know,

25   basketball courts in another part of the town."

          Sue Ghorayeb,  Official Court Reporter
                                                    26


 1          MS. ULMAN:  There are time limits on the SEQRA

 2   portion, the Environmental Review Board, as well as on the

 3   decision-making.

 4          THE COURT:  Okay.  Yes.  I think it looks like it's

 5   130-39 seems to have a --

 6          MS. ULMAN:  Right.

 7          THE COURT:  -- basically, failure of the Planning

 8   Board to report within 45 days shall be construed as

 9   approval.

10          Okay.  All right.  Go ahead, Ms. Hamilton.

11          MS. HAMILTON:  Just a few things you said

12   quickly --

13          THE COURT:  Yes.

RC -- Hearing Transcript (05-20-09).txt

14          MS. HAMILTON:  -- which is great.  The Village's
15  creation, Pomona's creation is over 40 years ago.  It's not
16  Airmont's creation, which was in '90, and which was clearly
17  related to Jewish entrance into the community.  It was all
18  about being opposed to condos that had no religious
19  affiliation.  It was about creating a bedroom community.
20          There is nothing in the Complaint that indicates
21  that Pomona's founding is part of some --
22          THE COURT:  No.  I understand that.  I understand
23  that.
24          MS. HAMILTON:  Well, Pomona is the defendant here.
25          THE COURT:  No.  I got that.

                Sue Ghorayeb,  Official Court Reporter
                                                        27


 1          MS. HAMILTON:  It's not Ramapo.
 2          THE COURT:  I got that.
 3          MS. HAMILTON:  And if you take out -- I mean, what,
 4  what the court in Iqbal said is that there are all sorts of
 5  claims against other defendants.  Here we got all sorts of
 6  claims against people that aren't even part of the lawsuit,
 7  that aren't our --
 8          THE COURT:  Well, but there are lots of, there are
 9  lots of statements attributed to Pomona residents, whether
10  they are public statements or they are statements written in
11  to the Journal News.  And there are some, some eye-opening
12  statements that are, that are not subtle and did not have
13  anything to do with density.
14          MS. HAMILTON:  Well --
15          THE COURT:  So --
16          MS. HAMILTON:  The problem is, is that, private
                            Page 24

RC -- Hearing Transcript (05-20-09).txt

17  individuals have a First Amendment right to say whatever they

18  want.  The Village cannot tell them they can't talk.

19          THE COURT:  I get that.  And I get that these

20  unnamed individuals, maybe some of whom may give up their

21  names to the Journal News are not defendants and they don't

22  speak on behalf of Pomona.

23          But my point is that some of the comments that are

24  attributed to the leaders of Pomona, saying basically, "don't

25  worry, I hear what you're saying.  Even though I'm not going

            Sue Ghorayeb,  Official Court Reporter

                                                        28


1   to say explicitly I agree with you, because I can't say it

2   explicitly, because then I'm going to end up in a federal

3   lawsuit.  But" -- wink, wink -- "just because I'm not saying

4   I agree with you, it doesn't mean I don't agree with you."

5           MS. HAMILTON:  Well, but the problem is, is that

6   the standard is, does the government, under Iqbal, have a

7   policy of discrimination?

8           It's not motivation.  Motivation is not, is not

9   questioned here.  The question here is whether or not the

10  government has set up a policy of discrimination against an

11  entity, a group.  And our position --

12          THE COURT:  But that's the whole point of

13  discrimination cases, what is the person's motive.  Why was

14  the -- put it in the Title VII context.  Why was the

15  plaintiff fired?  Well, because she was a she.  And that's

16  the whole point, that's the whole ballgame as to whether or

17  not they were motivated by gender bias.

18          MS. HAMILTON:  Well, and under the Second Circuit's

19  ruling in the Iqbal case, that would be the standard, but

                        Page 25

RC -- Hearing Transcript (05-20-09).txt

20  under the Supreme Court's rejection of that standard, there
21  must be facts that go to the actual defendants showing they
22  had an actual policy.
23          THE COURT:  Okay.  But Iqbal, I mean you are
24  trying, you are trying to get too much out of Iqbal.
25          Iqbal comes down to the fact that plaintiffs didn't

          Sue Ghorayeb,  Official Court Reporter
                                              29


1  allege enough as to Ashcroft and Mueller, period.
2          MS. HAMILTON:  Right.
3          THE COURT:  Okay.  So, if your argument is that
4  there is not enough specific allegations against Mayor
5  Sanderson, then we can have that conversation, but your
6  argument is much broader than that.
7          Your argument is, you are starting off by saying
8  futility does not apply here.  Because they didn't apply for
9  anything, this case is simply not ripe.  That's your
10  argument, right?
11          MS. HAMILTON:  It's one of them, yes.
12          THE COURT:  Okay.  I mean, but that applies to
13  every defendant.
14          MS. HAMILTON:  Well, not really.  I mean for one --
15          THE COURT:  I would think it would.  You would say,
16  "throw the case out, Judge, because it's not ripe."
17          MS. HAMILTON:  Well, if -- yes, and that's exactly
18  what's happening in other cases around the country involving
19  RLUIPA, because they are bringing claims before they are
20  filing applications.  I mean it's exactly what happened in
21  the Roosevelt case, and the district court ruled that it was
22  not ripe because they had not brought a claim and nobody knew

RC -- Hearing Transcript (05-20-09).txt

23  exactly what it was that they wanted to accomplish.  And so,

24  yes, if that's, if that's the scenario.

25          But my point about futility is that the futility

          Sue Ghorayeb,  Official Court Reporter
                                                        30


 1  exception, to the extent it exists, has only ever been

 2  vindicated in the Ninth Circuit and only when it's a

 3  reapplication question, never when it's the initial

 4  application.  And for federalism purposes, as well as other

 5  reasons, local governments should be able to get an

 6  application.  RLUIPA's legislative history says it.  The

 7  cases across the country, Morgan Hill, C.L.U.B., all of these

 8  cases say they have got to file something.

 9          THE COURT:  What -- look, if that's true, then what

10  to do with the language of digging in their heels?

11          Because Murphy doesn't say you only look at digging

12  in their heels after one application.

13          MS. HAMILTON:  Well, that is dictum, and I

14  litigated Murphy.

15          THE COURT:  Yes, but you didn't write it, so.

16          MS. HAMILTON:  Well, I did not write it.

17          THE COURT:  Okay.  So, I have got to go with what

18  they wrote.

19          MS. HAMILTON:  But that is a line out of Murphy

20  that was --

21          THE COURT:  It was applied in Westchester Day

22  School, cited not as dicta.  Certainly, other district court

23  decisions have considered it, not as dicta, but have found

24  that it didn't -- either did or didn't apply.

25          And in a motion to dismiss, where plausibility is
                              Page 27

RC -- Hearing Transcript (05-20-09).txt

Sue Ghorayeb,  Official Court Reporter
                                                                31


1   the standard, why is it -- why can't it be said that the
2   plaintiffs -- I mean, does plausibility apply to this piece
3   of futility I guess is my question?
4           What would the plaintiffs have to establish on
5   digging in their heels, absolute certainty, or at least a
6   plausible claim of digging in their heels?
7           Where do you think it is on a continuum?
8           MS. HAMILTON:  Well, I think they would have to
9   show a plausible claim based on fact.  They can't just say
10  that every -- it's interesting if you read the Complaint
11  carefully, because what they do is, they talk about the land
12  use determinations, the zoning changes, et cetera, that have
13  been made, and instead of talking about the fact they are
14  neutral and generally applicable, they say that they were
15  enacted solely to get to plaintiffs, solely to get to
16  religion.  They don't have any evidence of that.
17          THE COURT:  But temporal proximity is fair game.
18  And, again, in the employment context, "I got fired two
19  months after I complained about the discrimination against
20  me," and the cases say that's enough to state a claim for
21  employment -- for retaliation.
22          MS. HAMILTON:  It's not enough if you were never
23  employed there.  We are talking about the threshold question.
24          THE COURT:  Okay.  But the allegation is that soon
25  after the plan leaked, all of the sudden, this town starts

Sue Ghorayeb,  Official Court Reporter
                                                                32

RC -- Hearing Transcript (05-20-09).txt

1  adopting all of these changes to the zoning laws, which, you
2  know, if you add them up is checkmate.
3         I mean, their view is, "we can't, we can't even
4  start with the idea that we had, because of all these things
5  that have been adopted by the town."  I mean, you can't
6  seriously suggest that it was coincidence that these things
7  were adopted when they were adopted.
8         Your argument is, it had nothing to do with any
9  improper animus, it was intensity.  Okay.  So, the temporal
10 proximity is a fact from which a reasonable inference can be
11 drawn that these things were adopted in response to what the
12 town heard the plaintiffs wanted to do.
13        So, then, it's just a battle over whether or not
14 the adoption of these is a town, you know, acting properly to
15 protect against intensity in its bedroom community or whether
16 it contravenes RLUIPA and the various provisions of the State
17 and Federal Constitutions.
18        MS. HAMILTON:  The problem, Your Honor, is that in
19 every land use process, people come in with very ambitious
20 plans all the time, and the land use process is created so
21 that ambitious plans are made to fit with the community.
22        Here, what we are dealing with is an argument that
23 an extremely ambitious project can come in and be set down on
24 top of the community without the community having any input
25 whatsoever in public hearings on a plan and without the

                Sue Ghorayeb,  Official Court Reporter
                                                        33


1  community having their elected representatives decide if it's
2  consistent with the plan.

RC -- Hearing Transcript (05-20-09).txt

3          This is a -- whatever the plan is, it's
4    complicated.  There are aspects of it that are permitted,
5    like libraries.  There are aspects of it that are permitted,
6    like dormitories of a certain breed but not of others.
7          There are aspects that are -- if they wanted to,
8    they can have 90 homes on their hundred acres.  They can have
9    ten synagogues.  All --
10         THE COURT:  That's not what they want.
11         MS. HAMILTON:  Your Honor --
12         THE COURT:  They want this college and there are
13   certain practicalities that make 90 homes as the dorms not
14   work, because it's going to cut down dramatically on the
15   number of people they can educate and train.
16         MS. HAMILTON:  That's right, and that's why the
17   land use process works to create a result that everybody has
18   some input into.
19         THE COURT:  Right.  What, what does Pomona care as
20   to whether or not the institution is accredited?
21         What's Pomona's interest in this?
22         This land use process is a land use process, but
23   why do they care if it's accredited or not?
24         I'm glad you think the question is funny.  Why do
25   you care?

         Sue Ghorayeb,  Official Court Reporter
                                                    34


1          MS. HAMILTON:  I am stumped.  Accreditation is an
2    indication that it is not a covert business being run, that
3    it is not a for profit activity.  I mean, this is --
4          THE COURT:  Clearly, nobody thinks that this is a
5    covert business.  Is that really what you guys think?

                        Page 30

                    RC -- Hearing Transcript (05-20-09).txt
 6          No.  Okay.

 7          MS. HAMILTON:  It doesn't matter what we think,

 8  it's what the Complaint says.

 9          THE COURT:  Well, even the Complaint says why, why

10  you don't care about this.  Go ahead.

11          MS. ULMAN:  Do you mind?

12          MS. HAMILTON:  No.

13          MS. ULMAN:  Your Honor, that comes right out of

14  State law.  It's a general provision.  Everybody uses it.

15          THE COURT:  But, then, why do you wait until after

16  you heard about this plan to adopt this law?

17          MS. ULMAN:  We liberalized the law with respect to

18  religious uses and schools.

19          Dormitories were never permitted prior to the

20  adoption of this law.  That's why I am at a loss to

21  understand how they can -- Mr. Savad comes to many of our

22  meetings.  These laws were liberalized with respect to the

23  uses for religion and for schools.  They were not in any way

24  a result of, of this particular school coming in or this

25  particular use.

                Sue Ghorayeb,  Official Court Reporter
                                                        35


 1          THE COURT:  So the timing was coincidental in terms

 2  of your liberalizing the dorm laws?

 3          MS. ULMAN:  Prior to -- we started working on them,

 4  I believe, in 2005, and we made gradual changes --

 5          THE COURT:  But this is after --

 6          MS. ULMAN:  -- in 2007.

 7          THE COURT:  This is after the plaintiffs' plan

 8  coming out there and the word on the street, right?

                              Page 31

RC -- Hearing Transcript (05-20-09).txt

9          MR. STORZER:  After we purchased the property, Your

10   Honor.

11          THE COURT:  Yes.

12          MS. ULMAN:  Your Honor, I did not -- the laws that

13   were, that -- in fact were proposed by, by me when I became

14   the Village Attorney.

15          THE COURT:  Mm-hmm.

16          MS. ULMAN:  And these are -- the ones that were

17   adopted are very similar to laws that municipalities have

18   adopted throughout the State of New York and they in no way

19   were a result of either the plaintiffs' purchase or

20   discussions.  And, again, we really didn't know what they --

21   we didn't -- I personally did not know they were not

22   accredited until much, much later, during the conversation

23   with Mr. Savad.

24          THE COURT:  You mean that they could not be

25   accredited?

               Sue Ghorayeb,  Official Court Reporter
                                                            36


1          MS. ULMAN:  That they were not accredited.

2          THE COURT:  Were not accredited.  You assumed they

3   were?

4          MS. ULMAN:  I assumed they were.

5          THE COURT:  Okay, okay.  Okay.  Anything else you

6   want to address with respect to the ripeness issue?

7          I mean, how about whatever you want to talk about.

8          MS. HAMILTON:  Well, the -- our position boils down

9   to, it's pretty simple, one application, that's, that's

10   really all that the Village is asking for, so there is

11   something concrete for the public to discuss and to consider

                        RC -- Hearing Transcript (05-20-09).txt
12   in light of what appears to be a very intense use.

13          Neither RLUIPA nor the First Amendment provide a

14   carte blanche to have whatever project you want put in any

15   community you want under any zoning you like.  That is just

16   not what the law says, and all the interpretations of RLUIPA,

17   even the broad ones, have not gone that far.  So,

18   essentially, what's happening here is that the plaintiffs are

19   trying to push the envelope.

20          THE COURT:  Okay.  If you are right, that still at

21   most takes out some of the as-applied challenges, doesn't it?

22          I mean why -- well, let me start with some basics.

23   The FHA claims still survive, right?

24          MS. HAMILTON:  Don't survive?

25          THE COURT:  They do survive.


            Sue Ghorayeb,  Official Court Reporter
                                                    37


1          MS. HAMILTON:  They -- under Leblanc?

2          THE COURT:  Yes.

3          MS. HAMILTON:  They could survive.  Yes.

4          THE COURT:  Okay.  Well, so that means they do

5   survive unless you are going to tell me that Leblanc was

6   dicta too.

7          MS. HAMILTON:  Aspects of it.

8          THE COURT:  Okay.  Facial challenges.  First

9   Amendment challenges, equal protection challenges, why don't

10   those survive --

11          MS. HAMILTON:  Well --

12          THE COURT:  -- and have facial challenges?

13          MS. HAMILTON:  Well, for the same reason.  The

14   issue here --

RC -- Hearing Transcript (05-20-09).txt

15            THE COURT:  Facial challenges are when the law is

16   adopted it's unconstitutional, period.

17            MS. HAMILTON:  On its face.

18            THE COURT:  Yes.

19            MS. HAMILTON:  Well, I mean, our argument there is

20   that they have failed to state a claim.

21            THE COURT:  Okay.  But we will get to that.

22            But even if you are right on ripeness, because they

23   haven't submitted one application, then, at most, what that

24   does is take out the as-applied challenges.

25            MS. HAMILTON:  It takes out all of the

                 Sue Ghorayeb,  Official Court Reporter
                                                         38


 1   constitutional and RLUIPA as-applied challenges.

 2            THE COURT:  Okay.  So leaving the facial challenges

 3   under the First and Fourteenth, the First and Fourteenth

 4   Amendment, as well as RLUIPA --

 5            MS. HAMILTON:  Under -- right.  I mean taking us

 6   to the --

 7            THE COURT:  -- and FHA.

 8            MS. HAMILTON:  Right.  Which takes us to the

 9   standing issues.

10            THE COURT:  Okay.  So, is there anything else you

11   want to discuss about -- in terms of ripeness?

12            MS. HAMILTON:  No.  I mean, the only thing I would

13   add is just to refer the Court back to the S & R Development

14   decision which we sent in.

15            THE COURT:  I've got it.  I have read it.

16            MS. HAMILTON:  The new decision in Miles Christi,

17   which is very much on target, which is in the United States

RC -- Hearing Transcript (05-20-09).txt

18    District Court for the Eastern District of Michigan, which

19    is -- it says, "a case is unripe without filing of a single

20    application."

21          THE COURT:  Okay.  What's that cite again?

22          MS. HAMILTON:  It is 2009, U.S. District LEXIS

23    36228, decided on April 30th.

24          THE COURT:  Eastern Michigan?

25          MS. HAMILTON:  Eastern District of Michigan, yes.

                Sue Ghorayeb,  Official Court Reporter
                                                        39


1           THE COURT:  So we are going to pooh-pooh the Ninth

2     Circuit, but we are going to embrace the Eastern District of

3     Michigan?

4           MS. HAMILTON:  Well, no.  I love the Ninth Circuit.

5     They refused futility unless there is an application.  The

6     Ninth Circuit is fine by me.

7           THE COURT:  Okay.  All right.  Standing.

8           MS. HAMILTON:  Standing.  The question with respect

9     to standing is where is the injury, and it's difficult for

10    the plaintiffs to argue that they have been injured when

11    nobody knows what it is that they want.  In addition --

12          THE COURT:  Well, but that's just back to your

13    ripeness argument.

14          MS. HAMILTON:  Well, it's, it -- those are the

15    facts in this case.

16          THE COURT:  What they want is to build and develop

17    and operate the rabbinical college.

18          MS. HAMILTON:  But that's not -- to desire a

19    rabbinical college is incomprehensible in a land use

20    universe.  A land use application does not say "we want a

                            Page 35

RC -- Hearing Transcript (05-20-09).txt
21   rabbinical college."  It says, "we want the following uses
22   that are permitted under your Code and those that aren't.  We
23   want schools.  We want libraries," dah-dah dah-dah dah-dah.
24        So they have a list of uses that they want and we
25   have no idea how many libraries do they want.  We don't have

              Sue Ghorayeb,  Official Court Reporter
                                                           40


1    any idea what size of the institution that they want.
2         They say that facially dorms cannot possibly work
3    out for them, but there is no application for any dorms of
4    any kind.  We have no idea what kind of dorms they want.  All
5    we know is that they say that their faith involves people
6    being married and having children, but that doesn't answer
7    the question of the land use issue.
8         So it's hard to argue that there is an injury here
9    that justifies Federal Court jurisdiction until the local
10   government has had some chance to rule.  So, ripeness and
11   standing really blend into each other because of the facts of
12   the case, not because of anything the defendants have done.
13        THE COURT:  So, let's assume for the sake of
14   argument they have asked for the amendment, the amendment
15   gets turned down.  Why, why then don't they have standing?
16        MS. HAMILTON:  Well, the problem with standing then
17   is the question of causation, whether or not the local
18   government's decision caused what their constitutional claims
19   are.  I mean there is no causation right now, but if they are
20   claiming there is discrimination, they have got to show that
21   the decision by the government was discriminatory.  And so
22   how do we know causation --
23        THE COURT:  But that gets back to whether or not
                          Page 36

RC -- Hearing Transcript (05-20-09).txt

24    they state a claim.  I mean we've got -- the carts and the

25    horses are all mixed up now.  But, for example, you concede

Sue Ghorayeb,  Official Court Reporter

41


1     that even if you are right on the ripeness claim, that the

2     FHA claim survives and there are facial challenges that still

3     survive, and getting at least to whether or not they state a

4     claim.  But why don't they have standing at least to argue

5     that they do state a claim?

6             MS. HAMILTON:  Well, I guess we will start from the

7     bottom up.  With respect to the individuals --

8             THE COURT:  Okay.

9             MS. HAMILTON:  The individuals --

10            THE COURT:  The students and the teachers.

11            MS. HAMILTON:  The prospective students and

12    teachers for a prospective school.

13            THE COURT:  Yes.

14            MS. HAMILTON:  They can't possibly have standing if

15    all they are is theoretically prospective.  I mean that takes

16    hypotheticals to a new level.  And, so, the question is, is

17    who would have standing.

18            The only -- arguably, the only arguable group

19    that's got standing is the rabbinical college.  Kolel Belz

20    argues that they should have standing just because there

21    aren't enough rabbinical judges.  Well, that is not specific

22    enough to justify a Federal Court intervening.

23            THE COURT:  I mean what do you -- well, hang on.

24    Let's get back to the individuals.

25            What do we do, for example, with the Village

Sue Ghorayeb,  Official Court Reporter
Page 37

RC -- Hearing Transcript (05-20-09).txt

42

1  Arlington Heights?  It specifically held that an individual
2  had standing where that person sought to live in a planned
3  housing community that hadn't been built yet.  I mean, isn't
4  that what this is?
5         MS. HAMILTON:  It's -- this seems one step removed,
6  in the sense that these are individuals that may or may not
7  ever become involved with this school.  I mean, there's,
8  there's no --
9         THE COURT:  But rabbinical -- I gather, we are told
10  they are in as teachers and students.  They have -- it's been
11  decided.  So, before the school is built, they have had their
12  first acceptance letters go out and they have picked their
13  faculty.  That's not so outrageous.
14         The Village of Arlington Heights says the same
15  thing.  Somebody who is a prospective tenant, in a
16  development that hasn't been built yet, has standing to
17  challenge the local community's, you know, getting in the way
18  of the building of that, of that community.
19         MS. HAMILTON:  Well, I mean, that has to do with
20  the claims in that case.
21         The claims in this case are -- all rest on land
22  use, and the question is, who has standing with respect to
23  the various claims under -- for land use purposes.  Under
24  RLUIPA, the plain language is that only the land owner has
25  standing in these cases.  The other co-religionists don't

              Sue Ghorayeb,  Official Court Reporter

                                            43

1  have standing.

                    Page 38

RC -- Hearing Transcript (05-20-09).txt

2          THE COURT:  Okay.  But there is more claims than
3  just RLUIPA here.
4          MS. HAMILTON:  Well, but, but --
5          THE COURT:  I understand.
6          MS. HAMILTON:  It's one of the major elements of
7  their Complaint.  And, so, if they don't have standing with
8  respect to RLUIPA, that part of the lawsuit drops out for
9  now.
10          THE COURT:  Well, only as to the individuals.
11          MS. HAMILTON:  The facial challenges --
12          THE COURT:  The land owner gets, gets to press
13  ahead under RLUIPA, correct?
14          MS. HAMILTON:  Right, but only the land owner.
15          THE COURT:  Yes.
16          MS. HAMILTON:  Only the rabbinical college, and not
17  any of the individuals, and not any of the entities that say
18  that they have an interest in having this kind of entity
19  built.
20          THE COURT:  Yes.
21          MS. HAMILTON:  So that takes us back to the
22  rabbinical college.
23          THE COURT:  Okay.
24          MS. HAMILTON:  And with respect to standing for the
25  rabbinical college --

          Sue Ghorayeb,  Official Court Reporter
                                                    44


1          THE COURT:  Well, I suppose it keeps the
2  individuals' constitutional claims alive though.
3          MS. HAMILTON:  I think it's hard to say that their
4  constitutional claims are alive.  It will be one thing if
                        Page 39

RC -- Hearing Transcript (05-20-09).txt

5  they were accepted into the school as you have hypothesized.

6  THE COURT:  But the Village of Arlington Heights

7  the person, I mean it's like, "I plan to live in this hole in

8  the ground that hasn't been, you know, developed yet because

9  of improper conduct by local officials."  The Supreme Court,

10  not in dicta, says that's standing.

11  MS. HAMILTON:  I think -- okay, okay.  I'll back

12  off on that one for now.

13  THE COURT:  Okay.

14  MS. HAMILTON:  For now.

15  THE COURT:  For now.

16  MS. HAMILTON:  For the moment.

17  THE COURT:  All right.  So you want to get back to

18  then the college.

19  MS. HAMILTON:  Yes.  The problem with standing

20  right now is redressability.  The question would be:  If

21  there is no plan, but in fact they are asking for

22  redressability in this case, I guess, I suppose what they

23  would have to do is give you the plan and let you act as the

24  Zoning Board, and either decide they get everything they ask

25  for, because they asked for it and they're religious, or --

Sue Ghorayeb,  Official Court Reporter

45

1  THE COURT:  I want season tickets.

2  Okay.  Go ahead.

3  MS. HAMILTON:  I'll pretend I didn't hear that.

4  THE COURT:  It's on the record, you know.  The

5  whole world heard it.  It's a joke.

6  Go ahead, Ms. Hamilton.

7  MS. HAMILTON:  Okay.  You have totally derailed me

RC -- Hearing Transcript (05-20-09).txt

8   now.

9           THE COURT:  I'm sorry.

10          MS. HAMILTON:  That's okay.  If they have a plan --

11   which I assume they do, since they alleged that they have

12   asked a lot of experts about a plan.

13          If they have a plan, which is not in the Amended

14   Complaint, they would have to present it to you and you will

15   have two choices.  You can either say, "you get everything

16   you want," which is what is being asked, or you can say,

17   "well, let me go back and look at what the local zoning rules

18   are and I will figure out which of these uses are consistent

19   with the local Zoning Code and which are not, and I will go

20   through and I will craft the result that will be the

21   appropriate result under the land use Code and for your

22   interests."

23          That's -- that is such a deep violation of the

24   Federal Judge's relationship to local land use law, it's

25   stunning.  There is no way for a Federal Court to provide

              Sue Ghorayeb,  Official Court Reporter
                                                    46


1    adequate redress under the facts of this case right now.

2           THE COURT:  Well, except, what if -- maybe at most

3    plaintiffs can get in that scenario is a declaratory judgment

4    that the relevant provisions of the zoning law are

5    unconstitutional and violate RLUIPA.  And then that takes you

6    back to where everything was before these were adopted and

7    then they go and they make their applications to the town.

8           So maybe they don't get a judgment for millions of

9    dollars, but they get these provisions thrown out.

10          MS. HAMILTON:  And --

                        Page 41

RC -- Hearing Transcript (05-20-09).txt

11          THE COURT:  Either on the basis of a facial
12  challenge or on an as-applied challenge.  And then, and
13  then -- which is, they are happy with that, at least to some
14  extent, because they feel like, "okay, we now have a set of
15  rules that we can live with, that are fair, and then we can
16  go ahead and make our proposal."
17          MS. HAMILTON:  But they still have to show standing
18  with respect to the facial challenges.  I don't understand,
19  on the facts of this case -- say, say they were to prevail on
20  the -- on a single constitutional claim, you are saying that
21  the remedy would be to remove that from the Code and then to
22  send the whole case back to the local government?
23          THE COURT:  Put it this way.  If the State of New
24  York passed a law tomorrow which said that -- and I'm going
25  to make this -- take it way out of any context of this case,

            Sue Ghorayeb,  Official Court Reporter
                                                    47


1   but said that "every New York Mets fan will no longer be
2   allowed to work in a job and earn a salary more than $2 an
3   hour," let's say.  Okay.  And that's a facially invalid
4   statute and Mets fans would unite and say, "that's
5   unconstitutional."  They wouldn't be here saying, "and, by
6   the way, make me the CEO of Citibank."
7           They are saying, "throw out that law and we will
8   get the job we get.  But you can't, as a matter of equal
9   protection analysis, pass that kind of law in New York
10  State."  So, what's wrong with that?
11          MS. HAMILTON:  I am still trying to understand how
12  you would figure out that they have standing with respect to
13  any particular provision of the Code, because you don't know
                        Page 42

RC -- Hearing Transcript (05-20-09).txt

14    if the plan relates to that provision of the Code.

15          THE COURT:  But the Complaint -- why, why can't it

16    be said that the Complaint says enough about what they want

17    to do with the property that they have bought; that the

18    specific number of dorms is really not the point, it's the

19    fact that they can't construct the dorms they want, and that

20    they think that that provision is unconstitutional or

21    violates RLUIPA on its face?

22          MS. HAMILTON:  Because this is a classic example of

23    a generalized grievance which Lujan said is, is inadequate

24    for standing.

25          THE COURT:  But Lujan is, you know, people saying,

                  Sue Ghorayeb,  Official Court Reporter
                                                            48


1     "Oh, we don't want bad things to happen to the environment."

2          This is a very specific piece of property.  This

3     isn't, this isn't a bunch of plaintiffs saying, "boy, it

4     would really be nice if maybe someday we can buy some

5     property and this would, this would prevent us from even

6     thinking about buying property."

7          The claim here is, "we bought the property, then

8     all of these rules were adopted to prevent us from doing what

9     everybody knows we want to do with the property."

10          MS. HAMILTON:  Well, first of all, who knows?

11          They say at one point that no one knows what they

12    want to do.

13          THE COURT:  Who is they?  I'm sorry.

14          MS. HAMILTON:  The Second Amended Complaint.

15          THE COURT:  Okay.  Because you were pointing to

16    co-counsel.
                              Page 43

RC -- Hearing Transcript (05-20-09).txt

17          MS. HAMILTON:  On Paragraph 169, I think.

18          No.  Let me -- they say outright that the

19   defendants have acted here in a total vacuum of any

20   information about the plans for the rabbinical college.

21          THE COURT:  I'm sorry.  Where are you?

22          MS. HAMILTON:  It was Paragraph 185, under --

23          THE COURT:  Yes.  Okay.

24          MS. HAMILTON:  You got it?

25          THE COURT:  I got it.

        Sue Ghorayeb,  Official Court Reporter
                                                    49


1          MS. HAMILTON:  So, they allege that the defendants'

2    conduct was made in a total vacuum of any information about

3    the plans for the rabbinical college.  And then they claim

4    there are certain zoning rules that they have standing to

5    challenge facially, but how can they have standing when

6    nobody knows what they want to do?

7          It's not enough to say -- let's say they don't want

8    to build a rabbinical college.  Let's say they want to build

9    a hotel.  There are a vast variety of hotels out in the

10   world.

11          THE COURT:  You know, you took my hypo.  I was

12   going to use that question.

13          MS. HAMILTON:  Well, there you go.

14          THE COURT:  There you go.

15          Get ready to answer that question, counsel.

16          MS. HAMILTON:  Okay.  Well, then, you know.

17          So, the question is, if they come in and they say

18   that they want to build a hotel, they can build a tiny

19   bungalow or they can build a 14-story building, and those are

RC -- Hearing Transcript (05-20-09).txt

20  radically different land use impacts, and who knows which
21  parts of the Code would apply to whatever it is that they are
22  going to propose.  The same is true here.
23          They themselves said there are no other rabbinical
24  colleges like this in the country.  We have got no template
25  to figure out what's a standard rabbinical college.  At least

               Sue Ghorayeb,  Official Court Reporter
                                                        50


 1  if it were Wake Forest University, we can ask them, "is it a
 2  small, medium or large typical university?"
 3          Here, it is something that has not been done before
 4  and everyone is operating in the dark.  So for them to
 5  claim -- to cherry pick certain provisions of the regulations
 6  that they don't like is not enough.  That's just a
 7  generalized grievance.  That is not adequate injury in fact
 8  to give them the power to invoke federal jurisdiction in
 9  order to get a ruling on the law.
10          THE COURT:  Okay.  Anything else on standing?
11          MS. HAMILTON:  Nothing else on standing for the
12  moment.
13          And, finally, I mean, obviously, we have made
14  arguments with respect to stating a claim.  I don't know if
15  you want to get into those now or --
16          THE COURT:  Sure.  Let's do it.
17          MS. HAMILTON:  Okay.  The question about stating a
18  claim and the sufficiency of the Complaint, as I have said
19  repeatedly, and maybe I'm already done with this argument, is
20  that it is not enough, according to the Supreme Court, that
21  the facts pled are merely consistent with potential
22  liability.  It's not enough to quote beg phrases and then
                              Page 45

RC -- Hearing Transcript (05-20-09).txt

23  say, "well, that will be consistent with discrimination."

24  What the Supreme Court said is you need more facts than that.

25          THE COURT:  You are back to Iqbal again.

Sue Ghorayeb,  Official Court Reporter

51

1           MS. HAMILTON:  I'm back to Iqbal and the reversal

2  of the Second Circuit.   I mean --

3           THE COURT:  Look, I am not the Second Circuit.  So

4  they got reversed.

5           MS. HAMILTON:  I mean, you are controlled by the

6  Second Circuit.

7           THE COURT:  I am controlled by the Second Circuit,

8  but until the Supreme Court reverses them.  I am controlled

9  by the Second Circuit.

10          MS. HAMILTON:  Right.  But my point is, we have all

11  been briefing in light of pre-Iqbal rules created by the

12  Second Circuit.  Now we have a different arena where the

13  Second Circuit has been reversed and we have a new standard.

14          THE COURT:  Okay.  I don't think the plaintiffs

15  cited Iqbal other than maybe they repeated the standard in

16  Twombly, which is what we all used to cite Iqbal for.

17          MS. HAMILTON:  And that's what's rejected in Iqbal.

18          THE COURT:  Well, no, no, no, no, no, no, no, no.

19          MS. HAMILTON:  They say Twombly is not enough.  You

20  have to be careful about it.

21          THE COURT:  Well, no, I -- I know.  But the Supreme

22  Court didn't eviscerate Twombly.  I am just saying that

23  plaintiffs didn't cite Iqbal saying "our Complaint is

24  sufficient because we did what the plaintiffs did in Iqbal."

25  So the fact that Iqbal got reversed, I don't see how that

RC -- Hearing Transcript (05-20-09).txt

Sue Ghorayeb,  Official Court Reporter
52

1  really matters here.

2          MS. HAMILTON:  Well, but the Court says that

3  Twombly is not enough to understand the sufficiency of a

4  Complaint, and goes out of its way to say that this standard

5  now applies to every civil Complaint ever filed.

6          THE COURT:  I know.  But what it comes down to is

7  that the plaintiffs in Iqbal didn't allege enough facts to

8  put Ashcroft and Mueller on the hook.

9          MS. HAMILTON:  And that's our position, that the

10  facts that are alleged are thin at best.  If you take out the

11  allegations against surrounding communities and the private

12  individuals --

13          THE COURT:  Mm-hmm.

14          MS. HAMILTON:  -- you are left with a very, very

15  thin Complaint, virtually nothing.

16          THE COURT:  Okay.

17          MS. HAMILTON:  So that's --

18          THE COURT:  Okay.  I mean, look, I don't think I

19  need Iqbal to tell me that allegations as to surrounding

20  communities that aren't sued here is enough to state a claim

21  as to those who were sued.

22          MS. HAMILTON:  Okay.

23          THE COURT:  So I'm with you.

24          MS. HAMILTON:  It works for me.

25          THE COURT:  Okay.  Anything else?

Sue Ghorayeb,  Official Court Reporter
53

Page 47

RC -- Hearing Transcript (05-20-09).txt

1           MS. HAMILTON:  Not for now.

2           THE COURT:  All right.  Thank you very much.

3           MS. HAMILTON:  Thank you, Your Honor.

4           THE COURT:  All right.  Who is going to speak on

5      behalf of plaintiffs.

6           MR. STORZER:  I will, Your Honor.  I've never

7      started out an argument doing this, but if the Court would

8      give me a little bit of leeway, starting with the legislative

9      history here.

10          THE COURT:  Okay.

11          MR. STORZER:  Not, not what I usually want to do.

12     But the joint statement of Senators Hatch and Kennedy, when

13     they passed the law, really reflects a lot of the issues that

14     are going on here, when they said that RLUIPA was not

15     intended -- and this provision is quoted all the time by

16     municipalities in these cases.

17          "RLUIPA was not intended to relieve religious

18     institutions from applying for variances, special permits or

19     exceptions, where available, without discrimination or unfair

20     delay."  And there are at least four important points in that

21     statement there that the law bears out, as, as well as the

22     legislative history of that particular statute.

23          The first one is -- and I think the Court hinted at

24     this pretty clearly.  The only thing that the rabbinical

25     college can do here is ask to change the law.  There's

               Sue Ghorayeb,  Official Court Reporter
                                                    54


1      nothing else.  The defendants have repeatedly said in court

2      today and in their filings, in letters back and forth between

RC -- Hearing Transcript (05-20-09).txt

3    counsel, that there is -- there are no administrative

4    procedures by which the rabbinical college can build what

5    they need to build.

6            The Williamson case and its progeny talk about

7    administrative efforts.  There are no administrative efforts.

8    There are -- I guess if you want to characterize it a

9    legislative history.

10           THE COURT:  But, see, but that -- when I started

11   that argument, I wondered how much of that is semantics,

12   because at the end of the day, the law that we are dealing

13   with here is all part of 130, right?

14           I mean, it's, at least in theory -- putting aside

15   the wetlands for a second.

16           MR. STORZER:  Section 130, zoning.

17           THE COURT:  Yes.  So we are talking about zoning,

18   and there are a number of different ways it seems that people

19   who want to do something with their property, they either

20   convince the town that what they are doing comports with the

21   zoning requirements or that the zoning requirements shouldn't

22   apply.  And you can do that by getting a variance, you can do

23   that -- which you guys can't get here, and everybody

24   acknowledges you can't get a variance here.  But other people

25   might be able to get a variance and then other people can try

              Sue Ghorayeb,  Official Court Reporter
                                                        55


1    to get special use --

2            MR. STORZER:  Correct.

3            THE COURT:  -- permits.  And what's available to

4    you is an amendment, which you go to the town and you say,

5    "we don't think that this zoning provision should apply here,

                           Page 49

RC -- Hearing Transcript (05-20-09).txt

6    we want you to amend it for these purposes," and you get a

7    yeah or a nay.

8            And, by the way, you go to them and you say, "and

9    this is why we want it amended, and this is what we intend to

10   do," and they say yes or no, and then you are done.

11           MR. STORZER:  That would create -- no court in, in

12   the entire history of ripeness law that I've been able to

13   come up with, and we did our research, has ever held that

14   legislative remedies, which is what this is -- the Court was

15   provided with various different New York cases that stand for

16   the firm proposition that text amendments, zone changes,

17   whatever you want to call it -- zone change is kind of a

18   misnomer.  We can't change it to another zone.  There is only

19   one zone that permits this here.  It's not like there's an

20   educational zone that we can ask to be rezoned to.

21           We would have to change various provisions of the

22   zoning ordinance to the Village's Code, its, its legislation,

23   to say something different than what they say today.  And

24   if -- you know, if we want to start a -- if the Court wants

25   to create a precedent that suggests that one has to petition

Sue Ghorayeb,  Official Court Reporter
                                              56


1    Congress to change a statute, a federal statute that is

2    discretionary before anybody has standing to challenge such

3    a discriminatory statute in court, then, then that certainly

4    would be -- it would, it would be new law.

5            But this is, this is --

6            THE COURT:  Well, I'm really stuck there, because

7    Ms. Hamilton has a similar sort of absolutist position, which

8    is that no court has ever said futility was established

Page 50

                      RC -- Hearing Transcript (05-20-09).txt
 9  without at least one application, so.

10            MR. STORZER:  I believe --

11            THE COURT:  Either way, I am going to get reversed

12  here, so --

13            MR. STORZER:  I believe that the Lucas case --

14            THE COURT:  -- let's flip a coin.

15            MR. STORZER:  I believe that the Lucas case itself

16  was, was an example of, of a situation where --

17            THE COURT:  Okay.

18            MR. STORZER:  -- there was never any application

19  and there was futility.

20            THE COURT:  So your -- so the bottom line is

21  Article 11, you say, doesn't change anything, because Article

22  11 is a legislative fix.

23            MR. STORZER:  There is absolutely no basis for the

24  argument that one has to petition a legislature -- a

25  legislative body to change the law before one gets standing.


            Sue Ghorayeb,  Official Court Reporter
                                                        57



 1            THE COURT:  Okay.  What about the point that, at

 2  least in terms of the pleadings, at least in terms of what

 3  the town knows, what do you guys want to do with the land?

 4            MR. STORZER:  That's -- that -- and this is, this

 5  is --

 6            THE COURT:  I mean it's not wrong that there is a,

 7  there is a federalism component to this, where, you know,

 8  towns do have -- traditionally have always had some ability,

 9  some substantial ability to govern the zoning in the town.

10            MR. STORZER:  Absolutely.

11            THE COURT:  And, so, if they want to not have a

                              Page 51

RC -- Hearing Transcript (05-20-09).txt
12  McDonald's in the town, I mean, they will not have a

13  McDonald's in the town.  McDonald's can, you know, try to

14  change that.

15          But federal courts coming in and saying, "no, you

16  have to let plaintiffs do what they want," and the town says,

17  "well, we don't know what they want," and the truth is we

18  don't know what you want.  I mean, I have rough outlines, but

19  the specifics -- the devil is often in the details -- nobody

20  knows at this point.

21          MR. STORZER:  Okay.

22          THE COURT:  So, what would you have me do at the

23  end of the day?  There is this lawsuit.  What do you want out

24  of this?

25          MR. STORZER:  What we want at the end of this

              Sue Ghorayeb,  Official Court Reporter
                                                      58


1   lawsuit is very simple, and it's not the parade of horribles

2   outlined by opposing counsel here, that somehow you would be

3   ruling on setbacks and variances and utilities and all of

4   that.  That deserves to be in the local land use process.

5           We want -- we don't want to be exempt from the

6   process.  We want to have a fair process.  We want the Court

7   to enjoin the application or through a declaratory judgment

8   stating that the ordinances that were specifically passed to

9   keep this use out are not effective, and that we can apply

10  for a special exception, which this Village does.

11          And, again, the argument that this is Little

12  Pomona -- I believe was the phrase that was used in their

13  briefs.  This Village allows colleges.  It allows

14  dormitories.  You can have Wake Forest there if you want to.

                          Page 52

RC -- Hearing Transcript (05-20-09).txt

15  You are just not allowed to have a college that has the types

16  of dormitories that this protected class of individuals

17  requires in what they want to do.  So we were willing to

18  apply for special exception.

19          Of course, at this point, we would seek the Court's

20  continuing jurisdiction to oversee this process, because we

21  are pretty clear where that would end up, given the amount of

22  discretionary, discretionary judgments and decisions that

23  have to be made by any local body.

24          THE COURT:  So, basically, either you get what you

25  want in terms of the rabbinical college or they are breaking

            Sue Ghorayeb,  Official Court Reporter
                                            59


1  the law?

2          MR. STORZER:  We seek a -- we seek the right to get

3  a special exception under the Village's Code.

4          THE COURT:  But what if they say no, and they say,

5  "we don't want to, we don't want to do this"?

6          Putting aside these ordinances that you are

7  challenging.  They just say, "look, it's a residential

8  community.  We don't want something this big.  If you want to

9  do something that's a hundred students, that's fine."

10          At the end of the day, is it -- you know, I don't

11  know what the ideal plan is.

12          MR. STORZER:  As Your Honor, as Your Honor said,

13  if, if, if I'm a Mets fan, I want the opportunity to go and

14  find a job.  We want the opportunity to apply for this

15  special exception.  We think that under the nondiscriminatory

16  ordinance provisions --

17          THE COURT:  So you want the job.  I mean that's the

                        Page 53

RC -- Hearing Transcript (05-20-09).txt

18   fallacy of my, of my analogy, is that, you know, at the end

19   of the day, you can make it the Wake Forest College and Hotel

20   and they don't get to say no.

21              MR. STORZER:  That, that is not our position.

22   That's not what we are requesting in the Complaint.  We are

23   requesting the chance to apply, the chance to apply under a

24   fair process.

25              If, at the end of the day, the application was

                   Sue Ghorayeb,  Official Court Reporter
                                                              60

 1   denied on grounds that we believe weren't justified, then

 2   that may be the subject of another action.

 3              THE COURT:  What will be justifiable grounds?  What

 4   will be justifiable grounds?

 5              MR. STORZER:  The special exception factors that

 6   would exist under, under local and State law.

 7              THE COURT:  Okay.  Such as?

 8              I mean, why isn't density relevant here?

 9              MR. STORZER:  I believe that --

10              THE COURT:  I mean, the town population is what,

11   3,000?

12              MR. SAVAD:  Roughly $3,200.

13              THE COURT:  3,200.  So, if they are going to have a

14   thousand people living and working, as has been represented

15   to me -- that may be an exaggeration, that's fine -- but

16   that's a third of the population of the town, you are

17   increasing it, and there are traffic ramifications, there is

18   utilities, there is esthetics.  What --

19              MR. STORZER:  Your Honor, the Village's Code talks

20   about these things in a very objective manner.  It states the

                                 Page 54

RC -- Hearing Transcript (05-20-09).txt

21   amount of land that can be used as a percentage of total

22   land that can be used by a college by total square footage,

23   by dormitories.  This is all described in the Complaint.  We

24   are willing to live with the nondiscriminatory non-burdensome

25   elements of the Zoning Code that allow this specific use and

                  Sue Ghorayeb,  Official Court Reporter
                                                              61


 1   then allow dormitories themselves.

 2            Now, can the Village deny any use whatsoever

 3   regardless of how small?

 4            If we are talking about 750, 500, 250 students,

 5   based on a general concern that one more car is going to add

 6   too much traffic, or one percent utilization of the property

 7   is going to be too much density for the Village, that's

 8   something that's going to be challengeable either under

 9   State law or potentially under Federal law, but we are not

10   at that stage yet.

11            We completely agree with, with opposing counsel

12   that when it comes to these kinds of details, that has to be

13   worked out in the local process.  There is more than enough

14   here to demonstrate that there should -- there should be some

15   oversight of that process.

16            THE COURT:  I guess -- I mean, you know, the thing

17   is that the town to this day -- I mean, Paragraph 185 is not

18   a helpful paragraph for you.  Because what you do is, you

19   basically say, "the town has acted improperly here precisely

20   because they don't know what we're doing.  They just said

21   no."  And, so, the "in a vacuum" line, I am not sure why

22   that's a good fact for you to allege.

23            MR. STORZER:  I, I wrote that paragraph, so I will

                              Page 55

```
                      RC -- Hearing Transcript (05-20-09).txt
24   take the blame for it.  But what I meant when I wrote that
25   paragraph was --
```

Sue Ghorayeb,  Official Court Reporter

62

```
1            THE COURT:  Thinking more legislative history?
2            MR. STORZER:  -- was the, was the site plan that
3    was presented to -- I believe leaked by Preserve Ramapo,
4    these are the goods.  The specific plans for the buildings
5    and the roads --
6            THE COURT:  Okay.
7            MR. STORZER:  -- not the generalized plans --
8            THE COURT:  Leaked, leaked, what do you mean
9    leaked?
10           I mean, every day we read the media about leaks to
11   the web that turn out to be utterly false.
12           MR. STORZER:  The, the -- we believe that the
13   Village obtained the plans for -- certain plans, really the
14   concept plans.
15           THE COURT:  The Village did, the Village officials?
16           MR. STORZER:  Village officials.
17           THE COURT:  Obtained the plans?
18           MR. STORZER:  Obtained certain -- not from us.
19           THE COURT:  Engineering studies, I heard that.  We
20   all heard that.
21           MR. SAVAD:  If I may, Your Honor.
22           THE COURT:  Yes.
23           MR. SAVAD:  Paul Savad.
24           THE COURT:  Yes.
25           MR. SAVAD:  In connection with any land use, we
```

RC -- Hearing Transcript (05-20-09).txt
63

1   have SEQRA, and SEQRA is a process which, by the way, in

2   connection with the text amendment, the Village and Ms. Ulman

3   could tell you this, can drag on for four or five years, and

4   in the Complaint they have alleged they can do that.

5          THE COURT:  Let's get back to the leak.

6          MR. SAVAD:  Leaving that aside --

7          THE COURT:  Yes.

8          MR. SAVAD:  What our planners did is prepare --

9   under SEQRA you have to do a maximum buildout.  In other

10  words, take your property and take, for example, the maximum

11  amount of number of units that you can build on that

12  property.

13         Although, we -- in our, in our first phase, and as

14  we allege in our Complaint and my letters to Ms. Ulman, we

15  want 250 students, we did a hypothetical plan, as required

16  under State law, under SEQRA, showing a thousand units.  That

17  thousand units was sent by our planning consultants, right

18  here in Westchester, to the -- to the County agency, to the

19  County agency, traffic and a few other agencies.

20         We didn't even know they sent it.  We were working

21  on SEQRA.  We spent hundreds of thousands of dollars to get

22  this 4-inch book done and, all of the sudden, we hear that

23  it's leaked.  Well, the leak was our planning consultant

24  sent it out for comment by County agencies, so it became a

25  public record.  So the leak is not exactly a leak.

         Sue Ghorayeb,  Official Court Reporter
                                                      64

1          So, based on knowing that there conceivably could
                         Page 57

RC -- Hearing Transcript (05-20-09).txt

2   be one-thousand units, then, one month after we purchased it,

3   I start going to public hearings, all these things come out.

4           Wetlands, which apply only to us, because they

5   exempt residential dormitories, which cannot accommodate --

6           THE COURT:  Why does it apply to only you?

7           MR. SAVAD:  It exempts residential --

8           THE COURT:  Hang on.

9           MR. SAVAD:  -- by its terms.

10          THE COURT:  I understand that.  But I'm told that

11  the town allows for dormitories and colleges and museums and

12  libraries, and presumably wetlands would apply in those

13  instances, right?

14          MR. SAVAD:  Well, but there is nothing left to

15  build on.

16          THE COURT:  Yes or no?

17          MR. SAVAD:  Yes, but there's no land left.  There's

18  no land left.

19          THE COURT:  I know, but how can we say on its face,

20  if the wetlands provisions apply to nonresidential and the

21  zoning ordinances allow for nonresidential buildings, that

22  somehow that that violates?

23          MR. SAVAD:  Yeah, that's fact-specific.  I can

24  tell you --

25          THE COURT:  On its face, as a facial challenge, how

                Sue Ghorayeb,  Official Court Reporter
                                                        65


1   is that unconstitutional or violates RLUIPA?

2           MR. SAVAD:  That, that ordinance, Your Honor -- and

3   I was at every public hearing and I had to go with security

4   to attend these meetings.

                        Page 58

RC -- Hearing Transcript (05-20-09).txt

5         At each of those meetings, the tenor was to pass

6    things to stop us, and those were the comments made in

7    connection with the adoption; it's the wetlands; it's the --

8    which only applies to us.  It wouldn't apply to a 10,000 or a

9    5,000 square foot house, but it would apply to a 5,000

10   church, synagogue, or mosque.  But yet that didn't apply --

11        THE COURT:  Or a museum or a library.

12        MR. SAVAD:  Or a museum or a library, but there is

13   no land left in the Village for it.

14        THE COURT:  People can buy land I would assume.

15        MR. SAVAD:  No, it's all built up.  It's zoned

16   R-40.  It's zoned R-40.

17        And R-100, now 130 acres, by its very nature, by

18   the -- precisely in the ordinance says "you can have a

19   college.  You can have a college."

20        So, all these concerns about traffic and everything

21   are dealt with by professionals, and they're objective.  I've

22   never seen a case where ultimately the town or Village

23   engineers, the County engineer and the engineers for the

24   applicant don't all agree that it's good for traffic, or

25   there is bad drainage, or all of the sudden these

Sue Ghorayeb,  Official Court Reporter
                                              66


1    environmentalists come out of the woodwork, but those are

2    independent scientific standards.

3         In this particular case, and to make it really

4    simple, we want the same rights to apply for a college, just

5    take out the word accredited, because the students sitting

6    here -- and this is the class, part of the class, and five of

7    these people here are the plaintiffs, they want the right to

Page 59

RC -- Hearing Transcript (05-20-09).txt

8   attend a college.  And under their religious mandates what

9   they study and what they learn, what they inculpate into

10  themselves 24 hours a day cannot be done unless they live

11  there with their families, and culturally and biblically to

12  have children and multiply.

13          And what we say is, they intentionally targeted

14  this once this plan came out and all this happened.  If we

15  were to apply for a text amendment, Doris and I agree, we

16  will be there four, five years later.

17          If you look at Paragraph 206 -- just look at

18  Paragraph 206.  This is Mayor Sanderson's --

19          THE COURT:  I'm sorry.  206 of what?

20          MR. SAVAD:  Of the Complaint.

21          THE COURT:  Okay.

22          MR. SAVAD:  This is Mayor Sanderson's dream.  This

23  was made in 2007.  He has a vision of Pomona -- 2006.

24  "The year is 2011," and "the State Environmental Quality

25  Review Act process is almost finished."

            Sue Ghorayeb,  Official Court Reporter
                                                    67


1           They're talking about us.  That means they have

2   already planned ahead, in 2007, to have us stuck in the text

3   amendment process, which is completely discretionary.  They

4   don't have to take out -- they don't have to change the law,

5   and keep us stuck for four years.

6           THE COURT:  You know, politicians say they are not

7   going to run for reelection and they do.

8           MR. SAVAD:  Yeah, but this is --

9           THE COURT:  They say they are not going to run for

10  president and they do.

                        Page 60

RC -- Hearing Transcript (05-20-09).txt

11           MR. SAVAD:  Well, so they're saying this, but he
12   won't do it.  Look at Paragraph --
13           THE COURT:  I mean -- first of all, I mean, I have
14   to say, I mean I went through this.  This is precisely, I
15   wanted to get an education on, because one of the things I
16   was concerned about reading your allegations was, "hey, you
17   know, it's not ripe.  They have got to go through the process
18   and the process is quicksand."  I get that.
19           But in reading Article 11, it specifically says in
20   Section 130-39 that if you don't act on it in 45 days, then
21   it's adopted, the amendment.
22           MR. SAVAD:  No.
23           THE COURT:  And there are similar provisions
24   under -- okay.  Tell me why I'm wrong.
25           MR. SAVAD:  Because under SEQRA, they can send it

              Sue Ghorayeb,  Official Court Reporter
                                                      68


 1   out for years.  More and more they declare --
 2           THE COURT:  But SEQRA, as I understand it, is a
 3   State law.
 4           MR. SAVAD:  No.  They can drag it.
 5           THE COURT:  Is SEQRA a State law?
 6           MS. ULMAN:  Yes.
 7           MR. SAVAD:  Yes.
 8           THE COURT:  Okay.  First of all --
 9           MR. SAVAD:  But the -- I'm sorry.
10           THE COURT:  Please, let's calm down.  There is no
11   reason to wag a finger at me.
12           MR. SAVAD:  Oh, I'm sorry, Your Honor.
13           THE COURT:  SEQRA is not under attack in this
                            Page 61

RC -- Hearing Transcript (05-20-09).txt

14    lawsuit.

15             MR. SAVAD:  But the Village can use the process --

16             THE COURT:  Okay.  But if my aunt had a beard, she

17    would be my uncle.  Okay.  We are not here to talk about the

18    what ifs.  We are not here to talk about SEQRA.

19             We are here to talk about the things the Village

20    has done, the laws that they have adopted, that you say

21    violate various constitutional and statutory provisions.  I

22    am with you on that.

23             MR. SAVAD:  Yes.

24             THE COURT:  Let's put SEQRA to the side, because we

25    are not even at SEQRA because you haven't submitted a plan.

                  Sue Ghorayeb,  Official Court Reporter
                                                        69


1     SEQRA only comes in when you have submitted a plan.

2              MR. SAVAD:  I know that and I understand that.

3              THE COURT:  That's Ms. Hamilton's point, is that

4     land use is a process, and she is not wrong.  Even outside

5     the Ninth Circuit it's a process.

6              You go to a town and you say, "this is what we want

7     to do with our property.  And there is a town ordinance that

8     says you can only have, you know, white shingles.  We want

9     purple shingles," and you seek a variance, okay.  And there

10    is no SEQRA involved in that, obviously, maybe there is,

11    but -- okay.  So here your plan leaked.  They reacted by

12    passing all these ordinances, but we still don't know what

13    the plan is.

14             MR. SAVAD:  But if we have to apply for a text

15    amendment, because we are not accredited, we are being

16    treated differently than those institutions that can be

                              Page 62

RC -- Hearing Transcript (05-20-09).txt

17   accredited, therefore, we go right into quicksand.  We go
18   into a text amendment which can be discretionary with the
19   Village and they can simply deny it.
20        THE COURT:  Right.  And then you come to me and you
21   say "it's ripe."
22        MR. SAVAD:  But first we have to go through four
23   years of SEQRA before they deny it.
24        THE COURT:  You keep bringing in SEQRA.
25        MR. SAVAD:  Because they'll use that process.

        Sue Ghorayeb,  Official Court Reporter
                                              70


 1        THE COURT:  Okay.
 2        MR. SAVAD:  We are willing to do it, just take out
 3   the word accredited.
 4        MR. STORZER:  Your Honor, some of us have been
 5   living with this a long time.
 6        THE COURT:  Believe me, I get that, and I respect
 7   the passion that is governing the lawyers' conduct.
 8        As I said, I very much appreciate the briefing
 9   that's been done on this.  It's been excellent and very
10   helpful.  But I also recognize that there is a lot of
11   emotions out there on this, so I just want to make sure that
12   we keep them in check here.  Go ahead.
13        MR. STORZER:  The issue of a text amendment getting
14   an up or down vote in 45 days, I am not a land use lawyer
15   myself, but I am pretty certain that that is not the case.
16   It wasn't an issue.  It wasn't brought up in the motions.  We
17   would, we would be happy to address that if that was --
18        THE COURT:  Well, your point is, you have addressed
19   it, that it's a legislative fix, and that the ripeness
                    Page 63

RC -- Hearing Transcript (05-20-09).txt

20    doctrine here doesn't --

21           MR. STORZER:  Frankly, I simply have to say that I

22    can't imagine anything but a bright line saying "you don't

23    have to attempt to seek to petition a legislative body to

24    change a law before you have standing to challenge that law."

25    And, again, there is absolutely no precedent that can support

Sue Ghorayeb,  Official Court Reporter

71

1     such a position.

2            THE COURT:  I mean, as I said, you know, in

3     thinking about the argument and defendants' position that it

4     wasn't ripe, I was cognizant of the allegations in that

5     statement in Paragraph 206 of, you know, from plaintiffs'

6     standpoint, this is a war of attrition.

7            And from plaintiffs' standpoint, and it's alleged

8     in the Complaint, it's, it's, "hey, look, you know, the camp

9     never got anywhere and they gave up and sold the property.

10    So, maybe the name of the game here is just drag this thing

11    out until plaintiffs give up, they run out of money, whatever

12    it is."  I get that, and I get that, that there may be

13    constitutional implications from that, but the law on

14    ripeness is what it is.

15           The Second Circuit has laid out the four reasons as

16    to why that doctrine applies, and part of it is so there is a

17    record as to what it is that's being sought in terms of the

18    land use and what happened to that request.  Courts like

19    facts and they need -- they don't decide cases in the

20    abstract.  And what you don't get out of this lawsuit is

21    plaintiffs have a right to do something with the land.

22           I take it from your answer that's not what you are

Page 64

RC -- Hearing Transcript (05-20-09).txt

23  asking for, but that is the concern here, is that I'm not,

24  I'm not a Zoning Board either.  Okay.  So, that's why I asked

25  the question I asked about what it is that you at the end of

Sue Ghorayeb,  Official Court Reporter

72

1   the day think you can get out of this lawsuit.

2           MR. STORZER:  Your Honor, the Complaint is clear

3   as to what we are seeking in general terms.  We are seeking a

4   college.  We are seeking a dormitory that can accommodate

5   these individuals.

6           The actual plans, whatever, again, once again,

7   williamson and everything that came after williamson talks

8   about administrative relief.  There is, there is no

9   possibility for any administrative relief at all.

10          What are we seeking?

11          We are not seeking a building permit that gets

12  signed off on by the Court.  We are seeking the right to

13  apply under a fair process.  We don't have a fair process.

14          Towards the end of, of defense counsel's argument,

15  you made the suggestion of a declaratory judgment speaking to

16  those specific ordinances that we say either both -- either

17  and both discriminate against us, as well as substantially

18  burden our religious exercise, and that's exactly what we are

19  seeking, the right to be able to go through the process

20  without discrimination and without undue delay.  The, the --

21          THE COURT:  But, see, I guess, at the end of the

22  day, though, if the town -- you know, if you wanted to build

23  a giant widget factory there, and you represented a widget

24  company --

25          MR. STORZER:  Yes.

RC -- Hearing Transcript (05-20-09).txt

Sue Ghorayeb,  Official Court Reporter

1          THE COURT:  -- and the town just says, "we don't
2     want a widget factory on that -- you know, in our town, so
3     we're not gonna, we're not gonna grant you a variance."
4     Does the town have a right to do that?
5          MR. STORZER:  The town would have -- would not have
6     the right, to use the Court's example, to say, "you are
7     allowed to have factories in town, but you are not allowed to
8     have factories that build dreams."
9          This is what's happening here.  You are allowed to
10    have colleges.  You are allowed to have dormitories.
11         They gerrymandered their zoning ordinance in a
12    specific way to keep out a specific class of people.  This
13    is, at the very least, the Complaint certainly alleges these
14    kinds of facts.  We believe that there are ample facts to
15    support that allegation.
16         THE COURT:  Why don't you, why don't you go ahead
17    and address that point, because Ms. Hamilton says a lot of
18    what's in your Amended Complaint has to do with other towns
19    and other people, and, you know, anonymous people who say
20    things in the newspaper, but at the end of the day these are
21    not the decisionmakers.
22         MR. STORZER:  With the, with the Court's
23    permission, I would like to leave that argument to my
24    co-counsel, John Stepanovich.
25         THE COURT:  Yes.  Sure.

Sue Ghorayeb,  Official Court Reporter

RC -- Hearing Transcript (05-20-09).txt

1          MR. STEPANOVICH:  Thank you, Your Honor.  The
2    earlier quote from Paragraph 166, I think, was from Mayor
3    Marshall and he lost the election.  He got beat.
4          I think what's really relevant is the statements
5    from those officials that won the election.  And I would
6    point to the campaign literature from Candidates Sanderson,
7    Yagel and Louie, that's at our Paragraph 178, Exhibit 12,
8    where they have an unwavering --
9          THE COURT:  Paragraph 178 in the Complaint, right?
10         MR. STEPANOVICH:  178 in the Second Amended
11   Complaint, Exhibit 12.
12         That they have an unwavering long-term commitment
13   to the Village.  "To protect the Village, you must vote for a
14   team that is prepared to stand up to this threat.  A team
15   that's in it for the long-term, that has already prepared
16   themselves with a strategy to win this fight for Pomona."
17         THE COURT:  Right.
18         MR. STEPANOVICH:  Campaign material from Candidate
19   Sanderson, at 179, Exhibit 10.  "We are facing a proposal
20   that could completely change the Village and the makeup of
21   the Village.  My experience and my passion will help this
22   Village and allow this Village to fight this proposed
23   development."
24         Candidate Sanderson, at a -- actually, I think he
25   was elected Mayor by that point.  At a public meeting, before

              Sue Ghorayeb,  Official Court Reporter
                                                          75


1    Pomona's Civic Association.  We've set this forth in Exhibit
2    N, Laura Kraemer's affidavit.  "Several things have to be

RC -- Hearing Transcript (05-20-09).txt
3   done to prepare for this looming crisis."

4           THE COURT:  I don't mean to be a stickler, but I
5   am.  We have got to go off what's in the Complaint.

6           MR. STEPANOVICH:  I understand.

7           THE COURT:  Okay.

8           MR. STEPANOVICH:  Then we will, we will move on to
9   the --

10          THE COURT:  Well, some of this is in 178.

11          MR. STEPANOVICH:  Yeah.  And let me just -- it's in
12  there, Your Honor.

13          Let me just expand on what Mr. Savad was trying to
14  say in terms of his recitation of the letter to the editor.
15  That's in our Complaint at Paragraph 206.  And I understand
16  you indicated politicians say one thing and do another,
17  but I think this is very clear.

18          His "I had a vision" speech.  "The year is 2011."

19          THE COURT:  Oh, the cynicism.

20          MR. STEPANOVICH:  "During the last Village Board
21  meeting before the Village election...  Next is a report
22  about the Tartikov development.  The State Environmental
23  Quality Review Act process is almost finished.  The Village
24  Board will soon receive the application to make a decision
25  on granting a special permit for the huge development, or

                    Sue Ghorayeb,  Official Court Reporter
                                                            76


1   deny it.  The Board knows that if it is denied a Religious
2   Land Use and Institutionalized Persons Act lawsuit will
3   follow.  Fortunately, the Board has had a strong legal team
4   in place for the last four years and is well-prepared to
5   fight for the Village.

                            Page 68

RC -- Hearing Transcript (05-20-09).txt

6          "A resident asks if taxes will be going up this

7     year.  She (the Village treasurer) replies that the legal

8     defense fund created four years ago is almost $1 million

9     ahead of target, so no tax increase is foreseen.  There is

10    a murmur from the appreciative audience."

11          THE COURT:  Bully for Ms. Hamilton, a million

12    bucks.

13          MR. STEPANOVICH:  Great.  God bless her.  It's

14    great work if you can get it, Judge.  But here's the point.

15          THE COURT:  Yeah, I got it.

16          MR. STEPANOVICH:  These are not conclusory

17    allegations.  These are not our words.  These are their

18    words.  This legislation that's targeted against our clients

19    and the predecessors in interest, it's, it's -- we're not

20    making this up, Judge, it's there.

21          And I will say that there is -- the law is clear

22    that we are not required to jump through a series of hoops,

23    the last being obstructed by a brick wall.  But, Your Honor,

24    I think the facts are sufficiently clear that the brick wall

25    is built, it's there.

              Sue Ghorayeb,  Official Court Reporter
                                                      77


1          And I would point to, whatchamacallit, the

2     attachment, the letter back and forth between Mr. Savad and

3     Ms. Ulman.  I believe it's Exhibit 18 to the Second Amended

4     Complaint.  I think it's particularly telling.  And it is

5     her letter dated May 14th, the second paragraph.  "I do not

6     understand why you would request any meeting to discuss the

7     design of a project that is illegal."  That, Your Honor,

8     comes from the Village Attorney, a predetermination of our

RC -- Hearing Transcript (05-20-09).txt

 9  project being illegal.

10          Now, how are they going to ever approve a project

11  that she has already determined to be illegal?

12          If that's not digging in your heels and if that is

13  not absolute --

14          THE COURT:  But isn't the point to the process that

15  you would convince them it's not illegal?

16          Isn't that the whole idea behind going to a Zoning

17  Board and saying, "you know, you may think that this is

18  illegal, but it's not, and here is why it's not"?

19          I mean, again, assuming there were a variance,

20  which there is not, but -- "and, in any event, if it doesn't

21  comport with the zoning regulations, here is why you should

22  not apply them."

23          MR. STEPANOVICH:  In a perfect world, that's

24  absolutely true, Your Honor.  We're not in a perfect world,

25  we're in Pomona, and the facts -- our obligation under

                 Sue Ghorayeb,  Official Court Reporter
                                                          78


 1  futility is prove lack of administrative discretion, which

 2  Mr. Storzer has dealt with, or whether or not they have dug

 3  in their heels to make it perfectly clear that any

 4  application will ever be approved.

 5          That determination where she claims it's illegal,

 6  on top of all of the other statements, all of the other

 7  words, makes it perfectly clear that they have dug in their

 8  heels.

 9          THE COURT:  Okay.  But what about, what about

10  Ms. Hamilton's point?

11          I mean, are you aware of a case where a court

                              Page 70

RC -- Hearing Transcript (05-20-09).txt

12  applied futility where there was not a single application?

13          MR. STEPANOVICH:  We think that's, that's Lucas v.

14  South Carolina, addressed by counsel.  And --

15          THE COURT:  Okay.  Other than Lucas, though, no

16  other cases, correct?

17          MR. STEPANOVICH:  That's the Supreme Court, Your

18  Honor.

19          THE COURT:  You waive that around like it matters.

20          MR. STEPANOVICH:  Well, I'm, I'm sure the Court

21  understands.

22          THE COURT:  I forget the name of the decision.

23  There is the Judge Bianco decision where the Mayor said,

24  basically, "now, this is illegal" or "don't bother me with

25  this," and there Judge Bianco -- don't say any things about

                Sue Ghorayeb,  Official Court Reporter
                                                        79


1   him, I went to law school with him -- said, "that's not

2   enough, he can change his mind, you never know."

3          I mean, you know, I suppose on some level, if I

4   thought about it rationally, I would have thought my wife

5   would have said no, but I asked anyways.

6          MR. STEPANOVICH:  Well, I think that, I think that

7   that case will be appropriate and I'm sure Your Honor agrees

8   with that.

9          THE COURT:  Okay.  All right.  Go ahead.

10          MR. STORZER:  Your Honor, along those lines as

11  well, I think that we are kind of ignoring the elephant in

12  the tent here, which is the Leblanc case.  We have nearly

13  identically the same situation here as they had there.  They

14  had a zoning ordinance which was passed.  It was never

                            Page 71

RC -- Hearing Transcript (05-20-09).txt

15  applied.  I believe in that case there was actually something

16  that they could have applied for.  The, the --

17          THE COURT:  But isn't that -- but that's FHA,

18  right?

19          MR. STORZER:  No.  That was a First Amendment case

20  as well, Your Honor.

21          THE COURT:  Okay.

22          MR. STORZER:  And the Court held that both, that --

23          THE COURT:  You're right.  You're right.

24          MR. STORZER:  Right.

25          THE COURT:  But it's certainly in timing it's

                Sue Ghorayeb,  Official Court Reporter
                                                        80


1  previous to RLUIPA, so it's not an RLUIPA case.

2          MR. STORZER:  It's not an RLUIPA case, but it

3  postdates Williamson.  So, to the extent that the Supreme

4  Court suggested that one needs to seek administrative

5  remedies, there was no such requirement from the Second

6  Circuit, and there is nothing that overrules that.

7          We had a very similar, we had a very similar

8  situation there.  We had evidence of private parties that

9  were, that were hostile to the same protected class of

10  individuals.  That evidence was held to be -- could support

11  the jury's verdict that there was discrimination here.

12          We had the Fair Housing Act claims, the same types

13  of -- we had the same types of claims, although, RLUIPA was

14  not passed yet, at that point, and ripeness was a, ripeness

15  was a major issue to that court.

16          The Court looked at all of this evidence, the

17  totality of the circumstances, discriminatory intent, whether

                            Page 72

RC -- Hearing Transcript (05-20-09).txt

18  the law bears more heavily on one group than another, the

19  historical background of the situation -- of the decision,

20  looked at temporal facts, the specific sequence of events

21  leading up to the challenged decision, contemporary

22  statements made by the members of the decisionmaking body.

23          I mean we have statements here that talk -- you

24  know, the, the talk about the makeup of the Village,

25  protecting cultural and religious diversity in the Village.


            Sue Ghorayeb,  Official Court Reporter

                                                        81


1   How does cultural and religious diversity relate to density?

2           We have counsel for the Village telling a group of

3   people assembled not to cave in and sell, sell your houses to

4   them.  Who are the them in that situation?

5           These -- there is -- we are not talking about

6   random block postings made by people three villages over.  We

7   are talking about the Village's own officials, people running

8   for office, who are eventually elected to office and other

9   Village officials.

10          The Leblanc, the Leblanc court definitely looked at

11  that sort of evidence and said not only that it was ripe, but

12  it was sufficient to uphold the jury's verdict.

13          THE COURT:  But I'm trying to find where -- I mean

14  I have read Leblanc a couple of times, although, it's been a

15  couple of days.  I am trying to find where there is a

16  discussion of Williamson.

17          MR. STORZER:  In Leblanc, at Page 425, Your Honor.

18  "A person who is likely to suffer such an injury need not

19  wait until a discriminatory effect has been felt before

20  bringing suit."

                        RC -- Hearing Transcript (05-20-09).txt
21                THE COURT:  That's FHA, right?

22                MR. STORZER:  The same analysis was, was extended

23  to the --

24                THE COURT:  Well, but let's get to that.  The First

25  Amendment claims are picked up at 426, right?

                 Sue Ghorayeb,  Official Court Reporter
                                                            82


1                 MR. STORZER:  At 426.  "In determining whether a

2   law is based on religious animus, the same kinds of evidence

3   noted above with respect to a disparate treatment claim under

4   the FHA are relevant."

5                 It analyzed the same evidence and extended --

6                 THE COURT:  But it doesn't deal with Williamson,

7   right?

8                 There is no discussion of Williamson at all in

9   Leblanc.

10                MR. STORZER:  That, I would have to review it

11  again.  I don't believe so.

12                THE COURT:  Yeah, I don't remember Williamson.

13                MR. STORZER:  Again, ripeness was an issue.

14                In the actual discussion, the court specifically

15  noted that the Village itself had done nothing but adopt its

16  own Code and had not yet been called upon to apply it.

17                THE COURT:  Yes, I do remember that.

18                MR. STEPANOVICH:  This is controlling.

19                THE COURT:  No, it's dicta.

20                Okay.  Okay.  No.  You are right.  I think Leblanc

21  has a lot to say here.

22                MR. STORZER:  The, the challenge to laws that are

23  passed can be -- it's kind of a strange duck.  If a law is

                                Page 74

RC -- Hearing Transcript (05-20-09).txt
24  passed with discriminatory motive, is it a facial challenge;

25  is it an as-applied challenge?  The courts are divided on

Sue Ghorayeb,  Official Court Reporter
83


1   the issue.

2           THE COURT:  And how.  I have actually been

3   wrestling with that a lot.  I mean, they are kind of all over

4   the map.  Because generally speaking a facial challenge, you

5   don't deal with motive, except when it's an equal protection

6   claim.

7           MR. STORZER:  Right.

8           THE COURT:  And then --

9           MR. STORZER:  Or a First Amendment claim.

10          THE COURT:  Well, sort of.

11          MR. STORZER:  The City of Hialeah case.

12          THE COURT:  Yes, but even that's -- right.  But

13  First Amendment in terms of speech or First Amendment in

14  terms of all pieces of the First Amendment?

15          MR. STORZER:  The Church of the Lukumi Babalu Aye

16  v. City of Hialeah, free exercise.

17          THE COURT:  Free exercise, right.

18          MR. STORZER:  And I believe it was Justice

19  Kennedy --

20          THE COURT:  Kennedy concurring.

21          MR. STORZER:  -- concurring.  And that specific

22  section was relied upon by the Second Circuit in --

23          THE COURT:  Right.  In Leblanc, right.

24          MR. STORZER:  So that, that reasoning was adopted,

25  Your Honor, to the extent.  Whether the -- whether that's --

Sue Ghorayeb,  Official Court Reporter

RC -- Hearing Transcript (05-20-09).txt
84

1          THE COURT:  It still seems a lot like an as-applied
2     analysis even in Leblanc, because they are relying on the
3     facts, and they are putting into context the public
4     commentary and the reaction to certain statements that are
5     made and the pressure that's put on town officials.
6          MR. STORZER:  Right.
7          THE COURT:  So, it's not just an analysis of the
8     statute and saying, "well, on its face, it seems okay, but."
9     It's, it's -- I agree, it's a fine line.
10         MR. STORZER:  And the courts look at it
11    differently.
12         THE COURT:  What about RLUIPA, though?
13         I mean, RLUIPA is looking at -- if all you have
14    left is a facial challenge under RLUIPA, what's your argument
15    that Hialeah and Leblanc together in terms of the governing
16    principles means that you can look at motive or a facial
17    challenge under RLUIPA?
18         MR. STORZER:  Certainly, there is, there is plenty
19    of precedent that supports that.
20         But with respect first to ripeness, RLUIPA has a
21    specific provision that even if -- that states that standing
22    is to be governed only by the general rules of standing under
23    Article III, similar to the FHA's -- the gloss that's been
24    put on the FHA by the Supreme Court, that there are no --
25    there are absolutely no considerations of prudential

                Sue Ghorayeb,  Official Court Reporter
                                                          85

1     standing.  This is an Article III, is there injury, causation

RC -- Hearing Transcript (05-20-09).txt
2   or redressability.
3           A lot of the discussion as to ripeness comes from
4   pre-RLUIPA, free exercise cases that talk about prudential
5   considerations that just aren't in play here.
6           THE COURT:  Before we leave the question of
7   standing, one thing that Ms. Hamilton and I did not discuss,
8   but I would like you to address is -- forgive me if I get the
9   pronunciation wrong, but the standing of Kolel Belz.
10          MR. STORZER:  Right.
11          THE COURT:  What, what will be the argument there?
12          MR. STORZER:  The Kolel Belz is another religious
13  institution.  They have themselves about -- it's a specific
14  sect.  They have about 200 members.  They have no vest in.
15  They have -- they don't have the individuals that this
16  proposed rabbinical college will train to be rabbinical
17  judges for that particular group of Orthodox Jews.  The hope
18  is that some of the Kolel Belz students will be able to study
19  at this college and then be able to return.
20          THE COURT:  Are these among the students that have
21  been admitted?
22          MR. STORZER:  Yes, they have been admitted.
23          THE COURT:  Okay.  So, but why can't they assert
24  standing on their own?
25          MR. STORZER:  They do.

              Sue Ghorayeb,  Official Court Reporter
                                                    86


1           THE COURT:  Okay.  So --
2           MR. STORZER:  In -- we believe -- this is not
3   simply a situation where somebody is concerned about the
4   plight of tigers in Africa.  This is a group that needs a

RC -- Hearing Transcript (05-20-09).txt

5  specific type of educated individual that they don't have

6  access to and that this --

7          THE COURT:  But I thought the case law said, if you

8  want to go ahead and try to assert third-party standing, you

9  need to, among other things, establish a barrier to the

10  individual injured party's ability to redress the wrong.  But

11  here the individual students who have been admitted, you

12  would say, have standing, okay --

13          MR. STORZER:  Yes.

14          THE COURT:  -- so that should end it.

15          Why, why do we need the whole organization then

16  to assert standing on their behalf when they can do it, they

17  can do it themselves?

18          MR. STORZER:  There is an important relationship,

19  as a practical matter, between the two entities.  Obviously,

20  the case doesn't turn on this.

21          THE COURT:  I didn't mean to suggest it was.

22          MR. STORZER:  But there is the ACORN v. County of

23  Nassau case, which was, which was cited to the Court.

24          THE COURT:  Yes.

25          MR. STORZER:  That gave an advocacy group that

            Sue Ghorayeb,  Official Court Reporter
                                                    87


1  endeavors to fight discriminatory local and State government

2  decisions, had standing in that case, although, none of them

3  were specifically seeking housing themselves, but this could

4  be seen as falling under that category.

5          THE COURT:  Or by virtue of the distinction not

6  falling under it, because you have got the individual

7  plaintiffs who are asserting their interests.

RC -- Hearing Transcript (05-20-09).txt

  8           MR. STORZER:  Correct.

  9           THE COURT:  Okay.  All right.  I mean, it's not a

 10   big deal, but just before we left the topic of standing.

 11           MR. STORZER:  All right.

 12           THE COURT:  Okay.  What else would you like to

 13   cover?

 14           MR. STORZER:  Well, getting back to the, to the

 15   remedy that, that was one of the Court's first questions,

 16   this is why we submitted the Reaching Hearts decision that

 17   came out of the District of Maryland, because in that case,

 18   it was alleged that a specific ordinance was passed to keep a

 19   specific church out of, out of the jurisdiction.

 20           When the, when the court ruled that their rights

 21   under RLUIPA were violated, the relief that the court granted

 22   was a, basically, a declaration that that particular

 23   ordinance itself was invalid and to go forward in the land

 24   use process without that, which is exactly what we are

 25   seeking here.  So, this isn't something that's unprecedent or

              Sue Ghorayeb,  Official Court Reporter
                                                      88


  1   even -- unprecedent or even uncommon.

  2           The, the -- I'm not sure that the, that the

  3   defendants' standing arguments or even 12(b)(6) arguments

  4   really do anything more than restate the ripeness arguments

  5   themselves.  If the Court doesn't have anything further on --

  6           THE COURT:  Well, I have read what you have all

  7   said on whether or not you state a claim under 12(b)(6), and

  8   we have all surveilled the case law nationwide on this.  But,

  9   again, if there is anything else you wanted to add to your

 10   papers, now will be your time.

                         Page 79

RC -- Hearing Transcript (05-20-09).txt

11          MR. STORZER:  Well, I would, I would end by saying,

12    again, this, this, this case is about a -- you know, at the

13    end of the day, it's about a clash, a clash of cultures that

14    is happening in this Village, it's happening all around the

15    County, as the Court is well-aware.

16          One of the -- one of the elements -- one of the

17    allegations of the Complaint is that Pomona has joined a

18    lawsuit against the Town of Ramapo specifically to keep

19    out -- I believe that --

20          THE COURT:  Oh, I know all about that, because we

21    have a case that was removed.

22          MR. STORZER:  I understand that, Your Honor.

23          THE COURT:  And we have another case where we have

24    a motion pending there as well.  So, yes, I got you.

25          MR. STORZER:  I am not sure if the Village has

              Sue Ghorayeb,  Official Court Reporter
                                                    89


1     litigated other cases against the town in other circumstances

2     that don't involve this class of individuals, but, again,

3     that's -- there is a clash of cultures here.

4           The Mayor talks about the makeup of the Village,

5     about protecting cultural and religious diversity.  The

6     zoning law, the zoning process, the text amendment process,

7     the passing of new ordinances should not be the battle ground

8     on which these cultural issues have been fought, and,

9     unfortunately, that's what's happening here in Pomona.

10    That's why Congress passed RLUIPA.

11          Congress said RLUIPA shall be, shall be applied in

12    the broadest possible fashion, and the standing provision of

13    RLUIPA says it's only limited by Article III itself.  So, to

                              Page 80

                    RC -- Hearing Transcript (05-20-09).txt

14   the extent that there is any discretion on the part of this

15   Court to -- it has to be made to err on the side of

16   protecting religious freedom.

17           THE COURT:  Okay.  Thank you very much.

18           MR. STORZER:  Thank you, Your Honor.

19           MR. STEPANOVICH:  Your Honor, before we left

20   standing, are you okay on the FHA standing?

21           THE COURT:  I am square on FHA.

22           MR. STEPANOVICH:  Okay.  One response.  I guess

23   Ms. Hamilton said S and R Development, and that was a

24   reasonable accommodation of FHA claim.  That's different than

25   a disparate impact claim.  I just wanted to point that out.

              Sue Ghorayeb,  Official Court Reporter
                                                        90


 1           THE COURT:  Okay.

 2           MR. STEPANOVICH:  Thank you.

 3           MR. SAVAD:  One more thing, Judge.

 4           THE COURT:  Yes.

 5           MR. SAVAD:  If you will recall, on March 20th,

 6   there was a hearing before you in Chofetz Chaim v. the

 7   Village of Wesley Hills.  Pomona was in there.  And there

 8   were two attorneys appearing there.  There was -- Mr. Haspel

 9   was for the plaintiff and you had Mr. Zarin for Wesley Hills,

10   and you had Mr. Saracino for the Village of Pomona.

11           And in the record, Mr. Zarin said -- because he

12   said the Chofetz Chaim case is very thin, they are just

13   alleging racial or something of that sort.  And he said, "at

14   the end of the day" -- this is at Page 27 in your court

15   record, "I would submit, Your Honor, that these

16   municipalities could not keep these types of developments
                        Page 81

RC -- Hearing Transcript (05-20-09).txt

17    from happening in their municipalities, religious, any
18    religious or educational institution from locating in
19    municipalities under the common law of New York and RLUIPA,
20    and that this was made very clear in Mamaroneck.  They do
21    have that right, Your Honor."
22          And then he said, speaking for the villages,
23    including Pomona, "and we didn't do anything, the villages,
24    out of those normal procedures.  It wasn't like New
25    Hempstead.  We weren't sending out false information.  We

                Sue Ghorayeb,  Official Court Reporter
                                                            91


 1    weren't putting out pamphlets, Your Honor, saying this is the
 2    worst thing that's ever going to happen.  We were putting up
 3    a new slate for development to stop this project.  There is
 4    no literature that we tried to stop the project."
 5          So, I agree with Pomona and Wesley Hills' attorney
 6    that that is the standard, that that is what's happening
 7    here, and I think he must've read our Complaint when he was
 8    attending the argument for this Court to dismiss the Chofetz
 9    Chaim case.
10          Yes, there are emotions, but if one reads the
11    Complaint, one reads the motions, one reads the exhibits,
12    what these young men want is what any other young man in the
13    United States wants, the right to have an education.
14          These are all ordained rabbis, they don't need an
15    accredited school to behave like proper students, and all we
16    need is a level playing field.  Take out the word
17    accreditation, take out these laws that not -- environmental,
18    the environmental law takes off ten acres from our property.
19    It only applies to our property.  It's a factual
                          Page 82

RC -- Hearing Transcript (05-20-09).txt

20  determination.

21          The -- to put it before, before they changed the

22  law, it was only up till age 12th Grade, and what happened

23  was, they realized --

24          THE COURT:  In terms of a school that you can have?

25          MR. SAVAD:  Yes, only up to twelfth grade.  But as

Sue Ghorayeb,  Official Court Reporter

92

1   soon as -- they were dealing with Yeshiva of Spring Valley,

2   which they dragged through the dirt for five years.  I

3   represented them in their new project, which they received

4   approval for in the town in one year.

5           And, so, they changed -- as soon as we bought it

6   and the deed is recorded, Rabbinical College of Tartikov,

7   exactly one month later, I'm at a meeting and all these --

8   these are the facts on the ground -- all these targeted laws

9   were passed.

10          We are not asking for anything that preempts

11  zoning.  We are not asking for anything that takes us out of

12  RLUIPA.  What we are asking for is this Court under RLUIPA

13  to level the playing field, to fashion a remedy in which we

14  can apply and be treated just the way Wake, Wake College

15  would be treated, and all of these things, these objective

16  things are being determined by land planners.

17          Look, if the County engineer says there's

18  insufficient water drainage or the like, then the project

19  engineer will ultimately agree.  All those things, like in

20  Mamaroneck, were all dealt with and eventually all of the

21  professionals agreed and what was left was the pure

22  discrimination, to the point that after the trial the second

Page 83

RC -- Hearing Transcript (05-20-09).txt

23    time around, the judge wrote an airtight decision.

24           What we are asking is -- we bought this property.

25    Our client paid $12 million for a college property in 2004.

Sue Ghorayeb,  Official Court Reporter

93

1    What we are asking for is the right to apply, and my learned

2    counsel that deal in this area, FHA and RLUIPA, they can deal

3    with the technicalities.

4           But we know that you are familiar with what's going

5    on in this region more than any other Judge.  The cases are

6    before you.  And I think this is the right case to make the

7    right remedy and let them take it to the Second Circuit, but

8    we think this is the right case and that what we are doing is

9    legitimate.

10          One last thing I want to say.  Our first phase is

11   250 students.  This is not a housing project.  All we -- it's

12   pled in the Complaint that these students will receive

13   subsidies from between 12 and $2,400 a month.

14          This is a real college and we want the right to

15   prove it, that we are a real college, and we want the right

16   to utilize the State process with a level playing field by

17   Your Honor's decision.

18          THE COURT:  Yes, I know.  But when you said the

19   word "first phase," I'm sure that drew some attention, so.

20          Ms. Hamilton, I will give you the last word.

21          MS. HAMILTON:  Okay.  If Ms. Ulman could just make

22   a brief statement about the statements they said about her.

23          THE COURT:  Sure.  Yes, of course.

24          MS. ULMAN:  Your Honor, I just wanted to clarify.

25          THE COURT:  Yes.

Page 84

RC -- Hearing Transcript (05-20-09).txt

Sue Ghorayeb,  Official Court Reporter
94

1          MS. ULMAN:  The letter that was referred to by

2     Mr. Stepanovich was after a conversation between Mr. Savad

3     and myself, at which time we both agreed that the so-called

4     college not being accredited was not in compliance with the

5     Village Law.  And Mr. Savad was asking for a private meeting

6     to discuss that, and my comment was, "there's no point in

7     having a private meeting, because it's not going to

8     accomplish anything.  Apply for the zone change, and then the

9     Village can" --

10          THE COURT:  But they can't get it.  They need an

11     amendment, not a zone change, right?

12          They need an amendment.

13          MS. ULMAN:  They need an amendment, yes.

14          THE COURT:  Okay.  Okay.

15          MS. ULMAN:  It would be an amendment to one of our

16     laws, yes.

17          THE COURT:  All right.  Well, let's pick up on

18     that, Ms. Hamilton, because the question is whether it's one

19     of semantics or is it really what defeats your argument on

20     ripeness.  That -- you know, put it this way.  I think maybe

21     another way plaintiffs will phrase it, if the New York State

22     legislature passes an invalid law, the fact that you could,

23     you know, say "let's have a do-over on the law" doesn't mean

24     that the people can't challenge the constitutionality of the

25     law.  And that really Article 11 is not a zone change, it's

Sue Ghorayeb,  Official Court Reporter
95

Page 85

RC -- Hearing Transcript (05-20-09).txt

1   not a variance, it's not SUP.  It is "go back to the
2   legislative body of the town and change the law."  And, you
3   know, is that really, is that covered by Williamson and
4   Murphy and so forth?
5           MS. HAMILTON:  Yes, Your Honor, I think it is just
6   semantic.  I mean, it is the sort of application that's made
7   in communities in New York all the time.  It is not an
8   unusual request.  It's certainly not a requirement.  You go
9   up to Albany and you persuade all of the assemblymen and all
10  of the senators to do what you like.  It's a local
11  determination in light of local values.
12          I mean, what we are talking about here is
13  federalism and the ability of local communities to determine
14  if they are going to be bedroom communities or factory
15  communities.
16          I mean the question is -- what they are suggesting
17  is that federal law completely sets aside not just the laws
18  that are inconsistent with certain aspects of RLUIPA, but
19  sets aside the whole process.  So, I mean, we just go back to
20  the same thing over and over.
21          THE COURT:  Let me play devil's advocate for a
22  second.  First of all, you haven't made a Tenth Amendment
23  challenge to RLUIPA, and such challenges haven't faired very
24  well.  So, I don't really know that's really the point here.
25          The point here is that RLUIPA is on the books.  I

                Sue Ghorayeb,  Official Court Reporter
                                                          96


1   didn't draft it, I didn't pass it, neither did you.  It's on
2   the books, it's got to be enforced.  And what they're saying

                        RC -- Hearing Transcript (05-20-09).txt
3    is, is that what RLUIPA bars is land use regulations that

4    discriminate against people based on religion.

5           What they want wiped away are those provisions of

6    the zoning ordinances that have been adopted since the

7    property was purchased, and then, then have the process.

8    That's what they're saying.

9           They are not saying, "Judge, order the town to

10   allow us to build a college the way we wanted, with a first

11   phase, second phase, third phase."  They want a process.

12   Right now there is no process, because they look at the law

13   and the law says forget about it, and unless they can amend

14   the law, they're stuck.

15          MS. HAMILTON:  Well, they can amend the law in

16   light of public interest, which is to say, which is something

17   they often forget, that the public is involved in public

18   hearings for a text amendment.

19          This is not -- the process is not that they go in

20   and the legislators unilaterally decide, "well, do we like it

21   or not?"  The public has an opportunity for input for the

22   intensity of the use that's being proposed here, which is

23   unlike any other prior use.

24          So they are opposing the process.  They are not

25   just opposing the law but the whole process.  What they

                Sue Ghorayeb,  Official Court Reporter
                                                        97


1    really want, and you can see that in the Complaint, is they

2    want to go through the process with a Federal Court on their

3    arm.  And they want to be able to say at every turn not just

4    "we will file an RLUIPA lawsuit against you," which is the

5    normal mode of operation, but rather, "we have filed our

                            Page 87

RC -- Hearing Transcript (05-20-09).txt

6  lawsuit and it's sitting right here with the Judge watching

7  everything you do."  And with respect to federalism

8  principles, that takes RLUIPA extremely far.

9        THE COURT:  And the flip side of it is, you have

10  got a Mayor who says, "I have a vision, and it's 2000-never,

11  and this thing still hasn't happened, because we have thrown

12  up every hurdle we can.  We are paying Ms. Hamilton a million

13  bucks."  And, by the way, you are worth more than that.  And,

14  you know -- and, so, that's what they are dealing with.

15        MS. HAMILTON:  My co-counsel gets a few pennies

16  too.

17        THE COURT:  I mean, it is, it is -- it's what

18  obviously makes this a very challenging case, because there

19  are very important values on both sides of the equation.  And

20  that's -- and I understand, counsel made the point that you

21  have been living with this case, and I realize people in the

22  community and people who want to be in the community, and I

23  really appreciate counsel setting what I think is a very

24  important tone to this dialogue for those in the back, seeing

25  that counsel are approaching this with vigor and passion but

Sue Ghorayeb,  Official Court Reporter
                                          98


1  not crossing any lines.  So I get it, and I get that the

2  Federal Courts shouldn't be running towns.  I get that.

3        MS. HAMILTON:  Well -- and if you look at the

4  relief sought, they don't simply ask for an application; they

5  ask for the ability to get the application, the construction,

6  and the utilization of the college.

7        THE COURT:  That doesn't mean they are going to get

8  what they ask for.  As the Rolling Stones said, "you don't

```
                         RC -- Hearing Transcript (05-20-09).txt
 9   always get what you want."

10           MS. HAMILTON:  No, I understand that.

11           There is two other things.  Reaching Hearts

12   involved a case where there were three applications, not

13   zero.  And with respect to the constitutionality of RLUIPA,

14   we are not at the summary judgment motions yet, Your Honor.

15           THE COURT:  Oh.  So you are still waiving that

16   stick around later on.

17           MS. HAMILTON:  Oh, yes.

18           THE COURT:  Okay.  Well, you were the RLUIPA expert

19   that's been discussed in the pleadings.

20           MS. HAMILTON:  Yes, I know.

21           THE COURT:  Hang on.  I just want to make sure

22   Ms. Hamilton doesn't have anything else.

23           MS. HAMILTON:  And with respect to Mamaroneck, of

24   course, a plan was filed.  In Mamaroneck, there was --

25           THE COURT:  No.  I understand.  These cases are
```

                 Sue Ghorayeb,  Official Court Reporter

```
 1   being cited for different points.

 2           MS. HAMILTON:  I understand that.

 3           THE COURT:  So --

 4           MS. HAMILTON:  There just isn't another case where

 5   no application needs to be made --

 6           THE COURT:  No.  There's the case.

 7           MS. HAMILTON:  -- for RLUIPA or --

 8           THE COURT:  There is the one.  There is the one.

 9           MS. HAMILTON:  Lucas?

10           THE COURT:  Yes.

11           MS. HAMILTON:  I have to go reread it, but I don't
```

                    RC -- Hearing Transcript (05-20-09).txt
12  remember it being a futility exception to ripeness.

13          THE COURT:  Okay.  All right.  Okay.  We will both

14  reread it.

15          MS. HAMILTON:  But, in any event, the --

16          THE COURT:  What do you do with Leblanc?  What

17  about Leblanc?

18          MS. HAMILTON:  I think Leblanc is problematic for

19  our position, we know that.

20          THE COURT:  Okay.

21          MS. HAMILTON:  Which is why I was willing to say

22  that the Fair Housing Act claims are potentially problematic.

23          THE COURT:  But Leblanc is also First Amendment,

24  it's true.

25          MS. HAMILTON:  It is First Amendment, but it is

            Sue Ghorayeb,  Official Court Reporter
                                                          100


1   speech.  And the argument in that case or taken from the case

2   is you can't let speech claims sit, but we are dealing with

3   conduct here, not speech.  We are dealing with buildings.

4           THE COURT:  Okay.  I didn't understand Leblanc to

5   be limited to speech.

6           MS. HAMILTON:  Well, the statement they make about

7   going beyond -- that they need to go forward has to do with

8   the standard argument under the First Amendment.

9           THE COURT:  I mean, it specifically addresses free

10  exercise on Page 426 in Leblanc, citing Hialeah.

11          MS. HAMILTON:  Well, that's with respect to a

12  disparate treatment claim where you have evidence of actions

13  that are going to affect the plaintiffs.

14          THE COURT:  Right.

                              Page 90

RC -- Hearing Transcript (05-20-09).txt

15          MS. HAMILTON:  What actions are going to affect the

16   plaintiffs here?  We don't know.

17          THE COURT:  But, see, in Leblanc, there was the

18   adoption of the rules that were never actually applied.

19          MS. HAMILTON:  In a context where there was a jury

20   trial and there was evidence adduced of discrimination.

21   Here, we --

22          THE COURT:  But not, but not because an application

23   was made and denied.

24          MS. HAMILTON:  No, no, not because an application

25   was made and denied, but there was evidence of discrimination

                  Sue Ghorayeb,  Official Court Reporter

                                                            101


1    in that case.

2           THE COURT:  Okay.

3           MS. HAMILTON:  Our argument is --

4           THE COURT:  Discrimination in the adoption of the

5    rules that were under attack.

6           MS. HAMILTON:  Right, right.

7           THE COURT:  Okay.  But you heard what plaintiffs'

8    counsel said about their allegations.

9           MS. HAMILTON:  If you read the allegations, that's

10   not what these allegations -- these allegations do not allege

11   facts about discrimination with respect to the laws that were

12   passed.

13          As Ms. Ulman stated, they were working on the

14   school issue before that.  It's the same provision you see

15   across the State of New York.  It's going to be very hard for

16   them to argue that any of the changes in the law which

17   liberalized the rules were passed in order to limit them.

                              Page 91

RC -- Hearing Transcript (05-20-09).txt
18          They are in a better position after those

19   amendments than they were before.  And that's why Ms. Ulman

20   said she doesn't understand how there can be an argument they

21   were passed for discriminatory motives.

22          What their argument is, is that they didn't do

23   everything to make sure that they got everything they wanted.

24   That can't be a right.  That's not a constitutional right.

25   It's not an RLUIPA right.

                 Sue Ghorayeb,  Official Court Reporter
                                                           102


1          THE COURT:  Okay.  All right.  Anything else?

2          MS. HAMILTON:  That's it.  Thank you, Your Honor.

3          THE COURT:  Real quick.  I have given you all two

4   hours.

5          MR. STEPANOVICH:  The district court in Leblanc-

6   Sternberg did address the ripeness issue on the allegations

7   of the Complaint.  The district court --

8          THE COURT:  Right.  But that was early on in

9   pretrial, right?

10          MR. STEPANOVICH:  Right.  Exactly.

11          THE COURT:  Yes, yes.  But that -- and I guess

12   that's my point, though, that Leblanc in this circuit doesn't

13   go through a Williamson analysis, right?

14          I realize the district court -- back when the

15   district court was ruling in favor of the plaintiffs in that

16   case, there was an early decision, as I recall.

17          MR. STORZER:  We have -- again, Leblanc and this

18   case are different, because you are dealing with ordinances

19   that were passed with a discriminatory motive, not like

20   Williamson, not like Murphy, not like all of the other cases

                              Page 92

RC -- Hearing Transcript (05-20-09).txt

21  cited by the defense in furtherance of their Williamson

22  argument.  When you have ordinances that are passed with

23  discriminatory motive, it's different.

24          The only thing that I wanted to leave the Court

25  with was the text of RLUIPA itself.  I guess I will end with

            Sue Ghorayeb,  Official Court Reporter

                                              103


1  reading the text.  Each specific substantive provision of

2  RLUIPA begins "no government shall impose or implement a land

3  use regulation; substantial burden discrimination; equal

4  terms."  The, the --

5          THE COURT:  Yes, but the cases do -- I mean

6  Westchester Day talks about substantial burden really using

7  ripeness terms, that there is no substantial burden unless

8  you have applied and been rejected.  I mean, so I get the

9  language.  And, you know, starting off by citing the

10  legislative history and ending with reading the text sort of

11  makes you a legal equivalent of bipolar, but I got your

12  point.

13          MR. STORZER:  Thank you, Your Honor.

14          THE COURT:  Anything else?  Again, I want to thank

15  counsel.  I recognize -- and I say this to the people in the

16  back.  I recognize this is an important decision for all of

17  you.  I will do the best I can.  We have 400 cases on the

18  civil side, a hundred on the criminal side, but I have spent

19  a lot of time studying this issue.  I will get you an opinion

20  as soon as I can, but I want to thank counsel.

21          Again, thank you.  Have a good afternoon.

22          MR. STORZER:  Thank you, Your Honor.

23          MS. HAMILTON:  Thank you, Your Honor.

                        Page 93

```
                  RC -- Hearing Transcript (05-20-09).txt
24               MR. STEPANOVICH:  Thank you, Your Honor.

25               (Case adjourned)


                Sue Ghorayeb,  Official Court Reporter
```