Plaintiffs, including the prospective Dean and the Students as well as Tartikov's own representative. The testimony was completely consistent: It is not *bitul Torah* — a sin — for the students to live off-campus and travel to the rabbinical college. Dean Babad testified; "It takes me time to get to the kollel. Of course, it's not called a sin." A990. *See also,* A999-1000 ("it is not a sin" to travel to and from the kollel); A962 (not "committing an unjustifiable sin"). As Rabbi Rosenberg explained:

> Q. Is it your opinion that the time you spend traveling to the kollel and from the kollel to your home, that's justifiable because there's no on-campus housing?
>
> A. Right….
>
> THE COURT: Can we back up one second? For the people who built or created the kollel, did they commit a sin in not having on-campus housing?
>
> THE WITNESS: No, they'll get rewarded for creating a kollel.
>
> THE COURT: Even though it doesn't have campus housing.
>
> THE WITNESS: Everybody does what they could do. Not everybody has the means.
>
> THE COURT: All right.

Based on all this testimony, which was uncontradicted, the District Court's conclusion that the Plaintiffs "have professed a sincere religious belief based on religious doctrine to live on campus with their families" (A825) is simply not true.

The present case is very different from the cases Tartikov cites. For example, in *Fifth Ave. Presbyterian*, 293 F.3d at 574-75, the church submitted an

affidavit attesting to its belief in caring for the homeless on their property. Similarly, in *Holt*, 135 S.Ct. at 862, the plaintiff believed growing a beard was "a dictate of his religious faith, and the Department does not dispute the sincerity of petitioner's belief." Here, the Plaintiffs themselves testified that on-campus family housing was <u>not</u> a religious belief.

The District Court attempted to escape this evident fact by questioning the witnesses' credibility. Unbelievably, Tartikov — arguing on behalf of those very Plaintiffs — adopts the District Court's language that "the testimony upon which Defendants' rely <u>is of little value</u>." T.Br. 36, quoting A825 (emphasis added). That testimony was given by the Plaintiffs themselves.

Tartikov previously (T.Br. 34) sets out a series of bullet points as to what beliefs were sincerely held, including what "is a sin, known as *bitul Torah*…" Those bullet points were all based on the testimony of the very same Plaintiffs, who testified that living off-campus with their families and traveling to the rabbinical college was <u>not</u> *bitul Torah*. Tartikov and the District Court cannot rely on the Plaintiffs' testimony in all other respects and then reject it when the Plaintiffs honestly admit something devastating to Tartikov's case.[25] Tartikov cannot, after the fact, impeach its own witnesses. The only evidence in the record

---

[25] Nor can Tartikov rely on the District Court's incredible, (and insulting to its co-Plaintiffs) claim that, because English was their second language, "they were not saying" what they actually said. A826 n.27.

32

is that the Plaintiffs had no sincere religious belief in on-campus family housing to support the RLUIPA claim.

**B.**  **Tartikov Failed To Prove The Challenged Laws Imposed A**
   <u>**Substantial Burden**</u>

Tartikov (T.Br. 39) cites the factors for substantial burden from *Chabad Lubavitch*, 768 F.3d at 195-6.  However, Tartikov simply ignores several points in the Village's initial brief demonstrating that Tartikov failed to meet its burden of proof.  For example, the Village argued (V.Br. 68-70) Tartikov did not meet *Chabad Lubavitch's* requirement that the plaintiff "reasonably believed it would be permitted to undertake its proposed [development] when it purchased the property[.]"  768 F.3d at 196.  *See also Petra Presbyterian Church v. Northbrook*, 489 F.3d 846, 851 (7th Cir. 2007) ("Petra had no reasonable expectation of obtaining a permit" but went ahead and purchased the property).

The District Court pointed out the accreditation requirement existed since 2001, long before Tartikov purchased the Property.  A840.  That same law also prohibited all dormitories at the time of Tartikov's purchase.  TE1482.  Tartikov admitted that it never investigated the accreditation requirement, or other zoning, until long after purchase.  A840.  As Tartikov could have no reasonable expectation to build, on this basis alone, its RLUIPA claim should have been denied.

Tartikov does not address what should have been a "fatal" deficiency.  It does not even attempt to defend the District Court's flawed reasoning that a discrimination claim can override the reasonable expectation requirement.  A841.  As the Village explained, (V.Br. 69-70), there is a separate provision under RLUIPA for discrimination claims.  *See* 42 U.S.C. § 2000cc(b)(2).  Incorporating a discrimination element into the substantial burden section, "would render the nondiscrimination provision superfluous."  *Bethel World Outreach Ministries v. Montgomery County Council*, 706 F.3d 548, 557 (4th Cir. 2013).  *See also World Outreach Conference Center v. Chicago*, 591 F.3d 531, 534-5 (7th Cir. 2009).  The District Court's attempt to avoid the result of the uncontradicted evidence on this requirement must fail, necessitating reversal of the RLUIPA verdict.  Tartikov's failure to dispute the Village's argument confirms this.

### 1.     Tartikov Did Not Prove The Accreditation Law Was A Substantial Burden

Another argument Tartikov concedes by silence concerns the possibility of provisional accreditation.  Crucial to the District Court's analysis, is the claim that accreditation was impossible because a school must be operational before it can be accredited.  T.Br. 41.  The Village argued that provisional accreditation was a solution to this.  *See* V.Br. 66.  The District Court rejected the Village's argument on the basis that <u>Defendants failed to offer proof</u> provisional accreditation was possible.  A832.  The District Court improperly switched the burden of proof on

this, which falls on Tartikov.  Tartikov does not contest that it had the burden of proof, so it was required to prove provisional accreditation was impossible.  Tartikov just ignores this issue.

Tartikov (T.Br. 41-2) simply repeats the argument that "as planned" its rabbinical college could not be fully accredited, so it could not be built.  As the District Court recognizes, the Accreditation Law does not otherwise impose a substantial burden.  *See* A831-2.  Tartikov's failure to disprove provisional accreditation defeats its claim on this basis — the one on which the District Court relied extensively.  *See* A762; A774; A832.

### 2. Tartikov Did Not Prove The Wetlands Law Was A Substantial Burden

Once again, Tartikov's failure to confront the Village's arguments leaves its claim unproven.  As the Village (V.Br. 67-8) pointed out, 99% of the wetlands are also regulated by the State or Federal Government.  *See* A837.  Tartikov repeats the District Court's view that Pomona's permit requirement is more stringent.  T.Br. 47.  However, Tartikov does not address its failure to offer any evidence that it could obtain a federal or state permit to build the driveway that it, and the District Court, contend is a necessity.  Without such evidence, Tartikov has failed to prove the Wetlands Law itself imposes a substantial burden beyond the State or Federal laws.

Tartikov repeats the District Court's statement that the Property is the only ten acre parcel available. Tartikov confronts neither the lack of credibility of the testimony relied on, nor the fact that construction would not be limited to presently vacant land. *See* V.Br. 67. More importantly, Tartikov ignores the error by the District Court in once again improperly shifting the burden to the Defendants to prove another ten acre parcel exists. It was Tartikov who had the burden on this issue (which it does not contest) and, therefore, Tartikov that had to prove a ten acre parcel could not be formed out of the additional 30 acres its affiliate owns or, because this is a facial challenge, anywhere else in the Village.[26]

### 3. Tartikov Did Not Prove The Dormitory Restrictions Were A Substantial Burden

The remaining substantial burden argument comes down to Tartikov's desire to build multi-family housing for 250 to 1,000 families. At trial, however, there were only between 5 to 10 prospective students identified, even with all the inducements of free education and housing, plus a stipend. *Chabad Lubavitch*, 768 F.3d at 196, holds that a vital question is whether "feasible alternatives existed." As the Village (V.Br. 64) pointed out, Tartikov's affiliate already owns 14 houses

---

[26] In a footnote, Tartikov attacks the Wetlands Law as bad and poorly crafted. T.Br. 45 n.9. The law was taken from the N.Y. State law. TE1897. Further, the issue is the burden, not the quality, of the Wetlands Law.

abutting the Property, which constitute an excellent alternative.  The District Court disagreed, saying it was not "feasible" to limit the student body to 14.  A834.

The District Court's interpretation of "feasible," is simply unsustainable. "Feasible" is defined as "capable of being done."  MERRIAM-WEBSTER DICTIONARY, 2018.  Tartikov is capable of housing its ten students in the 14 existing homes.  Further, the District Court's contention that purchasing other property would not be "feasible," because Tartikov already owns sufficient land (A834 n.30), again improperly treats "feasible" as a synonym for desirable. Additionally, the District Court's approach divorces the feasible alternative requirement from the facial challenge.  If housing for the rabbinical college students could be done elsewhere in the Village, it is a feasible alternative and is not a substantial burden.  *See Midrash Sephardi v. Surfside*, 366 F.3d 1214, 1228 (11th Cir. 2004) (walking a few extra blocks is not a substantial burden).

Critically, Tartikov ignores all this, as well as the most important feasible alternative — subdividing the Property itself.  As the Village pointed out (V.Br. 65), Tartikov's "vision" is to use only 30 acres for the rabbinical college — leaving 70 acres to be subdivided into a large number of single family lots (even discounting for slopes and wetlands).  The parties stipulated that the Property, "may be developed with single family residences."  A732 (emphasis added).  Thus, Tartikov could develop homes on the property for up to seven times as many

students as it presently can identify. That does not include further subdivision of the adjoining 30 acres, which presently only have 14 homes. At some point, the actual number of homes available must outweigh some hypothetical numbers of students some day in the future. *See Vision Church v. Long Grove*, 468 F.3d 975, 1000 (7th Cir. 2006) (substantial burden not measured against future hopes for eightfold growth).

Tartikov's response is yet again to ignore this entire issue. It offers no response to the Village's argument that use of existing and presently buildable homes — even without acquiring additional land — demonstrates there is no substantial burden. Tartikov has the burden of proof to show the Village was wrong. It did not even attempt to do so — and cannot now.

### 4.    This Case Is Not About A Torah Community

Tartikov brought this lawsuit to challenge four laws that it claims burden its plan to build a rabbinical college. Tartikov said nothing about building a Torah Community. The Complaint bears this out, never mentioning a "Torah Community" while mentioning "Rabbinical College" 114 times. *See* V.Br. 63.[27] Tartikov never informed the Village that its intent was to build a Torah Community. *See, e.g.*, TE1624-1627; 1899. Only well into the litigation did

---

[27] Tartikov never moved to amend its Complaint on this point.

Tartikov begin to overlay its claims regarding a rabbinical college with talk about a Torah Community.

Tartikov describes a Torah Community as a place of exile "separated from the outside world, allowing those living there to be freed from the distractions of the outside world." T.Br. 37. To the extent that is possible in Pomona, a Rockland County bedroom community of one of the largest cities in the world, the Challenged Laws do not prohibit it. If Tartikov wanted to build the equivalent of a gated community on the Property, the Challenged Laws would allow that — because those laws only deal with educational institutions, not a Torah or any other kind of residential community.[28]

Tartikov argues that a Torah Community is inextricably intertwined with a rabbinical college. T.Br. 38. Once again, none of the pages in Tartikov's string citation from the record actually say that. In fact one citation is to Tauber's testimony that a Torah Community "has nothing to do with only Tartikov about the judges…" A912. Tartikov's discussion of the Torah Community is a particularly apt example of Tartikov's practice of making statements unsupported by the record. For example, Tartikov states the rabbinical college "will be devoted solely

---

[28] Other Village zoning laws might impose limits on a Torah Community, such as requiring it to be comprised of single family houses, but those laws are not at issue in this case. There was no testimony that a Torah Community had to be made up of a certain kind of housing.

to religious training of *dayanim*…" (T.Br. 36-7) (emphasis in original). Not a single page cited says this. To the contrary, the cited testimony of Rabbi Rosenberg also discusses a student fulfilling obligations to his family. A966. *See also* A978 ("everybody raises children nobody is going to take that away"); A1003 ("obligations to your family in the evening").

Tartikov (T.Br. 37) also claims that the prospective students are presently engaged in self-study "unaided by a knowledgeable instructor or even a study partner." Tartikov cites the testimony of three Plaintiff-Students: Rabbis Rosenberg (A954), Hershkowitz (A993) and Menczer (A1015). However, their actual testimony is to the contrary, as they all presently study together at Kollel Belz. Tauber describes a kollel as "a school similar to a college but is strictly for religious studies." TE1667.

Tartikov attempts to shift the focus to a Torah Community because the Plaintiffs themselves admitted student family housing was not a religious belief. Therefore, Tartikov needed a connection to claim the educational laws' prohibition of married student housing was a burden. So, Tartikov blurs the distinction between a rabbinical college and Torah Community. *See, e.g.*, T.Br. 43; 44. It was not the Village that viewed a Torah Community as unnecessary to the rabbinical college. It was Tartikov's own witnesses' statements that a rabbinical college and

a Torah Community were different things. *See* V.Br. 63.[29]  The prospective

students, the Dean and Tauber all testified that the family housing was completely

separate from the college's religious instruction, that the students could not study

at home (A966; 1003) and that all study would be in the classroom building

(A896-897; A980-981).

This Court in *WDS* addressed a similar situation.  The planned school

expansion included separate housing for the headmaster.  This Court recognized

that denial of a permit for construction of that housing, which was not to be used

for religious instruction, would not constitute a substantial burden.  *See WDS*, 504

F.3d at 348 (the line of demarcation for RLUIPA excludes "a case like the building

of a headmaster's residence, where religious education will not occur").  Similarly,

no study by the rabbinical college students will occur in the family housing, so that

housing falls outside of RLUIPA protection.[30]  Even if a Torah Community was

relevant to this case (which it is not), the Challenged Laws do not burden the

development of one on the Property or on the adjoining land owned by Tartikov's

---

[29] Similarly, it was Tartikov's witness who testified that a Torah Community was "more than ideal."  A990.

[30] Tartikov ignored this argument raised in the Village's initial brief.  *See* V.Br. 61-2.

affiliate.  As Tartikov has not met its burden of proof as to substantial burden for any of the Challenged Laws its RLUIPA claim must fail.[31]

## IV.

## THERE WERE NO OTHER STATUTORY OR CONSTITUTIONAL VIOLATIONS

### A.    Free Exercise

If a law is neutral on its face, to prove a violation of Free Exercise, a plaintiff must show that the law is not generally applicable; that it targets religious conduct for distinctive treatment.  A law crafted to be solely applicable to a particular person or institution is not generally applicable.  *Lukumi*, 508 U.S. at 542-3.  Tartikov argues that the Laws are not neutral under *Lukumi* (T.Br. 48) despite the fact that the District Court expressly found the Challenged Laws to be facially neutral.  A845.  As discussed *supra*, the Challenged Laws are generally applicable and *Lukumi* does not apply here.

---

[31] Similarly, any claims, such as New York Free Exercise, that depend on a finding of a burden must fail.  Tartikov (T.Br. 11-12) claims that the Village waived its opposition to this state law claim.  However, in its initial brief, the Village contested all state law claims.  *See, e.g.,* V.Br. 16 n.3.  Moreover, the case Tartikov cites, *Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998) states "[i]ssues not sufficiently argued in the briefs are considered waived. . ."  In finding a violation of the New York Free Exercise provision, the District Court relied on its previous ruling on substantial burden.  *See* A862 ("As discussed above, the burden imposed on Plaintiffs' religious exercise is substantial.").  The Village more than sufficiently argued the issue of substantial burden.  *See* V.Br. 53-70.

Tartikov states that the Village "offers little argument regarding the Free Exercise claim other than referring to its RLUIPA and Equal Protection analysis." T.Br. 48.  However, the District Court did not individually analyze the Free Exercise claim, relying instead on its RLUIPA and Equal Protection analyses.  *See* A845-6.  The District Court's conclusions under both analyses were wrong, as demonstrated *supra*.

Moreover, to prevail on a Free Exercise claim, Tartikov must show that the law has no neutral, secular purpose. *Commack Self-Service Kosher Meats v. Hooker*, 680 F.3d 194, 211 (2d Cir. 2012).  Tartikov failed to prove the Challenged Laws do not have the secular purpose of regulating an educational institution. Also, a Free Exercise claim must show different treatment because of religion. Tartikov was not treated differently because of religion, or in any other way: all educational institutions are subject to the Challenged Laws.  Tartikov states that the Village makes no argument to satisfy strict scrutiny.  Since Tartikov did not prove discriminatory intent or substantial burden, this assertion is irrelevant.

Tartikov also contends "there is no requirement that a targeted burden on religious exercise be 'substantial' under the Free Exercise clause." T.Br. 49.  As has been shown, there was no "targeted burden."  Tartikov did not prove a Free Exercise violation.

B.    **Free Association**

Regarding Free Association, Tartikov mistakenly states that the Village
ignores its claim that the Accreditation Law bans the college.  T.Br. 50.  The
Village discussed the error the District Court made in concluding that the
Accreditation Law prohibited Tartikov from obtaining a special permit.  V.Br. 73.
Further, the evidence suggests that Tartikov designed its college specifically so it
could not be accredited.  V.Br. 73.  More important, the Accreditation Law does
not significantly interfere with Tartikov's right to associate.  It can build, among
other things, synagogues, mikvahs or even a yeshiva.  The Challenged Laws limits
on housing do not substantially or significantly interfere with the students' ability
to engage in study to become rabbinical judges because they will not study or
associate in their homes. [32]  V.Br. 73.

Tartikov says the Wetlands Law "effectively bans any college in Pomona"
T.Br. 50.  This statement is baffling, as there is no evidence (and Tartikov cites
none) to support this conclusion.  Finally, Tartikov states that a Torah Community
is an essential component of its proposed use.  T.Br. 50.  As has been discussed at
length (*see supra* p. 38), this is simply not true, and the students can expressively
associate without one.

_____

[32] Tartikov incorrectly asserts, without citation, that the Village claims an outright
prohibition on the ability to associate for purposes of religious teaching is an
insignificant interference.  T.Br. 49.  The Village never argued that.

## C.  Fair Housing Act

Tartikov relies on the District Court's finding of discrimination to support its FHA Section 3604 (42 U.S.C. § 3604) claim.  T.Br. 52-53.  As discussed *supra*, there was insufficient evidence that the Challenged Laws were enacted out of religious animus.

Tartikov likens Judge Sand's decision in *U.S. v. Yonkers Bd. of Ed.,* 837 F.2d 1181 (2d Cir. 1987) to this case because there the court "relied on evidence that local officials acted to effectuate the discriminatory designs of private individuals."  T.Br. 52.  Here, however, the Challenged Laws were not enacted to satisfy "discriminatory designs" of Village residents.  There was no proof that Village officials enacted any of the Laws because of <u>discriminatory</u> comments made by the public or "private individuals."  The evidence does show that officials were conscious of residents' objection to overdevelopment, but that is different than discrimination, as the Village has continually stressed.  As to Local Laws 1 of 2001 and 5 of 2004, there was no public comment about Tartikov because no one knew about Tartikov.  The only commentary about YSV was positive.  As to the Local Laws 1 and 5 of 2007, the above review of the January 2007 hearing shows that the evidence simply does not support Tartikov's claim.

FHA Section 3617 (42 U.S.C. § 3617) requires proof that the Village retaliated for Tartikov having exercised or enjoyed rights protected by the FHA.

First, what rights were "exercised or enjoyed" by Tartikov? It never applied to do any building in the Village. Notwithstanding this deficiency, the District Court found the evidence was sufficient because the Village "had piled on layers of regulation" to interfere with Tartikov's use of the Property and that the Village's "principal purpose in enacting the Laws was to prohibit Plaintiffs from building dwellings on the Property." A861-862; *see also* T.Br. 53-4.[33] Since Local Law 1 of 2001 was enacted before Tartikov even existed, how could it have been enacted to prevent Tartikov from building? Similarly, Local Law 5 of 2004 was drafted before the Village knew Tartikov owned the Property, much less its intended use. Local Law 1 of 2007 was also drafted before anyone knew what Tartikov intended to build. Finally, because no development plans had ever been presented to the Village, the Wetlands Law was passed without knowledge by any official of what effect, if any, it would have on Tartikov's hypothetical project. More importantly, Tartikov, like the District Court, fails to supply any authority for its assertion that "layers of regulation" constitute retaliation (*see* V.Br. 75), particularly when two "layers" pre-date Tartikov and drafting both the third and fourth layers pre-date its

---

[33] Tartikov claims that the District Court correctly concluded that the student housing component of its Torah Community qualifies as a dwelling under the FHA. T.Br. 50. As discussed, a rabbinical college does not require a Torah Community, and Tartikov did not bring this case to challenge any Village Laws regarding a Torah Community. V.Br. 58-59, 61-63.

housing plan.  The "layers of regulation" argument simply does not support the retaliation claim.

Tartikov states that even if the District Court had done a disparate impact analysis, Tartikov would have won, claiming that record "fully supports judgment" for it based on disparate impact.  T.Br. 54.  However, Tartikov does not provide any evidence from the record.  A disparate impact claim requires comparison of two groups, the affected and unaffected, *Tsombanidis v. W. Haven Fire Dept,* 352 F.3d 565, 575 (2d Cir. 2003).  Tartikov had to identify an appropriate comparison group and prove "a causal connection between the facially neutral policy and the alleged discriminatory effect." *Id.*  Tartikov never identified a group, and the record is devoid of any comparison.  Additionally, Tartikov failed to present or even address the necessary statistical evidence or an equivalent analytic comparison required to establish a prima facie case. *Id.* at 578.

## V.

## THE INJUNCTION WAS IMPROPER

### A.  <u>The Judgment Exceeded The Relief Granted In The Decision</u>

As with other claims, what Tartikov does not address in its brief is significant.  Tartikov does not contest the critical point that the injunctive relief granted by the District Court differs substantially from the remedy in its decision. The District Court acknowledged that the "appropriate and adequate" remedy was

simply enjoining the Challenged Laws.  A864.  The appropriateness of this remedy
is supported by precedent.  *See* V.Br. 76.  Tartikov fails to even attempt to explain
how the much more expansive injunction was justified, particularly in the absence
of any additional findings.  Secondly, Tartikov does not address the Village's
argument that by maintaining jurisdiction over any and all remedies the District
Court essentially becomes the Village's zoning board of appeals with regard to any
application that Tartikov files.  *See* V.Br. 80-81.  Decisions of this Court, and other
courts, consistently warn against such action.  *See Murphy*, 402 F.3d at 349; *see
also Congregation Anshei Roosevelt v. P&ZB*, 338 Fed. Appx. 214, 219 (3d Cir.
2009); *Greenbriar Village v. Mountain Brook City*, 345 F.3d 1258, 1262 (11th Cir.
2003).

## B.  The District Court Did Not Hear Any Evidence Before Issuing The Judgment

Tartikov (T.Br. 55) asserts the Village's claim that the District Court did not
take any evidence before the Judgment was entered is "false."  In support of this,
Tartikov references only letters submitted by counsel.  Those letters are not
evidence, as this Court has recognized.  *See Salahuddin v. Goord*, 467 F.3d 263,
272 (2d Cir. 2006) ("[w]e may consider only the underline evidence before the district court,
and summary judgment cannot be entered on the basis of factual statements only in
the parties' briefs") (emphasis added); *Nenninger v. Port Jefferson*, 509 Fed. Appx.
36, 38 (2d Cir. 2013) (same); C.A. Wright and A.R. Miller, FEDERAL PRACTICE &

PROCEDURE § 2723 ("the court may not take cognizance of positions regarding the facts based on exhibits that are merely part of the brief and have not been otherwise appropriately introduced into evidence").

The District Court issued the Judgment based only on arguments proffered by counsel in letter briefs. It did not conduct an evidentiary hearing or consider any expert analysis. As the Village previously pointed out (V.Br. 79), in cases where this Court has upheld broad injunctive remedies, the District Court held such a hearing. Thus, both of Tartikov's most adamant denials are not supported by the record.

Tartikov also disputes the Village's contention that the District Court adopted Tartikov's proposed Judgment almost verbatim. T.Br. 55. On March 1, 2018 Tartikov's counsel sent a letter to the District Court attaching a proposed Judgment. SA112. This submission and the Judgment are identical. The Village acknowledges that this last submission was preceded by other draft proposed judgments submitted by both parties. However, during the process of considering those drafts, the District Court made very few changes to the first submission made by Tartikov — none of them substantive. The most troubling provisions, which alter the state process, for example, are unchanged. A comparison of Tartikov's first submission of January 8, 2018 (SA5-11) with the final March 1, 2018 version (SA116-121) confirms how little it changed.

## C.   The Judgment Conflicts With New York State Land Use Law

In response to the Village's argument that the Judgment unlawfully departs from SEQRA, Tartikov cites the District Court's statement that it did not see the Judgment "as upsetting SEQRA."  T.Br. 55.  What Tartikov does not tell this Court is that these statements were made by the District Court after the appeal was filed in this case, and should not be considered.[34]

Tartikov claims the relief granted regarding SEQRA and the application process was within the District Court's discretion.  T.Br. 56.  Tartikov asserts the injunction here is less onerous than the *Fortress Bible Church v. Feiner*, 694 F.3d 208 (2d Cir. 2012).  However, *Fortress Bible* was an <u>as-applied challenge</u> where the plaintiff Church, prior to filing suit, had already gone through a "lengthy SEQRA process" over several years.  *Id.* at 221.  Similarly, in *Sherman v. Chester*, 752 F.3d 554, 557 (2d Cir. 2014), the plaintiff filed multiple applications over ten years.  *See also WDS*, 504 F.3d 346 (application filed and denied by ZBA).  Tartikov complains about an eleven year delay, but unlike these as-applied cases, Tartikov never filed an application.

---

[34] The Village is moving to strike this section of Tartikov's brief as it is not based on material that is part of the record of trial.  On May 9, 2018, the District Court held a hearing on the Village's motion to stay the Judgment pending appeal.  At that hearing, on likelihood of success the Village contended the District Court exceeded its authority in altering the SEQRA process.  The District Court's comments on which Tartikov relies now were made after the appeal was filed and in full knowledge that the Village was challenging the Judgment.

Tartikov argues the injunction comports with state law, i.e., SEQRA. T.Br.

57. In *Jackson v. NYS Urban Development Corp.*, 67 N.Y.2d 400, 416 (1986), the

New York State Court of Appeals stated that "it is not the role of the courts to

weigh the desirability of any action or choose among alternatives, but to assure that

the agency itself has satisfied SEQRA, procedurally and substantively." The

injunction violates this principle by having the District Court make these decisions.

Under SEQRA, the lead agency decides whether a segmented review is

appropriate. *See* V.Br. 77. Section 617.2 (ag) of SEQRA defines segmentation as

"the division of the environmental review of an action such that various activities

or stages are addressed under this Part as though they were independent, unrelated

activities needing individual determination of significance." The "determinations

of significance" are made by the lead agency during the application process and

after the lead agency is established. 6 NYCRR 617.6 (b)(2)(3). However, in

adopting Tartikov's proposed judgment, the District Court has usurped that role,

and ordered a segmented review itself.

Tartikov claims that "a project is not impermissibly segmented where a

developer submits a plan and represents that it has 'no immediate intention of

developing the property further'" and that its hypothetical college "has

independent utility from any development plans that may evolve in the future

because the current project can functionally operate without any additional

51

development." T.Br. 57.[35]  This is an astonishing statement, given that Tartikov

has never submitted a plan, as the District Court repeatedly recognized.  *See, e.g.,*

A762; A793.

How can there be segmentation when the scope of the project is unknown,

and the lead agency on the application (which has not been filed) has not even been

designated, no less made a determination?  Tartikov's segmentation argument is

not plausible because what it will apply for is unknown and the District Court took

no evidence to support the determination (SPA-4) that segmentation would be

more protective of the environment.  The Judgment allows Tartikov to segment the

project into as many phases as it wants, potentially avoiding an Environmental

Impact Statement (EIS), and possibly any meaningful environmental review.  More

importantly, the District Court is not the New York lead agency and should not be

acting as such.

Tartikov incorrectly contends that the Judgment does not conflict with

SEQRA and New York Village Law timeframes, because the Judgment uses

language identical to Village Law.  T.Br. 58.  Tartikov states N.Y. Village Law §

7-725-a(8) requires a planning board to hold a public hearing on a site plan "within

---

[35] To support its claims, Tartikov (T.Br. 57) cites two cases, *Saratoga Springs
Pres. Foundation v. Boff*, 110 A.D.3d 1326 (2d Dept 2013), and *Friends of
Stanford Home v. Niskayuna*, 50 A.D.3d 1289 (3d Dept 2008).  In each of these
cases an application had been filed and the SEQRA process had occurred.

sixty-two days from the day an application is received." T.Br. 58. Tartikov

contends that state courts have interpreted this provision to mean an application is

not "received" until "complete." T.Br. 59-60. Thus, Tartikov claims "the 62-day

period to commence a hearing under Pomona Law would not begin to run until a

DEIS was accepted." T.Br. 60. The Judgment, however, does not say the 62 days

runs from receipt of a "complete" application, and will not be enforced by a state

court. The Judgment, states that "Defendants shall conduct a public hearing on

Plaintiffs' site plan application within sixty-two (62) days <u>from the day an</u>

<u>application is received</u>." SPA4 (emphasis added). Thus, there is a direct conflict.

Tartikov offers to resolve this conflict on the basis that <u>Tartikov</u> "has stated

that the 62-day period runs from when the DEIS is accepted." T.Br. 61. Tartikov

is not the court and, while it may have drafted the language in the Judgment, that

language says nothing about a "complete application" or "from when the DEIS is

accepted." Tartikov cannot rewrite the Judgment now. The actual language of the

injunction controls, which places the Village on the horns of a dilemma with which

of the mandatory provisions to comply.

Tartikov has no real response to the charge that by closing any hearing after

60 days the Judgment improperly interferes with the important state policy of

providing opportunity for public participation. *See* V.Br. 78. Tartikov (T.Br. 58)

cites two New York State cases, *Costco v. Oyster Bay*, 90 A.D.3d 657 (2d Dept

2011) (dealing with the times to review a Final EIS), and *Lowe's Home Centers v. Venditto*, 15 Misc.3d (A) (Nassau Sup. Ct. 2007) (unpublished local court ruling) asserting there are limits on the public comment period on a DEIS. Neither case deals with the time for public comment. Tartikov merely asserts that, without limiting the public's opportunity for comment, the SEQRA process would become "never-ending." T.Br. 58. This is no excuse for the Judgment so severely limiting the opportunity for public participation mandated by state law. Various state cases demonstrate such public hearings can frequently last for a considerable period of time.

## RESPONSE TO CROSS APPEAL

## VI.

### THE TRIAL COURT CORRECTLY DISMISSED TARTIKOV'S AS-APPLIED CHALLENGE

Tartikov never filed a land use application of any kind. Yet it contends (T.Br. 75) that the District Court should have allowed its as-applied challenge to proceed. An as-applied challenge without an application is not only an oxymoron; it is contrary to the settled law of this Court. Since Tartikov's as-applied challenge was not ripe, the District Court properly dismissed it.

## A.     <u>This Court Requires One Meaningful Application</u>

As Tartikov recognizes, this Court's decision in *Murphy v. New Milford*

*Zoning Commission*, 402 F.3d 342 (2d Cir. 2005) is the seminal case in this area.[36]

*Murphy* explains that a party bringing an as-applied challenge to zoning laws has a

"high burden of proving that [this Court] can look to a final, definitive position

from a local authority to assess precisely how they can use their property." *Id.*, at

347. Therefore, *Murphy* requires, as a jurisdictional prerequisite, that a party

submit "at least one meaningful application" (*id.* at 348) — a requirement Tartikov

acknowledges. T.Br. 76. Here there was no position from the Village because

Tartikov never submitted such an application.

*Murphy* sets out four considerations that underlie the application

requirement: (1) it aides in development of a full record; (2) it is the only way the

court knows precisely how the regulation will be applied to the particular parcel;

(3) a requested variance may provide the relief sought without judicial

entanglement; and (4) land use disputes are uniquely matters of local concern

suited to local resolution — "federal courts do not sit as zoning boards of review."

---

[36] *Murphy* has been faithfully followed by later decisions of this Court. *See, e.g.*, *Islamic Community Center v. Yonkers Landmark Preservation Bd.*, 2018 U.S. App. LEXIS 18369 *6-8 (2d Cir. July 6, 2018); *Safe Harbor Retreat v. East Hampton*, 629 Fed. Appx. 63, 65 (2d Cir. 2015), *cert. den.*, 137 S. Ct. 74 (2016). It has also been cited with approval by several other circuits. *See, e.g., Insomnia v. Memphis*, 278 Fed. Appx. 609, 613 (6th Cir. 2008).

402 F.3d at 348-9.[37]  These considerations are particularly apt here where the
District Court had no details, no less precise information, on how Tartikov
intended to use the property.  *See* A279-280 (the "particulars of Congregation's
planned use remain abstract … still merely an undefined plan").  An application
would have developed the record, eliminating the confusion that has plagued this
case (*see, e.g.*, A279; A762); would allow this Court to know precisely how the
Village zoning law would apply, rather than resting on hypotheticals, and would
have saved the trial court from its subsequent entanglement with local and state
land use law.  Since Tartikov made no application, the District Court, after an
exhaustive review of the relevant law, properly dismissed all as-applied claims.
A285.[38]

## B.  Tartikov Could Have Made An Application

Tartikov incorrectly claims that no application procedure was available.
T.Br. 76.  While it was undisputed that Tartikov could not obtain a <u>use</u> variance
(A280-281), there were other application avenues.  First, Tartikov could have

---

[37] Other circuits have adopted these four guiding considerations.  *See, e.g.*, *Guatay Christian Fellowship v. San Diego County,* 670 F.3d 957, 977 (9th Cir. 2011), *cert. den.*, 565 U.S. 940 (2012); *Congregation Anshei Roosevelt*, 338 Fed. Appx. at 217; *Grace Community Church v. Lenox Township*, 544 F.3d 609, 613-615 (6th Cir. 2008).

[38] As the District Court noted (A270-271), the standard under New York law is the same, requiring the same result.  *See, e.g.*, *Equine Facility v. Pavacic*, 155 A.D.3d 1035 (2d Dept. 2017).

applied for a zone change or text amendment.  The Village Attorney initially

suggested applying for a zone change before this lawsuit was filed.  TE1624.  In

*BT Holdings v. Chester*, 670 Fed. Appx. 17 (2d Cir. 2016), this Court affirmed

dismissal of an as-applied challenge on the grounds a New York plaintiff could

have applied first to the Village Board for a zone change but did not.  In such cases

"the burden is squarely on the plaintiff to provide evidence that it did so apply in

order to establish that its claim was ripe." *Id.*, 19.

Further, Tartikov's failure to utilize the very procedure recommended by the

Village defeats its claim that no avenue was available.  *See Safe Harbor Retreat*,

629 Fed. Appx., at 65 (plaintiff "failed to apply for the special permit that both the

building inspector and Zoning Board identified as the appropriate avenue"), *cert.*

*den.*, 137 S. Ct. 74 (2016); *Sunrise Detox v. White Plains*, 769 F.3d 118, 124 (2d

Cir. 2014) ("By forgoing the avenues for relief outlined in the Commissioner's

revised determination, Sunrise deprived the city of the opportunity to issue a final

decision."); *Lost Trail v. Weston*, 289 Fed.Appx. 443, 445 (2d Cir. 2008) (town

attorney advised two options which were not followed).

Tartikov - without citing authority - tried to draw a distinction between a

variance application and a text amendment.  A276.  However, "the term variance is

not definitive or talismanic; <u>if other types of permits or actions</u> are available and

could provide similar relief, <u>they must be sought</u>.  Hoehne, 870 F.2d at 533-35

(discussing the availability of relief via … <u>zone change</u>).” *Southern Pacific Transp. v. Los Angeles*, 922 F.2d 498, 503 (9th Cir. 1990) (emphasis added). *See also*, *Guatay Christian Fellowship*, 670 F.3d at 967 (failure to seek a “zoning change” made claims unripe). *Murphy* referenced a variance application because that case arose in Connecticut, where variances are the usual tool. 402 F.3d at 353. In New York, use variances are much more restricted, so other tools are used. Tartikov, however, refused to follow the Village Attorney’s advice to at least apply for a zone change. TE1624.

Moreover, as Defendants pointed out in their motion (*see* Defendants’ Memorandum of Law in Support of Motion to Dismiss (S.D.N.Y. Dkt. # 37, p. 9), Tartikov could have applied for an <u>area</u> variance. *See also,* TE1885 (the Village “Zoning Board[] of Appeal[] has authority to grant use <u>or area variances</u> to a property owner”) (emphasis added). Area variances have a completely different standard than use variances under New York law. *See* N.Y. Village Law §7-712-b(3); TE828-9.[39] Local zoning boards “have broad discretion in considering applications for area variances …” *Hargraves v. Rye ZBA*, 162 A.D.3d 1022, 1023

---

[39] Village Law § 7-712-b is the same statute that covers use variances. The same Village Zoning Code, §130-28, would apply to both.

(2d Dept. 2018). Tartikov offered no evidence that it could not have applied for an area variance, and the record is silent on this issue.[40]

Tartikov (T.Br. 77-8) relies upon the absence of a use variance to excuse its failure to comply with *Murphy's* one meaningful application rule. As this Court pointed out in *Safe Harbor Retreat*, 629 Fed. Appx. at 65, however, where one "door has definitely closed," and there was "another, perfectly good door nearby," plaintiff "must try to open it before running to federal court."

## C.     Tartikov Cannot Rely On Futility

Tartikov asserts (T.Br. 75) that it suffered an injury independent of the land use decision. It did not. This Court has recently reaffirmed that even a claim of intentional discrimination does not relieve a party of the necessity of one application. *See Islamic Community Center*, 2018 U.S. App. LEXIS 18369 at *6. Tartikov's only demonstrated injury was the inability to use its property as it allegedly intended, which is not an independent injury.

Tartikov next claims that any application would have been futile. T.Br. 79. As the District Court recognized (A275), futility is a "narrow" exception. *See Nenninger*, 509 Fed. Appx. at 38. *Murphy* limits futility to cases where the local government agency lacks discretion to grant the relief requested, or makes it clear

---

[40] Tartikov cannot attempt to argue now that area variances are unavailable or futile.

any application will be denied. 402 F.3d at 349. Prior to filing suit, it was not clear that any application here would have been denied. To the contrary, the Village Attorney had just invited an application. The District Court recognized that hostility or negative statements are insufficient (A283-284), which *Islamic Community Center*, 2018 U.S. App. LEXIS 18369, confirms. There, this Court expressed concern over "the troubling reports … regarding anti-Muslim animus," yet still held the case unripe. *Id.*, at *9.

Tartikov (T.Br. 78) also asserts that the Village Board lacked the ability to grant an application. However, Tartikov offered no evidence of that concerning either an area variance or zone change.[41]

Moreover, as the District Court pointed out (A278), a party is required to submit one meaningful application before it can claim futility. "[T]his exception protects property owners from being required to submit multiple applications," not from the "obligation to file" the first one. *Id.*, quoting *Southern Pacific Transp.*, 922 F.2d at 504. Numerous other Circuits agree that futility can only be invoked after an initial application. *See*, *e.g.*, *Guatay Christian Fellowship*, 670 F.3d at 982; *DLX v. Kentucky*, 381 F.3d 511, 525 (6th Cir. 2004), *cert. den.*, 544 U.S. 961

---

[41] As to the text amendment, Tartikov only argued it should not have to apply for one (A276), not that the Board <u>lacked the discretion</u> to grant one. "[M]ere doubt that their application would be denied is insufficient…." *Dreher v. Doherty*, 531 Fed. Appx. 82, 83 (2d Cir. 2013).

(2005); *Gilbert v. Cambridge*, 932 F.2d 51, 61 (1st Cir. 1991), *cert. den.*, 502 U.S. 1051 (1992); *Unity Ventures v. Lake Cty.*, 841 F.2d 770, 776 (7th Cir. 1988), *cert. den.*, 1988 U.S. LEXIS 4331 (1988). Tartikov never addressed this requirement, which bars its futility claim.

Tartikov instead contends that an application would be futile because there "is no uncertainty as to how the Challenged Laws affect the Plaintiffs." T.Br. 77-8. As proof of that, Tartikov relies on certain findings by the District Court in its Decision <u>after trial</u>. Those findings have no application to the District Court's ruling dismissing Tartikov's as-applied challenge 4½ years <u>before trial</u>. *See, e.g., Members for a Better Union v. Bevona,* 152 F.3d 58 (2d Cir. 1998) (the district court held a five-day bench trial but in deciding subject matter jurisdiction, this Court only considered facts at the time the case was filed); *see also Wisconsin Bell v. Bridge,* 334 F. Supp.2d 1127, 1137 (W.D. Wisc. 2004) (in deciding ripeness "subsequent events would be irrelevant") citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 571 n.4 (1992).[42] It would be unfair to reverse a trial court's ruling on a motion to dismiss based on subsequent evidence without allowing the court the opportunity to evaluate the evidence in relation to its earlier ruling.

_____

[42] Thus, Tartikov's references to what the "district court ultimately found" (*see, e.g.*, T.Br. 77-8) are irrelevant.

Moreover, Tartikov's argument is built on the false premise that no "other application procedure [was] available." T.Br. 76. Had Tartikov applied for the recommended zone change or text amendment, the Board might have altered the very provisions that the District Court found "preclude the rabbinical college from being built." A775. For example, the Accreditation requirement was not enacted to exclude legitimate colleges (*see* TE1893). No Village official (nor Tartikov itself when it purchased the Property) knew such a rabbinical college could not be accredited. Therefore, the Village might very well have relieved Tartikov of that requirement on a showing this unique rabbinical college was legitimate. As Tartikov never made the recommended application, there is no way to know. The District Court, on the motion record, properly concluded "the question of how the Village's zoning ordinances would be applied is purely speculative…." A280.[43] Tartikov had the burden to submit an application to end that speculation. Tartikov improperly ran to court rather than submit an application. Tartikov has been

---

[43] The cases Tartikov cites regarding uncertainty have no relevance to Tartikov's situation. In *Palazzolo v. Rhode Island*, 533 U.S. 606, 618-19 (2001), the landowner actually submitted two proposals, which were both denied. In *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1013 (1992), the agency stipulated that no permit would have been issued. *See also MacDonald, Sommer & Frates v. Yolo County*, 477 U.S. 340, 351 (1986) (owner submitted one subdivision proposal but Board had not given final definitive position); *Suitum v. Tahoe Regional Planning Agency*, 520 U.S. 725, 739 (1997) ("agency has no discretion to exercise").

offering various excuses for its action since, but the fact remains - without an application there can be no as-applied challenge.

## VII.

## TARTIKOV FAILED TO PROVE ITS OTHER RLUIPA CLAIMS

### A.    Tartikov Did Not Prove Its Equal Terms Claim

As the District Court stated in its decision, there are three types of equal terms violations:

> (1) a statute that facially differentiates between religious and nonreligious assemblies or institutions; (2) a facially neutral statute that is nevertheless 'gerrymandered' to place a burden solely on religious, as opposed to non-religious, assemblies or institutions; or (3) a truly neutral statute that is selectively enforced against religious, as opposed to non-religious[,] assemblies or institutions.

A855.  The third type of violation is not applicable here and was not addressed by the District Court or briefed by Tartikov.

As to the first type, the District Court found Tartikov failed to prove the Challenged Laws facially differentiate between religious and nonreligious uses.[44]

Tartikov argued that, unlike educational institutions, libraries and museums are not

---

[44] Tartikov erroneously labels the District Court's ruling a mixed question of law and fact, asserting that requires *de novo* review. T.Br. 80.  First, the ruling is based on the District Court's factual findings regarding the comparison to non-religious libraries and museums so the review standard should be clearly erroneous.  Second, this Court reviews mixed questions of law and fact either *de novo* or clearly erroneous depending on whether legal or factual questions predominate. *Cornell v. Kirkpatrick,* 665 F.3d 369, 380 (2d Cir. 2011).  Here factual questions predominate.

subject to any specific building coverage or floor area limitations.[45]  The District

Court concluded this was only partially correct, stating that libraries and museums

are subject to a maximum lot restriction.  A856.  Tartikov, claiming that

educational institutions are treated differently than libraries and museums (T.Br.

82), misses the point.  The statutes it claims violate Equal Terms are laws

regarding educational institutions.  Libraries and museums are not educational

institutions.  As they are not subject to the Challenged Laws they are not valid

comparators.

Citing *Third Church of Christ, Scientist v. City of New York*, 626 F.3d 667,

670 (2d Cir. 2010), Tartikov says this Court has recognized there can be "less than

equal" treatment if the impact of the religious use causes no greater harm than that

of the non-religious use.  T.Br. 83.  Tartikov's reliance on this case is misplaced,

because in *Third Church*, this Court agreed with the lower court that plaintiff

church's catering activities were similar to those of the co-op and hotel

comparators.  *Id*. at 671-72.[46]  Tartikov makes no claim, and there is no evidence to

support any claim, that its hypothetical college engages in the same activities as

_____

[45] Tartikov says the District Court found that its use was subject to greater
development restrictions.  T.Br. 82.  This is incorrect.  The court found that
museums and libraries are not subject to any explicit floor coverage limitation
A856.

[46] The Village notes that *Third Church* was an as-applied challenge, not a facial
challenge.

libraries and museums. "[A] comparator for an equal terms claim must be similarly situated *with regard to the regulation at issue.*" *Tree of Life Christian Schools v. Upper Arlington*, 2018 U.S. App. LEXIS 26400, at *22 (6th Cir. 2018) (emphasis in original). At issue here are the Challenged Laws, laws that do not apply to libraries or museums.

Tartikov seeks to compare the environmental and infrastructure impacts of libraries and museums versus those of its proposed college. T.Br. 84. Since libraries and museums are not valid comparators, this argument is equally without merit. Even if it was a viable argument, since there is no evidence as to what Tartikov actually intends to build, comparison is not possible.

Tartikov also claims that <u>its</u> project was treated unequally. Again, Tartikov compares its hypothetical college with non-educational institutions. As the District Court ruled, the Challenged Laws treat all educational institutions the same. To use the terminology of the statute cited by Tartikov, under the Challenged Laws, "a" religious school is not treated on less than equal terms than "a" non-religious school.

Tartikov further claims an Equal Terms violation because, unlike museums and libraries, schools must obtain a special permit. This argument fails for same reason — <u>all</u> schools, religious or secular, are required to obtain a special permit.[47]

**B.**   <u>**Tartikov Did Not Prove Its Exclusion And Limits Claim**</u>

To succeed on this RLUIPA claim Tartikov had to prove that the Challenged Laws totally exclude all religious assemblies from the Village. *Adhi Parasakthi Charitable v. W. Pikeland,* 721 F.Supp.2d 361, 386-7 (E.D. Pa. 2010). Noting that there are currently three houses of worship in the Village, the District Court found that there was no evidence that all religious institutions were excluded. The court noted that Tartikov used the incorrect "frame of reference" for its test, i.e., that if Tartikov can show that it was excluded, it wins: "Plaintiffs' interpretation of the total exclusion provision finds no support in the law." A850. Tartikov failed to present any evidence, of the Village's laws pertaining to other religious

---

[47] Tartikov does not assert the second type of violation, that the Challenged Laws were "gerrymandered" to place a burden solely on religious institutions. Here, each of the Challenged Laws applies to <u>all</u> educational institutions. There are no distinctions, or "carve-outs" for nonreligious educational uses. Tartikov offered no evidence that the Laws burden "almost only" religious uses.

institutions.  Further, the Challenged Laws concern schools[48], not religious institutions.[49]

With no supporting authority, Tartikov argues a different statutory interpretation is possible.  T.Br. 87-8.  It contends that the statute could have been written to require exclusion of "all religious assemblies" and, therefore, Congress must have meant to prohibit the exclusion of some particular religious assemblies like Tartikov.  *Id.*[50]  The statute, however, says "totally excludes religious assemblies," not a religious assembly or some religious assemblies.  Tartikov's sojourn into alternative statutory interpretation is fruitless.

Nonetheless, Tartikov asks the Court to adopt an interpretation of the statute that means that no religious assembly (i.e., Tartikov's "one of a kind" college) can be excluded.  However, the cases from which Tartikov extracts snippets do not support this position.  In *Vision Church*, the Seventh Circuit states "[i]n the present case, the Village, by permitting churches in all residential districts as a special use,

---

[48] Tartikov claims that the District Court agreed that any school "is banned throughout Pomona by virtue of the Wetlands Law"  T.Br. 87.  The District Court made no such finding. *See* A796-7.

[49] In a footnote (T.Br. 87 n.22), Tartikov claims that there is no administrative procedure to permit its proposed use.  As discussed (*see supra* p. 56), this is not correct.

[50] Tartikov claims the language of the statute is "ambiguous," but a plain reading of the statute reveals that is incorrect.  Therefore, delving into the legislative history is unnecessary.

has not completely or totally excluded religious assembles from its jurisdiction."

468 F.3d at 990. In, *Eagle Cove Camp & Conf. Ctr. v. Woodboro*, 734 F.3d 673,

680 (7th Cir. 2013), analyzing plaintiff's total exclusion claim relating to a

proposed Bible camp, the court ruled, not based on a particular use, but because

"[i]t is further undisputed that Eagle Cove could construct a religious church or

school on the subject property. This is hardly a complete and total exclusion".

Thus, the 7th Circuit looked at <u>other</u> types of uses that were not proposed by the

plaintiff. In *Calvary Chapel Bible Fellowship v. Riverside*, 2017 U.S. Dist. LEXIS

217331 * 57-8 (C.D.Cal. Aug. 18, 2017), the court held that, "because the

undisputed evidence shows that such a large portion of the County is zoned to

allow religious institutions, [plaintiff] cannot meet its burden of showing that the

County 'totally excludes' or 'unreasonably limits' religious assembles in violation

of RLUIPA." Similarly in *Int'l Church v. San Leondro*, 632 F. Supp. 2d 925, 948

(N.D. Cal. 2008), *rev'd. on other grounds*, 634 F.3d 1037 (4th Cir. 2011), the court

noted that the city allowed churches in all residential zones. *See also Petra*

*Presbyterian Church v. Northbrook*, 409 F.Supp.2d 1001, 1007 (N.D. Ill. 2006)

*aff'd* 489 F.3d 846 (7th Cir. 2007) ("70% of land in Northbrook is located in zoning

districts where Religious Organizations may locate either as of right or by way of

special permit); *Adhi Parasakhti*, 721 F.Supp.2d at 376 ("The Ordinance does not

close out religious expressive speech, but instead seeks to insure that it occurs in a

time, place, and manner that is consistent with the government's land use goals").

Thus, not one case Tartikov cites supports its flawed interpretation.

Under Tartikov's reasoning, any type of religious assembly, of any size, shape or form should be allowed anywhere in a municipality. Such reasoning turns the principles of land use on their head and eviscerates a municipality's zoning powers.[51]

## **CONCLUSION**

For all of the above reasons, the Defendants' appeal should be granted and the Plaintiffs' cross-appeal denied

---

[51] The District Court ruled in favor of the Village in Tartikov's RLUIPA Unreasonable Limitations and *Berenson* causes of action. *See* A851-853; A862-864. As Tartikov has not addressed these causes of action, or the issues underlying them, in its brief, such claims are deemed waived on appeal.

Dated:  Stamford, Connecticut
        November 6, 2018

                            APPELLANTS


                    By: /s/ John F.X. Peloso, Jr.
                        John F.X. Peloso, Jr, Esq.
                        Thomas J. Donlon, Esq.
                        ROBINSON & COLE LLP
                        1055 Washington Boulevard
                        Stamford, CT  06901

                        Marci A. Hamilton, Esq.
                        36 Timber Knoll Drive
                        Washington Crossing, PA  18977

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.      This document complies with the word limit of Federal Rule of Appellate Procedure 32 and Local Rule 32.1(a)(4)(A) because excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f).

☒      The document contains 16,298 words, or

☐      The document uses a monospaced typeface and contains _____ lines of text.

2.      This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

☒      This document has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14 point font, or

☐      The brief has been prepared in a monospaced typeface using _____ with _____.

/s/ John F.X. Peloso, Jr
John F.X. Peloso, Jr, Esq.
Thomas J. Donlon, Esq.
ROBINSON & COLE LLP
1055 Washington Boulevard
Stamford, CT  06901
Telephone:  (203) 462-7500
November 6, 2018