No.

IN THE

# Supreme Court of the United States

CONGREGATION RABBINICAL COLLEGE
OF TARTIKOV, INC., *et al.*,

*Petitioners,*

*v.*

VILLAGE OF POMONA, N.Y., *et al.*,

*Respondents.*

———————

ON PETITION FOR A WRIT OF CERTIORARI TO THE UNITED
STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

## PETITION FOR A WRIT OF CERTIORARI

JOSEPH A. CHURGIN
DONNA C. SOBEL
SAVAD CHURGIN
55 Old Turnpike Road,
   Suite 209
Nanuet, New York 10954
(845) 624-3820

ROMAN P. STORZER
STORZER & ASSOCIATES, P.C.
1025 Connecticut Avenue NW,
   Suite 1000
Washington, DC 20036
(202) 857-9766

JOHN G. STEPANOVICH
   *Counsel of Record*
JAMES M. HENDERSON, SR.
   *Of Counsel*
STEPANOVICH LAW, PLC
618 Village Drive, Suite K
Virginia Beach, Virginia 23454
(757) 410-9696
john@stepanovichlaw.com

*Counsel for Petitioners*

296576



COUNSEL PRESS

(800) 274-3321 • (800) 359-6859

*i*

## QUESTION PRESENTED

When it enacted the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §§ 2000cc, *et seq.*, Congress created a cause of action allowing a claimant to "obtain appropriate relief against a government." *Id.* § 2000cc-2(a). Congress expressly directed that standing "to assert a claim" "shall be governed by the general rules of standing under article III of the Constitution." *Id.* The Second Circuit below, as have the Third, Sixth, and Ninth Circuits, looked beyond those general rules of standing under Article III, and, relying on other considerations, concluded that the Petitioners lacked standing to assert RLUIPA claims arising under the Substantial Burdens provision of the Act, 42 U.S.C. § 2000cc(a), as well as claims arising under the Fair Housing Act ("FHA") and the Free Exercise Clause of the First Amendment. In doing so, the Second Circuit entered a decision in conflict with decisions of the First, Fifth, Seventh, and Eleventh Circuits.

The question presented is:

Whether, under RLUIPA's Substantial Burdens provision, an owner of real property seeking to use such property for religious exercise has Article III standing to challenge a municipality's zoning law that prohibits outright the owner's proposed land use without first being required to either apply for permits or variances that the municipality has no power to grant or to seek a *legislative* change to the zoning law from the municipality?

*ii*

## PARTIES TO THE PROCEEDINGS
## IN THE SECOND CIRCUIT

In the court below, the Defendants-Appellants-Cross Appellees were Village of Pomona, N.Y., ("Village" or "Pomona"), the Board of Trustees of the Village of Pomona, N.Y., Ian Banks, as Trustee and in his official capacity, Alma Sanders-Roman, as Trustee and in her official capacity, Rita Louie, as Trustee and in her official capacity, Brett Yagel, as Trustee and in his official capacity, and Nicholas L. Sanderson, as Mayor. The Plaintiffs-Appellees-Cross Appellants were Congregation Rabbinical College of Tartikov, Inc, ("Tartikov"), Rabbi Mordechai Babad, Rabbi Wolf Brief, Rabbi Herman Kahana, Meir Margulis, Rabbi Meilech Menczer, Rabbi Jacob Hershkowitz, Rabbi Chaim Rosenberg, and Rabbi David A. Menczer.

*iii*

### RULE 29.6 CORPORATE
### DISCLOSURE STATEMENT

Pursuant to Rule 14.1(b)(ii) and Rule 29.6 of the Rules of the Supreme Court, Petitioner Tartikov discloses that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

*iv*

## LIST OF ALL PROCEEDINGS

1.  U.S. District Court for the Southern District of New York, Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona, 07–CV–6304 (KMK), Docket No. 53, January 4, 2013.

2.  U.S. District Court for the Southern District of New York, Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona, 07–CV–6304 (KMK), Docket No. 207, September 29, 2015.

3.  U.S. District Court for the Southern District of New York, Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona, 07–CV–6304 (KMK), Docket No. 333, December 7, 2017.

4.  U.S. Court of Appeals for the Second Circuit, Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona, NY, Case 18-869, Documents 242-243, December 20, 2019.

5.  U.S. Court of Appeals for the Second Circuit, Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona, NY, Case 18-869, Document 262, February 6, 2020.

*v*

## TABLE OF CONTENTS

*Page*

QUESTION PRESENTED . . . . . . . . . . . . . . . . . . . . . . . i

PARTIES TO THE PROCEEDINGS IN
   THE SECOND CIRCUIT . . . . . . . . . . . . . . . . . . . . ii

RULE 29.6 CORPORATE DISCLOSURE
   STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

LIST OF ALL PROCEEDINGS . . . . . . . . . . . . . . . . . . iv

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . .v

TABLE OF APPENDICES . . . . . . . . . . . . . . . . . . . . . vii

TABLES OF AUTHORITIES . . . . . . . . . . . . . . . . . . . viii

PETITION FOR A WRIT OF CERTIORARI. . . . . . . .1

CITATIONS OF OPINIONS AND ORDER . . . . . . . . .1

CONCISE STATEMENT OF JURISDICTION . . . . .1

CONSTITUTIONAL PROVISIONS,
   TREATIES, STATUTES, ORDINANCES,
   AND REGULATIONS INVOLVED . . . . . . . . . . . .2

CONCISE STATEMENT OF THE CASE . . . . . . . . .2

STATEMENT OF THE BASIS FOR
   FEDERAL JURISDICTION IN THE
   DISTRICT COURT. . . . . . . . . . . . . . . . . . . . . . . . .8

*vi*

*Table of Contents*

*Page*

REASONS FOR GRANTING THE WRIT . . . . . . . . . .8

Review is Warranted Because The Court Below Has Entered a Decision in Conflict with the Decisions of Other United States Courts of Appeal on the Same Important Matter . . . . .11

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .33

*vii*

## TABLE OF APPENDICES

*Page*

APPENDIX A — OPINION OF THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT, DATED DECEMBER 20, 2019 . . . . . . . . . . . . . . . . . . . . . . . . .1a

APPENDIX B — OPINION & ORDER OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, FILED DECEMBER 7, 2017 . . . . . .92a

APPENDIX C — OPINION AND ORDER OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, FILED SEPTEMBER 29, 2015 . .233a

APPENDIX D — OPINION AND ORDER OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, FILED JANUARY 7, 2013 . . .408a

APPENDIX E — DENIAL OF REHEARING OF THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT, FILED FEBRUARY 6, 2020 . . . . . . . . . . . . . . . .536a

APPENDIX F — RELEVANT CONSTITUTIONAL AND STATUTORY PROVISIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . .538a

*viii*

## TABLE OF CITED AUTHORITIES

*Page*

**Cases**

*Abbott Labs. v. Gardner,*
    387 U.S. 136 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

*Church of Our Lord & Savior Jesus Christ v.*
    *City of Markham, Illinois,*
    913 F.3d 670 (7th Cir. 2019) . . . . . . . . . . .10, 11, 24, 27

*Cohens v. Virginia,*
    6 Wheat. 264 (1821) . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

*Colorado River Water Conservation Dist. v.*
    *United States,*
    424 U. S. 800 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

*Columbia Broad. Sys. v. United States,*
    316 U.S. 407 (1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

*Congregation Anshei Roosevelt v. Planning &*
    *Zoning Bd. of Borough of Roosevelt,*
    338 F. App'x 214 (3d Cir. 2009) . . . . . . . . . . .10, 12, 31

*Dougherty v. Town of N. Hempstead Bd. of*
    *Zoning Appeals,*
    282 F.3d 83 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . .19

*Grace Community Church v. Lenox Township,*
    544 F.3d 609 (6th Cir. 2008) . . . . . . . . . . . . . . . . . . . .23

*ix*

*Cited Authorities*

*Page*

Guatay Christian Fellowship v.
  Cty. of San Diego,
  670 F.3d 957 (9th Cir. 2011)............10, 11, 25, 26

Herrington v. County of Sonoma,
  857 F.2d 567 (9th Cir. 1988).....................28

Knick v. Twp. of Scott, Pennsylvania,
  139 S. Ct. 2162 (2019).......................16, 17

Lujan v. Defenders of Wildlife,
  504 U.S. 555 (1992)..........................13, 14

MacDonald, Sommer & Frates v. Yolo Cnty.,
  477 U.S. 340 (1986)............................24

Midrash Sephardi, Inc. v. Town of Surfside,
  366 F.3d 1214 (11th Cir. 2004)............. passim

Miles Christi Religious Order v.
  Twp. of Northville,
  629 F.3d 533 (6th Cir. 2010)............... passim

Murphy v. New Milford Zoning Comm'n,
  402 F.3d 342 (2d Cir. 2005) ..........19, 25, 29, 31

Nasierowski Bros. Inv. Co. v. City of Sterling
  Heights,
  949 F.2d 890 (6th Cir. 1991).....................19

*x*

*Cited Authorities*

*Page*

*Nat'l Org. for Marriage, Inc. v. Walsh,*
    714 F.3d 682 (2d Cir. 2013) . . . . . . . . . . . . . . . . . . . . . .13

*Opulent Life Church v.*
    *City of Holly Springs, Miss.,*
    697 F.3d 279 (5th Cir. 2012). . . . . . . . . . . . . . . *passim*

*Raines v. Byrd,*
    521 U.S. 811 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . .9

*Roman Catholic Bishop v. City of Springfield,*
    724 F.3d 78 (1st Cir. 2013). . . . . . . . . . . . . . . . *passim*

*Simon v.*
    *Eastern Ky. Welfare Rights Organization,*
    426 U.S. 26 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . .15

*Sprint Communications, Inc. v. Jacobs,*
    571 U.S. 69 (2013). . . . . . . . . . . . . . . . . . . . . . . . . . . .8

*Steel Co. v. Citizens for Better Environment,*
    523 U.S. 83 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . .9

*Temple B'Nai Zion, Inc. v.*
    *City of Sunny Isles Beach, Fla.,*
    727 F.3d 1349 (11th Cir. 2013). . . . . . . . . .10, 12, 25, 30

*Tree of Life Christian Sch. v.*
    *City of Upper Arlington,*
    536 F. App'x 580 (6th Cir. 2013) . . . . . . . . . . . . . . . . .24

*xi*

*Cited Authorities*

*Page*

*Triple G Landfills, Inc. v. Bd. of Comm'rs,*
     977 F.2d 287 (7th Cir. 1992) . . . . . . . . . . . . . . . . . . . .21

*Warth v. Seldin,*
     422 U.S. 490 (1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

*Williamson Cnty. Reg'l Planning Comm'n v.*
     *Hamilton Bank,*
     473 U.S. 172 (1985) . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Yee v. City of Escondido,*
     503 U.S. 519 (1992) . . . . . . . . . . . . . . . . . . . . . . . 22, 30

**Statutes and Other Authorities**

Article I of the United States Constitution . . . . . . . . . . .2

Article III of the United States Constitution . . . *passim*

28 U.S.C. § 1254(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

28 U.S.C. § 1343(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

28 U.S.C. § 1343(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

28 U.S.C. § 1367(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

28 U.S.C. § 2201 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

*xii*

*Cited Authorities*

*Page*

28 U.S.C. § 2202. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

42 U.S.C. § 1983. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

42 U.S.C. § 2000cc(a)(1). . . . . . . . . . . . . . . . . . . . . . . .20

42 U.S.C. § 2000cc(b)(1) . . . . . . . . . . . . . . . . . . . . . . . .20

42 U.S.C. § 2000cc(b)(2) . . . . . . . . . . . . . . . . . . . . . . . .20

42 U.S.C. § 2000cc-2(a) . . . . . . . . . . . . . . . . . . . . . .9, 15

42 U.S.C. § 2000cc-5(7)(B) . . . . . . . . . . . . . . . . . . . . . .22

42 U.S.C. § 3513(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

42 U.S.C. § 2000cc. . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

13B Wright & Miller, *Federal Practice & Procedure*
   § 3532.1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

Village of Pomona Code § 130-9 . . . . . . . . . . . . . . . . . .5

Village of Pomona Code § 130-28(D). . . . . . . . . . . . . . .6

Village of Pomona Code § 130-10(F). . . . . . . . . . . . . . .6

1

## PETITION FOR A WRIT OF CERTIORARI

Tartikov, Rabbi Mordechai Babad, Rabbi Wolf Brief, Rabbi Herman Kahana, Meir Margulis, Rabbi Meilech Menczer, Rabbi Jacob Hershkowitz, Rabbi Chaim Rosenberg, and Rabbi David A. Menczer respectfully petition for a writ of certiorari to review the judgment of the United States Court of Appeals for the Second Circuit in this case.

## CITATIONS OF OPINIONS AND ORDER

The opinion of the court of appeals (Petitioners' Appendix ("App.") *infra*, 1a-91a) is reported at 878 F.3d 488. The district court's opinion granting judgment after trial to the petitioners (App. 92a-232a) is reported at 280 F. Supp. 3d 426. The district court's decision on cross-motions for summary judgment (App. 233a-407a) is reported at 138 F. Supp. 3d 352. The district court's decision on the motion to dismiss (App. 408a-535a) is reported at 915 F. Supp. 2d 574.

## CONCISE STATEMENT OF JURISDICTION

The Second Circuit issued its opinion on December 20, 2019. App. 1a-91a. On February 6, 2020, the Second Circuit denied a petition for rehearing or rehearing en banc. App. 536a-537a.

On March 19, 2020, this Court entered an Order extending "the deadline to file any petition for a writ of certiorari due on or after the date of this order . . . to 150 days from the date of the lower court judgment, order denying discretionary review, or order denying a timely petition for rehearing."

2

This Court has jurisdiction under 28 U.S.C. § 1254(1).

## CONSTITUTIONAL PROVISIONS, TREATIES, STATUTES, ORDINANCES, AND REGULATIONS INVOLVED

Relevant provisions of the First and Fourteenth Amendments of the United States Constitution, of Article I of the Constitution of the State of New York, of RLUIPA, and of the FHA are set forth in the appendix. App. 24a, 96a.

## CONCISE STATEMENT OF THE CASE

In 2004, Tartikov purchased approximately 100 acres of land in Pomona, New York to build a rabbinical college to train students to become rabbinical judges (*dayanim*). App. 24a, 96a. This project is motivated by the sincerely held religious belief of Tartikov to establish rabbinical courts, or *bais din*, and by the sincerely held religious beliefs of the individual students to become rabbinical judges to serve in *bais din*.[1] App. 31a. Tartikov's rabbinical college will be a Torah community in which students isolate themselves from outside distractions and devote themselves to mastering the Code of Jewish Law in order to become full-time *dayanim*. App. 31a-32a. Jewish law requires Tartikov's students to marry young, to have large families, to live with their families, and to teach

---

1. Orthodox Jews use *bais din* to resolve disputes between and among them and to provide religious guidance to members of their community for the religious issues that arise frequently concerning the proper application of the laws that govern every aspect of their daily lives. App. 96a.

3

their children the Torah. App. 178a. The rabbinical college will include housing for students and their families so that the students can study day and night while meeting their religious obligations to their families. App. 96a-99a.

In the 2000s, Pomona passed a series of laws that blocked Tartikov's ability to build its college (the "Challenged Laws"). Pomona's 2004 Law, prohibiting student family housing[2] and requiring schools to be accredited,[3] excludes Tartikov's use completely from the Village.[4] Pomona then passed two additional ordinances

---

2.  Student family housing is necessary because most students will be married with children, and will need to live on campus because of the rigor of the program. The Court of Appeals left these findings undisturbed on appeal. App. 31a-32a, 85a, 98a, 176a-179a, 181a.

3.  Neither New York State nor any other accrediting agency could accredit Tartikov, a requirement under the 2004 Law, because the school must already be in existence to be accredited. Thus, Tartikov found itself in a Catch-22 situation; it cannot be accredited until its facilities exist, and its facilities cannot be built until it is accredited. App. 100a.

4.  Significant evidence confirmed that Pomona targeted Orthodox Jews by its adoption of the 2004 Law. Such evidence included Pomona targeting the Orthodox/Hasidic community in the adjacent Town of Ramapo by opposing the same type of adult student housing that Pomona's 2004 Law prohibited on the basis that such student housing accommodated Orthodox/ Hasidic Jews; and that the Village Trustees passed a resolution excoriating public officials "who abdicate their responsibility of office by placing the politics of special interest groups," referring to the Orthodox/Hasidic community, "ahead of the best interest of the people . . . ." App. 128a-130a, 68a. The Court of Appeals, however, disagreed with the District Court's trial findings on that issue. App. 72a-75a. Instead the Court blamed the Hasidic community for the hostility directed toward them. App. 67a-68a.

4

in 2007, a law that restricted the amount of building space devoted to housing students and a "Wetlands Law" that prohibited access to the property at issue, both of which also effectively prohibited the rabbinical college use. Local Law No. 1 of 2007, which amended provisions of the Dormitory Law originally adopted in 2004, was passed "during a contentious Board of Trustees meeting" where Village residents stated their opposition to Tartikov's development because it was proposed by Orthodox/Hasidic Jews. App. 130a.

Village trustees announced their intent to thwart Tartikov's plans. In 2007, three Trustees published campaign materials urging voters to "stand up to the threat" that Tartikov posed. App. 132a-133a. In a campaign video, one Trustee warned that the rabbinical college "could completely change the village and the *make-up* of the village." App. 114a, 133a. Two others authored a letter to the editor of the local newspaper calling Tartikov's proposed residents "homogeneous" individuals, then intentionally spoliated both a Facebook post regarding Orthodox/Hasidic Jews as well as text messages between them about the Facebook post to prevent Tartikov's attorneys (and the trial court) from becoming aware of the evidence. App. 114a, 133a-134a, 268a-272a, 284a-287a. One Trustee stated that Pomona should "maintain[] its cultural and religious diversity." App. 134a.

Tartikov sued the Village in 2007, challenging these laws together with a 2001 Law that regulated educational institutions.[5] Tartikov argued in part that Pomona

---

5. The 2001 Law is not at issue in this Petition.

5

adopted the Challenged Laws because of the Village's hostility toward Orthodox Jews.[6] Moreover, Tartikov argued that the Challenged Laws burdened Plaintiffs' religious exercise in violation of RLUIPA's Substantial Burdens provision by prohibiting their religious land use throughout the Village.[7] App. 169a.

Following a ten-day trial, the District Court found that Pomona had enacted all of the Challenged Laws to "thwart the development of the rabbinical college because it was proposed by Orthodox/Hasidic Jews." App. 226a. The Court of Appeals affirmed these findings with respect to both 2007 Laws but reversed with respect to the 2001 Law and 2004 Law. App. 58a-86a.

Tartikov's Substantial Burden claim derives from Pomona's 2004 and 2007 Laws, which completely prohibit the rabbinical college from existing within Pomona. Under Pomona's regulations, a use that is not permitted by its zoning code may not be established. Village of Pomona Code § 130-9. Pomona consists of a single zoning district, the "R-40" district, which permits certain uses by right as "permitted uses," and other uses by "special permit." App. 116a. Uses that are neither permitted uses nor special permit uses may be allowed with a "use variance" if the

---

6.   Counts 4, 6, 7, 10 and 11 of Tartikov's Second Amended Complaint relied on Tartikov's discrimination theories. Additionally, Counts 12 and 13 stated claims under the Fair Housing Act, which were predicated on Tartikov's discrimination arguments, but were inexplicably grouped together with its "burden" claims by the Court of Appeals.

7.   Counts 1 and 5 of Tartikov's Second Amended Complaint relied on Tartikov's burden theories.

6

standard for a variance is met. Village of Pomona Code
§ 130-28(D). One element of that standard requires an
applicant for a use variance to prove that there is no other
possible economic use for the property. Pomona *admitted*
that Tartikov could not meet that standard. App. 117a.

An "Educational Institution" is a special permit use
within the R-40 district. Village of Pomona Code § 130-
10(F). While the 2004 Law permitted "Dormitories" as
part of an Educational Institution use, it explicitly forbade
family dwelling units as dormitories and dormitory rooms
with separate cooking, dining or housekeeping facilities.
App. 105a-106a. These prohibitions effectively excluded
the rabbinical college. App. 116a-117a. The 2004 Law also
prohibited non-accredited Educational Institutions, which
also excludes the rabbinical college, as described above. *Id*.

It was undisputed that no application of Pomona's
regulations could permit Tartikov to build its rabbinical
college. Pomona's zoning authorities do not "have the
discretion to issue a special use permit . . . ." App. 460a;
*see also* App. 195a, 210a. Furthermore, Tartikov "cannot
obtain a variance to develop its rabbinical college" because
it does not meet state law requirements for a variance.
App. 117a. Specifically, Tartikov cannot prove that there
is no other economic use for the property. *Id*. The Court
of Appeals did not address these specific holdings.

Pomona defended by arguing that Tartikov was
required to petition its Board, a legislative body, to
*amend* its laws *before* Tartikov's claims ripened. App.
197a. Additionally, Pomona admitted that the Board of
Trustees is "not required to consider a petition for a text
amendment." App. 197a. And, if Tartikov had submitted

7

such a petition, that petition would have been heard by the same Board members who sought and won election on their promises to stand up to the "threat" of Tartikov and who passed the 2007 laws to thwart Tartikov from building its rabbinical college. The text amendment process is not a "feasible solution" because it would have left Tartikov "at the mercy of the same body that has a now-proven history of discriminating against them." *Id.*

Because Pomona excluded Tartikov's rabbinical college outright through the Challenged Laws, the District Court held that Tartikov carried its burden of showing that the Challenged Laws substantially burden its religious exercise. App. 200a-201a. The District Court further held that Pomona failed to show both that the Challenged Laws furthered a compelling governmental interest and that they were the least restrictive means of furthering such an interest. App. 201a-202a.

Ignoring the merits of Tartikov's "burden" claims, in a one-paragraph discussion, the Court of Appeals reversed the District Court's decision and held that Tartikov lacked standing to challenge the Laws with respect to its "burden" (and FHA) claims because it had not submitted "a formal proposal" for its use. App. 55a. The Court of Appeals ignored the District Court's findings that no special permit or variance was available for Tartikov's use. App. 117a, 196a-197a. Without addressing the fact that the rabbinical college was prohibited outright, with no possibility to obtain a permit, variance, or other relief under the applicable regulations, the court held that the harm to Tartikov resulting from the outright prohibition of its use was "merely conjectural." App. 55a.

8

As a result of the 2004 Law, Tartikov, its students, and its faculty remain unable to exercise their religious beliefs sixteen years after purchasing the property. Pomona continues to exclude Tartikov's use of the property. App. 181a-183a.

## STATEMENT OF THE BASIS FOR FEDERAL JURISDICTION IN THE DISTRICT COURT

Petitioners invoked the jurisdiction of the District Court pursuant to 28 U.S.C. §§ 1331, 1343(3) and (4), 42 U.S.C. § 1983, 42 U.S.C. §§ 2000cc, *et seq.*, and 42 U.S.C. § 3513(a) to pursue redress for the deprivation of rights, privileges and immunities secured by the laws and Constitution of the United States. Petitioners invoked the jurisdiction of the District Court pursuant to 28 U.S.C. §§ 2201 and 2202 to obtain their requested declaratory relief. Petitioners invoked the supplemental jurisdiction of the District Court pursuant to 28 U.S.C. § 1367(a) to pursue redress for their claims arising under state law.

## REASONS FOR GRANTING THE WRIT

In *Sprint Communications, Inc. v. Jacobs*, 571 U.S. 69, 77 (2013), this Court stated:

> Federal courts, it was early and famously said, have 'no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given.' *Cohens v. Virginia*, 6 Wheat. 264, 404 (1821). Jurisdiction existing, this Court has cautioned, a federal court's 'obligation' to hear and decide a case is 'virtually unflagging.' *Colorado River Water Conservation Dist. v. United States*, 424 U. S. 800, 817 (1976).

9

In RLUIPA, Congress subjected certain disputes related to land use regulations and actions by governments to judicial review in an action brought by "a person" asserting "a violation of this chapter as a claim . . . ." *See* 42 U.S.C. § 2000cc-2(a). Further, Congress directed that a claimant's standing to sue would be judged by reference to standing principles under Article III of the United States Constitution:

> Standing to assert a claim or defense under this section shall be governed by the general rules of standing under article III of the Constitution.

*Id*. Congress lacks constitutional power to relieve Article III courts of their duty to assure themselves that a claimant satisfies constitutional requisites for standing. *See, e.g.*, *Steel Co. v. Citizens for Better Environment*, 523 U.S. 83, 94-95 (1998) (explaining this Court's independent duty to assure itself of Article III standing). As this Court has explained, however, "Congress may grant an express right of action to persons who otherwise would be barred by *prudential* standing rules." *Warth v. Seldin*, 422 U.S. 490, 501 (1975) (emphasis added); *Raines v. Byrd*, 521 U.S. 811, 820 n.3 (1997) (acknowledging that Congress *may* "grant a particular plaintiff the right to challenge an Act's constitutionality" and, in the process, "eliminate[] any prudential standing limitations and significantly lessen[] the risk of unwanted conflict with the Legislative Branch when that plaintiff brings suit.").

In the years subsequent to the enactment of RLUIPA, several of the Circuit Courts have divided into two camps with respect to their evaluation of the disputed standing of RLUIPA claimants. In one camp, the First, Fifth, Seventh, and Eleventh Circuits have concluded that RLUIPA

10

claimants that satisfied Article III considerations had established their standing to sue under RLUIPA. *See Roman Catholic Bishop v. City of Springfield*, 724 F.3d 78, 90-91 (1st Cir. 2013); *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 286-88 (5th Cir. 2012); *Church of Our Lord & Savior Jesus Christ v. City of Markham, Illinois*, 913 F.3d 670, 680-81 (7th Cir. 2019); *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1223-24 (11th Cir. 2004); *Temple B'Nai Zion, Inc. v. City of Sunny Isles Beach, Fla.*, 727 F.3d 1349, 1357-59 (11th Cir. 2013). In the second camp, the Second, Third, Sixth, and Ninth Circuits have concluded that RLUIPA claimants had failed to establish their standing to sue under RLUIPA, despite meeting the traditional standards for Article III standing, by requiring a showing of something additional[8] beyond injury, causation and redressability. *See* App. 1a-91a; *Miles Christi Religious Order v. Twp. of Northville*, 629 F.3d 533, 537-38 (6th Cir. 2010); *Guatay Christian Fellowship v. Cty. of San Diego*, 670 F.3d 957, 979-83 (9th Cir. 2011); *Congregation Anshei Roosevelt v. Planning & Zoning Bd. of Borough of Roosevelt*, 338 F. App'x 214, 218-19 (3d Cir. 2009).

Here, the Second Circuit disregarded its "virtually unflagging" "obligation" "to hear and decide a case," thus departing from both this Court's clear command *and* Congress' direct grant of jurisdiction over the claims that the Second Circuit dismissed. In so doing, the Second Circuit joined the Third, Sixth and Ninth Circuits in

---

8.  These Circuits are varied with respect to what other administrative, legislative or judicial remedies a plaintiff must seek—beyond the initial injury—before a claim becomes "ripe" for review.

11

turning away litigants seeking to assert claims under RLUIPA by adding additional requirements to satisfy their assessments of standing.

Worse, disregarding this Court's instruction and Congress' grant, the Second Circuit staked out a standard for determining one aspect of standing—*ripeness*—decidedly at odds with the standards that other Circuit Courts employ. In so doing, the Second Circuit entered a decision in conflict with the decisions of other United States Courts of Appeals. For this reason, the Court should grant the petition and issue its writ to review the judgment below.

**Review is Warranted Because The Court Below Has Entered a Decision in Conflict with the Decisions of Other United States Courts of Appeal on the Same Important Matter.**

Review of the decision below is necessary to resolve a well-developed split among eight of the Circuit Courts of Appeals regarding the applicable "ripeness" test for RLUIPA claims arising in the land use context. The First, Second, Third, Fifth, Sixth, Seventh, Ninth, and Eleventh Circuits have divided over the standards applicable to determining whether a RLUIPA claimant has satisfied standing requirements. *See Roman Catholic Bishop v. City of Springfield*, 724 F.3d 78, 90-91 (1st Cir. 2013); App. 1a-91a; *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 286-88 (5th Cir. 2012); *Miles Christi Religious Order v. Twp. of Northville*, 629 F.3d 533, 537-38 (6th Cir. 2010); *Church of Our Lord & Savior Jesus Christ v. City of Markham, Illinois*, 913 F.3d 670, 677-79 (7th Cir. 2019); *Guatay Christian Fellowship v. Cty. of*

12

*San Diego*, 670 F.3d 957, 979-83 (9th Cir. 2011); *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1223-24 (11th Cir. 2004); *Temple B'Nai Zion, Inc. v. City of Sunny Isles Beach, Fla.*, 727 F.3d 1349, 1357-59 (11th Cir. 2013). *See also Congregation Anshei Roosevelt v. Planning & Zoning Bd. of Borough of Roosevelt*, 338 F. App'x 214, 218-19 (3d Cir. 2009).

In *Tartikov*, the Second Circuit decidedly departed from the standard adopted by Congress for resolution of the questioned standing of a RLUIPA claimant to assert claims under Article III of the Constitution. Compounding its error, the Second Circuit adopted—for purposes of resolving the question of standing—a standard at odds with both Congress' instruction and with the decisions of other Circuit Courts. The Second Circuit reasoned:

> An injury in fact sufficient to confer standing is 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.' . . .
>
> Tartikov's claims fall into two distinct groups, each of which asserts a different alleged injury. . . .
>
> . . . . Whether Tartikov has standing to pursue each group of claims turns on whether the alleged injury is an injury in fact for Article III purposes.
>
> . . . . Tartikov's second group of claims . . . allege[] that the four challenged laws prevent it from building and operating a rabbinical

13

> college on the property and thus interfere with
> its religious freedom. Tartikov, however, never
> submitted a formal proposal for the building
> project, applied for a permit, or engaged in any
> other conduct that would implicate or invoke
> the operation of the challenged zoning laws.
> Whatever harm may arise from the application
> of the zoning laws to TRC's property is merely
> conjectural at this time.

App. 53a-55a.

Here, under well-established principles governing
Article III standing, Tartikov unquestionably had
constitutional standing to challenge a law that completely
prohibited its planned religious land use.[9] Article III
of the Constitution limits the authority of the federal
courts to the decision of "cases" and "controversies."
*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559 (1992).
For a dispute to be within the power of a federal court,

---

9.  While the Second Circuit used the term "standing," it
specifically applied the concept of ripeness. As it had previously
held,

> Constitutional ripeness, in other words, is really
> just about the first *Lujan* factor—to say a plaintiff's
> claim is constitutionally unripe is to say the plaintiff's
> claimed injury, if any, is not "actual or imminent," but
> instead "conjectural or hypothetical."

*Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 688 (2d Cir.
2013) (footnote omitted) (citing *Lujan*). *See* App. 55a ("Whatever
harm may arise from the application of the zoning laws to TRC's
property is merely conjectural at this time. We therefore lack
jurisdiction . . . .").

14

the claimant must have standing—that is, the claimant
must have alleged a sufficient interest in the dispute.
The "irreducible constitutional minimum" of standing
requires a plaintiff to establish three elements: (1) the
plaintiff has suffered a concrete injury; (2) that injury is
fairly traceable to actions of the defendant; and (3) it must
be likely—not merely speculative—that the injury will be
redressed by a favorable decision. *Id.* at 560-61.

Application of those Article III standing principles
would have satisfied the Second Circuit that Tartikov
possessed the requisite standing for its challenges. The
2004 Law contained an explicit prohibition on student family
housing—an integral component of Tartikov's planned
rabbinical college—where none previously existed. In
addition, the 2004 Law, which imposed a requirement that
educational institutions must be accredited, bars Tartikov
from building its rabbinical college because Tartikov, as
proposed, cannot be accredited by any accrediting body.
App. 100a ("It cannot be accredited by the Board of
Regents . . . [or] by the Association of Advanced Rabbinical
and Talmudic Schools").

Tartikov's injury was therefore both "(a) concrete
and particularized" and "(b) actual or imminent, not
conjectural or hypothetical . . . ." *Lujan,* 504 U.S. at 560.
The "causal connection between the injury and the conduct
complained of" is also obvious: Pomona's enactment of the
2004 Law imposed and implemented a heretofore non-
existent prohibition against student family housing. *Id.*
Finally, it was not only "likely," but certain that "the injury
[would have been] redressed by a favorable decision,"
as the court could have struck down the 2004 Law's
prohibition (as the district court did), which would have

15

removed the insurmountable legal obstacle that prevented the use. *Id.* (quoting *Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 38 (1976)).

Under RLUIPA's "Cause of Action" provision, all that is necessary to establish standing is that "irreducible constitutional minimum" of standing. *See* 42 U.S.C. § 2000cc-2(a) ("Standing to assert a claim or defense under this section shall be governed by *the general rules of standing under article III of the Constitution*") (emphasis added). In *Abbott Labs. v. Gardner*, 387 U.S. 136, 150 (1967), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977), this Court, quoting *Columbia Broad. Sys. v. United States*, 316 U.S. 407, 418-19 (1942), stated that the issuance of final regulations was a "final decision" for ripeness purposes because "'the expected conformity to them causes injury cognizable by a court of equity.'"

In concluding that Tartikov was required to "submit[] a formal proposal for the building project, appl[y] for a permit, or engage[] in any other conduct that would implicate or invoke the operation of the challenged zoning laws[,]"[10] the Second Circuit created a fourth, draconian

---

10.   As discussed above, there is no "permit," "variance," or other relief that is available to Tartikov. The only theoretical path to permitting Tartikov's use would be to amend or repeal the 2004 Law itself. App. 117a, 197a, 460a. Parsing the court's statement, it described three possibilities: "submitt[ing] a formal proposal," "appl[ying] for a permit," or "engag[ing] in any other conduct . . . ." App. 55a. The first does not exist in a vacuum; a proposal is "submitted" in the context of a land use application such as a special permit or variance, neither of which was available in this case. The second, again, was unavailable, as neither a special

16

prerequisite to establish standing, that a claimant must petition a legislative body to change a law before it can claim an "injury" cognizable under Article III.

The Second Circuit's interpretation of RLUIPA and Article III standing requirements directly conflicts with the legal standards enunciated by the First, Fifth, Seventh, and Eleventh Circuits, while aligning the Second Circuit with the Third, Sixth, and Ninth Circuits in largely abandoning Article III standing analysis in a misguided attempt to avoid exercising the jurisdiction Congress conferred on them by enacting RLUIPA. As we explain below, seven of the Circuit Courts have adopted interpretive rules for standing in RLUIPA cases; together with the decision below, those Circuits have adopted two divergent approaches that are hopelessly conflicted. That substantial disarray in the Circuit Courts over the standard to be applied in deciding the standing of RLUIPA claimants begs this Court to intervene to resolve the conflict.

Stretching this Court's decision in *Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172 (1985),[11] far beyond its original context, the Second,

_____

permit nor a variance would permit Tartikov's use. The third, vague statement "engaged in any other conduct" could refer to nothing other than petitioning the Pomona Board of Trustees for a text amendment to amend or repeal the 2004 Law, which is what the Village itself has argued. App. 197a.

11. The "poor reasoning" of *Williamson County* recently led the Court to overrule the second "prong" of that decision, that a landowner was required to avail itself of state remedies for a taking prior to being considered "ripe" for review. *Knick v. Twp. of Scott, Pennsylvania*, 139 S. Ct. 2162, 2174 (2019). That "poor reasoning" echoes sharply in the Second Circuit's conclusion

17

Third, Sixth, and Ninth Circuits have staked positions that are unmoored from the traditional application of the "injury in fact" requirement of Article III standing, imposing an atextual obligation to undertake efforts far exceeding Article III standing principles before federal courts deign to exercise jurisdiction. As discussed within, these Circuits, unlike the First, Fifth, Seventh, and Eleventh Circuits, have subjected RLUIPA claimants, as a *mandatory* prerequisite for invoking the jurisdiction of the federal courts, to the requirement that they have pursued one or more "variances" or other administrative applications. And no Circuit has adopted the Second Circuit's requirement that a claimant pursue a legislative remedy before its claim is ripe.

*First Circuit*: In *Roman Catholic Bishop v. City of Springfield*, 724 F.3d 78, 90-91 (1st Cir. 2013), the First Circuit confronted a RLUIPA claimant, the Catholic Bishop of Springfield, who asserted that the legislative designation of a Catholic Church property as a historic site sufficed to satisfy Article III principles of standing prerequisite to the Bishop's RLUIPA challenge to that historic designation. *Id*. at 83. In that case, the day

---

that Tartikov was required to engage in "any other conduct that would implicate or invoke the operation of the challenged zoning laws." App. 55a. Since it is undisputed that the *only* "conduct" available to Tartikov was to petition the Village's legislative body to repeal or change the 2004 Law—as opposed to seeking a permit or variance, which might have implicated *Williamson County's* first prong but which the Village admitted was not available to Tartikov—the reasoning of *Knick* is equally applicable here. *See id.* ("*Williamson County* was not just wrong. Its reasoning was exceptionally ill founded and conflicted with much of our takings jurisprudence."). The Second Circuit's requirement of seeking legislative change prior to having standing to challenge a law is as illogical as requiring the pursuit of state remedies for a taking.

18

immediately following the legislative enactment of the designation, the Bishop sued the City of Springfield, asserting that the disputed historic designation violated RLUIPA. *Id.* at 88. When he sued, the Bishop did not have any pending plan to make changes to the disputed church property that the Bishop would have been required to submit to the City for approval. *Id* at 83.

Directly contrary to the Second Circuit's decision, the First Circuit held that the bare legislative act—enacting a law designating a church as a historic district—sufficed to confer standing on the Bishop.

> To the extent that RCB has argued that the mere existence of the Ordinance creates a ripe controversy, we find that its claims are ripe. With regard to this attack on the enactment of the Ordinance, RCB has credibly alleged that the requirement of submitting to the SHC's authority presently imposes delay, uncertainty, and expense, which is sufficient to show present injury. *See Opulent Life Church v. City of Holly Springs,* 697 F.3d 279, 288 (5th Cir. 2012) (considering inability to use property as intended as a factor in the ripeness inquiry). Of course, the extent and significance of this alleged injury is a merits question. For the purposes of the ripeness inquiry, it is enough to note that it is self-evidently plausible that they exist.

> . . . .

> . . . . Because these challenges rest solely on the existence of the Ordinance, no further

19

factual development is necessary, and the
Ordinance's existence does confront RCB with
a 'direct and immediate dilemma.' *Sindicato
Puertorriqueño*, 699 F.3d at 9 (quoting *Verizon
New Eng.,* 651 F.3d at 188).

*Roman Catholic Bishop of Springfield*, 724 F.3d at 90-
93. Thus, the First Circuit concluded that the Bishop had
satisfied the Article III requirement of standing, even
before filing any application under the historic zoning
designation, a remedy that was available to the Bishop. *Id.*
at 90 ("As to the first component of the fitness question,
we conclude that one aspect of RCB's complaint satisfies
Article III's case or controversy requirement: specifically,
RCB's claim that the enactment of the Ordinance itself
burdens RCB's religious practices and undermines its
religious freedom"). The Bishop's claim was that the bare,
legislative act of designating a Catholic Church property
as a historic property burdened his (and the Church's)
religious practices.

Significantly, the First Circuit refused to apply
*Williamson County*[12] to its ripeness analysis:

---

12.  As that court noted:

Like us, other circuits have found that the *Williamson
County* analysis is sometimes inapposite for non-
Takings constitutional challenges to land use decisions.
*See, e.g., Dougherty v. Town of N. Hempstead Bd. of
Zoning Appeals*, 282 F.3d 83 (2d Cir. 2002) (First
Amendment retaliation claim); *Nasierowski Bros.
Inv. Co. v. City of Sterling Heights,* 949 F.2d 890, 894
(6th Cir. 1991) (procedural due process claim). *But see
Grace Cmty. Church,* 544 F.3d at 617-18 (procedural
due process claims are exception to the general
application of *Williamson County*); *Murphy,* 402 F.3d

20

> [W]e do not rely, as did the district court, on *specialized Takings Clause ripeness doctrine*. In regulatory takings cases, a property owner must follow the procedures for requesting the applicable zoning relief, and have its request denied, before bringing a claim in court. *Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 190-91, 105 S. Ct. 3108, 87 L. Ed. 2d 126 (1985). But the Supreme Court has stated that this requirement 'is compelled by the very nature of the inquiry required by the Just Compensation Clause.' *Id.* at 190, 105 S.Ct. 3108; *see* 13B Wright & Miller, *Federal Practice & Procedure* § 3532.1.1 (describing takings cases as comprising '[a] special category of ripeness doctrine'). Specifically, regulatory takings inquiries focus on the economic impact of a regulation on the subject property, and that impact is only apparent once there is a final zoning decision.

724 F.3d at 91-92 (emphasis added). In this respect, *Roman Catholic Bishop* evinces the First Circuit's faithful application of RLUIPA's stated scope of coverage. Every substantive provision of RLUIPA's land use provisions applies both to the "implement[ation]" of land use regulations *and* to their "impos[ition]."[13] Thus,

---

at 350-51 (applying *Williamson County* to RLUIPA and First Amendment free exercise claims).

724 F.3d at 92 n.12.

13.  *See* 42 U.S.C. § 2000cc(a)(1) ("No government shall *impose* or *implement* a land use regulation . . . .") (emphasis added); *id.* § 2000cc(b)(1) (same); *id.* § 2000cc(b)(2) (same); *id.* § 2000cc(b)(3) (same).

21

for example, Congress prohibited governments from "imposing" or "implementing" land use regulations in a manner that substantially burdens religious exercise unless the burden furthers a compelling government interest by the least restrictive means possible. "Imposing" a land use regulation, by its ordinary and natural meaning, would include the act of enacting such a regulation, and "implementing" that land use regulation would encompass all of the executive actions taken to enforce the regulation.

In some lower courts, the prohibition on "imposing" regulations disappears in an interpretative debacle that makes "impose" the identical twin of "implement." The consequence of that strained and narrow reading by other Circuit Courts, as described below, is that the substantive provisions of RLUIPA are judicially narrowed, leaving claimants without the statutory protections Congress intended.

*Fifth Circuit*: In *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 286-88 (5th Cir. 2012), the Fifth Circuit concluded that Opulent Life Church demonstrated standing to pursue its claim that enactment of a zoning district that directly prohibited churches in the newly created district violated RLUIPA:

> Opulent Life's facial challenges are easily ripe. First, they are fit for judicial decision because they raise pure questions of law. *See Triple G Landfills, Inc. v. Bd. of Comm'rs*, 977 F.2d 287 (7th Cir. 1992) ("This lawsuit . . . mounts a facial attack upon the validity of the ordinance itself . . . . The issues posed are purely legal . . . . [T]he case is fit for judicial decision."). Second, Opulent Life would suffer hardship

22

> if review were delayed. Before Holly Springs
> amended its ordinance, Opulent Life already
> faced considerable hardship absent immediate
> judicial review. Compliance with Section 10.8
> would have been onerous, and noncompliance
> would have meant forfeiting the larger meeting
> space Opulent Life has leased. Now Opulent
> Life would suffer even more acute hardship
> were review to be withheld. The amended
> ordinance bans Opulent Life from its leased
> property. Each day that passes without Opulent
> Life being able to occupy its new building
> is a day in which its religious free exercise
> is curtailed. *See* 42 U.S.C. § 2000cc–5(7)(B)
> ("The use ... of real property for the purpose
> of religious exercise shall be considered to be
> religious exercise" under RLUIPA.). Opulent
> Life's facial challenges are ripe and that suffices
> for us to decide the merits of this interlocutory
> appeal.

697 F.3d at 286-88. Significantly, and directly contrary to
the Second Circuit's decision, the Fifth Circuit held that
"even assuming arguendo that *Williamson County*'s final-
decision rule applies to Opulent Life's claims, it presents no
barrier to our adjudicating Opulent Life's facial challenges
to the ordinance. The Supreme Court has held *Williamson
County* to be inapplicable to facial challenges." *Opulent
Life Church*, 697 F.3d at 287 (footnote omitted) (citing *Yee
v. City of Escondido*, 503 U.S. 519, 533-34 (1992).

*Sixth Circuit*: The Sixth Circuit held that a religious
order's RLUIPA claims related to its use as a residence
of a house in a residential neighborhood—in which several

23

fathers and brothers of the order lived, conducted private daily masses, and hosted regular Bible studies with attendance ranging from five to fifteen individuals— were not sufficiently ripe because they had "not gone to the zoning board to determine whether the ordinances require it to submit a site plan" nor sought a variance.[14] *Miles Christi Religious Order v. Twp. of Northville*, 629 F.3d 533, 535, 538, 541 (6th Cir. 2010). *See also Grace Community Church v. Lenox Township*, 544 F.3d 609 (6th Cir. 2008) (dismissing claims based on ripeness even though township revoked a special use permit because "the Church made no effort to resolve the dispute locally"). The Sixth Circuit reached that conclusion despite the fact that the township had engaged in various enforcement actions (including threatening to ticket vehicles, conducting surveillance on the order, recording license plates, and issuing a ticket for a zoning violation) but dismissed such harms as merely the "first whiff of governmental insensitivity . . . ."[15] *Id.* at 540.

Yet even the Sixth Circuit did not go so far as the *Tartikov* court in requiring the plaintiff to petition for a

---

14.   Chief Judge Batchelder dissented, believing that the final decision requirement was met because of the township's Director of Community Development's determination that "Miles Christi had intensified the use of its property" and the subsequent enforcement action. *Id.* at 542. She also alternatively determined that the Order suffered an immediate injury because, inter alia, it had canceled a religious event. *Id.* at 548-49.

15.   Unlike *Tartikov*, where New York law made a variance unavailable to Tartikov, the Sixth Circuit noted that "[t]he zoning board may grant a variance to the religious order," 629 F.3d at 538.

24

legislative change to an undisputed prohibition,[16] having concluded that, as presented by the religious order's complaint, it could not "'know[] how far the regulation goes,' . . . and indeed which regulations apply[.]" *Id.* at 539 (quoting *MacDonald, Sommer & Frates v. Yolo Cnty.,* 477 U.S. 340, 348 (1986)); *see* 697 F.3d at 541 ("Because Miles Christi's claims *turn on the meaning of the ordinances,* they will not ripen until the zoning board weighs in") (emphasis added)). Here, there is no dispute as to which regulations apply (the 2004 Law), and how far they go (they ban adult student housing and unaccredited educational institutions outright). Presumably, if the Sixth Circuit had certainty as to these questions, its decision would have come out differently. Nor would Miles Christi be required "to cancel any Bible studies, masses or other religious activities," *id.* at 540, unlike Tartikov, which still cannot operate its rabbinical college sixteen years after purchasing the property. *See id.* at 541 (noting "suspension of the state-law ticketing proceeding").

*Seventh Circuit*: In *Church of Our Lord & Savior Jesus Christ v. City of Markham, Illinois,* 913 F.3d 670, 677-79 (7th Cir. 2019), directly contrary to *Tartikov,* the Seventh Circuit held that a challenge to "zoning use classifications" would be ripe without any conditional use

---

16.   In a later unpublished decision, that court raised the question, but did not decide whether to go as far as the Second Circuit did in *Tartikov*: "We decline to consider whether the holding in *Miles Christi* covers situations where the plaintiff did not seek a *zoning amendment* because new information has come to light." *Tree of Life Christian Sch. v. City of Upper Arlington,* 536 F. App'x 580, 582 (6th Cir. 2013) (emphasis added). In other words, the Sixth Circuit contemplated the outrageous position adopted by the Second Circuit that a party lacks Article III standing to challenge the law unless they first petition the legislative body to change that law.

25

permit or variance being sought. *Id.* at 677-78 (holding that while a "variance might alleviate burdens imposed by the city's parking regulations, . . . it does not address zoning use classifications, which are the subject of this lawsuit," and that applying for a conditional use permit "would [not] address . . . the church's primary contention that operating a church is a permitted use"[17]). The church's main contention was that the zoning ordinance did not permit church uses by right anywhere within the jurisdiction, but only with a conditional use permit. *Id.* at 672-75. The restriction in this case is even more severe, as the proposed use is not permitted at all within the Village.[18]

Ultimately, the Seventh Circuit concluded that "the church's claims satisfy *Williamson County*'s final decision

---

17.   The Seventh Circuit did not suggest that consideration of the availability of a conditional use permit has no place in a RLUIPA action, as it may be relevant to the issues of liability and damages. *Id.* at 679. The availability of a conditional use permit, however, does not render a challenge to the zoning ordinance itself "unripe."

18.   The court noted that, "[a]lthough [it has] not addressed this specific question, [it has] declined to apply *Williamson County*'s final decision test to other non-Takings Clause challenges to local zoning codes," *id.* at 678, while also noting that the Second, Sixth and Ninth Circuits have applied *Williamson County* to RLUIPA claims. *Id.* (noting conflict between *Temple B'Nai Zion, Inc. v. City of Sunny Isles Beach*, 727 F.3d 1349, 1357 (11th Cir. 2013); *Roman Catholic Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 92 (1st Cir. 2013); *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 287 n.7 (5th Cir. 2012); and *Guatay Christian Fellowship v. Cty. of San Diego*, 670 F.3d 957, 976 (9th Cir. 2011); *Miles Christi Religious Order v. Twp. of Northville*, 629 F.3d 533, 537-38 (6th Cir. 2010); *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 352 (2d Cir. 2005)).

26

test, even if it does apply" because the city made a final decision regarding the church's zoning use classification. *Id.* at 678. As here, however, "there is no ambiguity about the city's interpretation on the" relevant zoning classification. *Id.*; *see id.* at 678-79 ("Since 2012, the city has always taken the position that churches are a conditional use in the R-3 districts, and nothing in the record or the parties' arguments suggests the city might reconsider that interpretation.").

*Ninth Circuit*: In *Guatay Christian Fellowship v. Cty. of San Diego*, 670 F.3d 957, 979-83 (9th Cir. 2011), the Ninth Circuit, applying *Williamson County*, held that a church was required to apply for a "use permit" prior to its RLUIPA claims being considered "ripe."[19] The Ninth Circuit found persuasive that "the County has the power to grant the permit that the Church needs, . . . ." *Id.* at 980. Here, Pomona *lacks* such power to permit Tartikov's use, yet the Second Circuit still required the submission of some unspecified "proposal."

As in *Miles Christi Religious Order, supra,* in *Guatay Christian Fellowship*, the Ninth Circuit also

---

19.  It is unclear what the Ninth Circuit understood itself to be doing:

> Because we today apply the final decision ripeness requirement outlined in *Williamson County* to the Church's RLUIPA claims, determining them to be premature for lack of a final decision by the County, we need not decide whether the Church's claims are unripe as a matter of prudence or of constitutional law.

*Id.* at 980 (noting that, while this Court treated the final decision requirement outlined in Williamson County as a matter of prudential ripeness, the Ninth Circuit treats it as a matter of "both Article III and prudential concern").

27

found relevant the fact that the parties' religious exercise was not presently being impeded. *See Guatay Christian Fellowship,* 670 F.3d at 979 ("the Church here has not alleged a colorable argument of immediate injury: it did not need to vacate the premises upon receipt of the County's communications, and it is currently enjoying use of the building for the pendency of this suit").

In contrast with the Seventh Circuit in *Church of Our Lord & Savior Jesus Christ, supra,* and in contrast with the Eleventh Circuit in *Midrash Sephardi, Inc. v. Town of Surfside,* 366 F.3d 1214 (11th Cir. 2004), *infra,* the Ninth Circuit held that the existence of enforcement actions against the church did not render the matter "ripe" for adjudication. *See Guatay Christian Fellowship,* 670 F.3d at 980-81 (holding that the "County's 'cease and desist orders'" were insufficient to satisfy *Williamson County's* "final decision requirement"). Nor was the financial burden imposed sufficient to establish "ripeness," as it was in *Opulent Life. Id.* at 981-82 ("Although the Church's alleged financial straits are lamentable, this is no fault of the County's and is no reason for us to except the Church from the obligations of all Use Permit applicants."). Such conflicting holdings further demonstrate the need for review.[20]

---

20. The Ninth Circuit's "futility" discussion demonstrates further disarray on the subject. On one hand, it recognized the concept of futility described in *Williamson County* as "refer[ring] to conditions that make the process itself impossible or highly unlikely to yield governmental approval of the land use that claimants seek—such as government obstinacy or where the only governmental body to which claimants can appeal is unable to authorize claimants' desired land use." *Id.* at 981. On the other, it then appeared to go beyond *Williamson County* to eliminate futility as an exception at all:

28

*Eleventh Circuit*: The Eleventh Circuit, in *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214 (11th Cir. 2004), did not mention, let alone apply, *Williamson County* in holding that Jewish congregations had standing to challenge (under both the Equal Terms and Substantial Burdens provisions of RLUIPA) a zoning ordinance that excluded their use from specific zoning districts (again, similar to *Tartikov*[21]), despite their lack of any valid attempt to apply for a permit or variance:

> Surfside denied a Midrash application for a special use permit, and denied Midrash's application for a zoning variance to operate in its current location because Midrash failed to provide written permission from [the owner]. Midrash did not appeal either denial, nor did it seek [the owner's] permission to re-apply for either a special use permit or a variance.

> . . . . Young Israel has never attempted to obtain a CUP or a variance.

> Finally, even if the Church had made a sufficient "futility" argument, Ninth Circuit jurisprudence in this area still does not excuse permit-seekers who fall into this exception from the final decision requirement from submitting at least one complete permit application.

*Id.* at 982 (citing *Herrington v. County of Sonoma*, 857 F.2d 567, 569 (9th Cir. 1988)). This final statement falls in line with the Second Circuit's decision, as both Circuits would appear to require a plaintiff to engage in a futile and pointless effort to seek relief that a local government is not empowered to grant.

21.   Unlike in *Tartikov*, however, Surfside did permit the use in one other zoning district, the RD-1 district.

29

*Midrash Sephardi, Inc.*, 366 F.3d at 1220-21 (footnotes omitted).

> Surfside argues that the congregations lack standing to assert that the SZO violates their constitutional rights because neither Midrash nor Young Israel has attempted to locate property in the RD-1 district, nor has either synagogue applied for a CUP or received OSB's permission to do so. Surfside's argument misses the point of the congregations' contention: even if a "suitable property" existed in RD–1 district, the congregations believe they have a legal right to remain in the business district.
>
> Surfside has already sought to enforce § 90–152 against the congregations in an earlier state court action. In the instant action, Surfside seeks an injunction prohibiting the congregations from continuing at their current location, as well as an imposition of civil penalties. As a result of Surfside's attempts to enforce the provisions of § 90–152 against them, the congregations have suffered the requisite injury for standing purposes. We find that the congregations have standing to challenge the application of business district regulations outlined in SZO § 90–152.

*Id.* at 1223-24 (footnote omitted). The Eleventh Circuit's decision is not only in conflict with that of the Second Circuit in *Tartikov*, but also with the Second Circuit's earlier decision in *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342 (2d Cir. 2005).

30

Nine years following *Midrash Sephardi*, the Eleventh Circuit revisited these issues in a case that presented a similar factual scenario to *Roman Catholic Bishop*, *supra*. In *Temple B'Nai Zion, Inc. v. City of Sunny Isles Beach*, 727 F.3d 1349, 1357 (11th Cir. 2013), the court found that a plaintiff's claims that "the mere enactment of the resolution declaring it to be a historic landmark violates RLUIPA, [the Florida Religious Freedom Restoration Act], and the Constitution" were ripe for review. As the court explained:

> In other words, the Temple alleges an injury stemming from the City's initial act of designating it to be a historic site, not from the *application* of any land use regulation to its property.

*Id.* at 1357-58. Further, the court declined to apply *Williamson County* to the temple's RLUIPA claim, holding that "staying our hand would do nothing but perpetuate the plaintiff's alleged injury." *Id.* at 1357; *see also id.* ("we think it an inappropriate tool for the specific facts presented here"). The court held, rather, that "[i]n such cases, we think traditional notions of ripeness provide the appropriate mode of analysis, and so we apply them here." *Id.* Finally, the court recognized that "*Williamson County*'s finality principles do not apply to facial claims that a given regulation is constitutionally infirm. *See Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 287 (5th Cir. 2012) ('The Supreme Court has held *Williamson County* to be inapplicable to facial challenges.' (citing *Yee v. City of Escondido*, 503 U.S. 519, 533-34 (1992))." *Id.* at 1359 n.6.

31

*Third Circuit*: In an unpublished decision,[22] *Congregation Anshei Roosevelt v. Planning & Zoning Bd. of Borough of Roosevelt*, 338 F. App'x 214, 218-19 (3d Cir. 2009), the Third Circuit gave fair indication of its future direction in answering these questions as they arise in RLUIPA cases. The Third Circuit employed a standard whereby an additional application for a variance, despite a final agency determination that a particular use was in violation of the zoning ordinance,[23] might or might not be required to establish a "ripe" case or controversy, depending on the facts:

> While it is true that the plaintiffs in *Murphy* and *Taylor* did not seek any review of an initial land use decision, as the Congregation did here, it does not necessarily follow that a decision by a board on appeal is a final determination ripe for federal review. Nor can we say that a variance application is always necessary to satisfy the finality requirement. The cases are fact-specific.

---

22.  Under the Third Circuit's internal procedure rule 5.7, 3d Cir. R. 5.7, *Congregation Anshei Roosevelt* is not controlling precedent, but it still provides a strong indication as to that Circuit's future direction.

23.  The court stated that "the Board did not determine that the Yeshiva was not a house of worship and thereby a violation of the ordinance," yet it did in fact make a final, appealable "determination that the Yeshiva represents an intensification of use requiring a variance." *Id.* at 217. That the yeshiva could then have additionally applied for a variance did not change the fact that a final determination was made. At the very least, the concrete harm of being required to engage in an administrative process that may or may not have been discriminatory or overly burdensome—the type of harm recognized by the Fifth and Eleventh Circuits—did not persuade the court otherwise.

32

*Id.* at 217 n.4. In that case, however, the Third Circuit required the plaintiff to seek a variance:

> The factual record is not sufficiently developed to decide fully the RLUIPA claim here, and the Board has not issued a definitive position as to the extent the Yeshiva can operate on the synagogue property. If the Congregation and the Yeshiva apply for a variance, the Board would develop a record to determine the potential effect of the use, and whether (and, if yes, to what extent) the use is permitted. . . . The Board may decide to allow the Yeshiva to operate fully, it may place some restrictions, or it may deny any operation of the Yeshiva on the property.
>
> Permitting the Board to reach a final determination on a variance application may resolve the constitutional issues the Congregation alleges. For starters, it is not apparent that the Congregation has suffered any constitutional injury simply because it must apply for a variance; indeed, it appears the Yeshiva is still operating at the synagogue. Put simply, we do not know the extent, if any, of the Congregation's alleged RLUIPA injury without a final determination as to whether the Yeshiva will be permitted on the property.

*Id.* at 218-19. The Third Circuit, in language reminiscent of *Williamson County*, concluded that "the Board has not issued a definitive position as to the extent the Yeshiva can operate on the synagogue property," because the Yeshiva had not applied for a variance. *Id.* at 218. Although the

33

Third Circuit required the plaintiff to pursue variance relief, it was clear that such relief might have been available to the yeshiva. *Id.* at 217. In stark contrast, in *Tartikov*, no variance, special permit, or other application could be granted for the use.

## CONCLUSION

Faithful to the congressional command that RLUIPA claimants may prosecute their claims on satisfaction of Article III standing principles, the First, Fifth, Seventh, and Eleventh Circuits have complied with their "virtually unflagging" "obligation" "to hear and decide a case . . . ." In doing so, these Circuit Courts have not interposed additional, extra-statutory and extra-constitutional obligations on RLUIPA claimants. By contrast, and departing from the holdings of those Circuits, the Second, Third, Sixth, and Ninth Circuits have disregarded the intent of Congress that RLUIPA claimants can establish their standing to assert their claims by reference only to Article III principles governing standing.

Among the decisions of the Second, Third, Sixth, and Ninth Circuits, *Tartikov* represents the zenith of judicial hostility toward claims involving religious land use.[24] The

---

24. Despite recognizing that good ground existed for Tartikov to allege, and the District Court to find, that the Village acted on a prohibited, anti-religious bias directed at the Orthodox Hasidic community with respect to the 2004 Law, the Second Circuit panel expressed the shocking view that Pomona's bias resulted from pressures the Hasidic community applied to the housing resources of the region. *See Tartikov*, App. 67a-68a ("*[W]e are mindful that municipalities of Rockland County have faced significant development pressure from Hasidic people in recent years. It is easy to see how bias could play a role in influencing a municipality's decision whether to allow a religious*

34

Second Circuit's decision presents a critical threat to religious freedom. Under *Tartikov*, a RLUIPA claimant can obtain no judicial relief unless, first, it throws itself into a pursuit of *legislative* repeal of the challenged ban from a hostile governmental body. Regardless of the Second Circuit's intent in imposing an extra-textual standing component, the effect of such a hurdle is, without doubt, to eliminate religious land uses through lengthy and resource-draining efforts otherwise unnecessary to establish Article III standing.

The petition for a writ of certiorari should be granted.

Respectfully submitted,

JOSEPH A. CHURGIN
DONNA C. SOBEL
SAVAD CHURGIN
55 Old Turnpike Road,
   Suite 209
Nanuet, New York 10954
(845) 624-3820

ROMAN P. STORZER
STORZER & ASSOCIATES, P.C.
1025 Connecticut Avenue NW,
   Suite 1000
Washington, DC 20036
(202) 857-9766

JOHN G. STEPANOVICH
   *Counsel of Record*
JAMES M. HENDERSON, SR.
   *Of Counsel*
STEPANOVICH LAW, PLC
618 Village Drive, Suite K
Virginia Beach, Virginia 23454
(757) 410-9696
john@stepanovichlaw.com

*Counsel for Petitioners*

---

*institution to undertake a large construction project*. But we must be cognizant also that municipalities may resist development pressures for legitimate reasons unrelated to discriminatory animus") (emphasis added). Such "victim blaming" disregards the Village's responsibility for its discriminatory bias and for giving effect to that bias.