TE-1765

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

\---------------------------------------------------------------------------X

CONGREGATION RABBINICAL COLLEGE OF      Case No. 07-CV6304(KMK)
TARTIKOV, INC., RABBI MORDECHAI BABAD,
RABBI WOLF BRIEF, RABBI HERMEN KAHANA,
RABBI MEIR MARGULIS, RABBI GERGELY
NEUMAN, RABBI MEILECH MENCZER,
RABBI JACOB HERSHKOWITZ, RABBI
CHAIM ROSENBERG, RABBI DAVID A.
MENCZER, and RABBI ARYEH ROYDE,

Plaintiffs,

-against-

VILLAGE OF POMONA, NY; BOARD OF TRUSTEES OF
THE VILLAGE OF POMONA, NY; SANDERSON,
AS MAYOR; IAN BANKS as Trustee and in his official capacity,
ALMA SANDERS ROMAN as Trustee and in her official capacity,
RITA LOUIE as Trustee and in her official capacity,
and BRETT YAGEL, as Trustee and in his official capacity,

Defendants.

\---------------------------------------------------------------------------X

## TRIAL DECLARATION OF STEVEN H. RESNICOFF

Steven Resnicoff, declares as follows, pursuant to 28 U.S.C. § 1746:

### STATEMENT OF OPINIONS OF THE DECLARANT

1.     I make this declaration on behalf of the Plaintiff Congregation Rabbinical College of Tartikov, Inc. to support my opinions:

        a   that there is a religious obligation to create a system of Jewish courts in which Jews can have their disputes adjudicated;

        b   that Orthodox/Hasidic Jews believe that every Jewish male is biblically commanded to engage in rabbinic study--the study of the Torah;

        c   that Tartikov's proposed curriculum is an excellent program that reflects a legitimate course of religious study;

TE-1766

        d   that Jewish law strongly encourages young men to marry early and raise large families; and

        e   that there is a religious basis for Tartikov's students to live in a Torah community, as proposed by Tartikov.

<u>STATEMENT OF BASIS OF THE OPINIONS OF THE DECLARANT</u>

2.      In preparing this Declaration, I have generally relied upon my years of experience in the fields of Jewish law, secular law and education. I have also relied on my February 3, 2014 meeting with the individual plaintiffs (except for Rabbi Margulis), Rabbi Mordechai Babad (the proposed dean), and plaintiffs' attorneys. I have also relied on a conversation I had by phone with Rabbi Menczer on March 4, 2014.

3.      In addition, I have relied on the various texts and commentaries which I cite in this Declaration. I have also reviewed a document prepared by the plaintiffs, **Trial Ex. 260**, that sets forth some of the plaintiffs' religious beliefs. Some of the sources cited by that document are also cited by me in this report.

4.      I have also reviewed the Second Amended Complaint (**Trial Ex. 148**) in this lawsuit, Congregation Rabbinical College of Tartikov, Inc., *et al.* v. Village of Pomona, N.Y., *et al.*

5.      I also reviewed a document that is the Proposed Rabbinical College of Tartikov Program Schedule (**Trial Ex. 261**) that I understand was prepared by some of the Plaintiffs, including Rabbi Menczer.

6.      I earned my B.A. at Princeton University, which I received in 1974 as a participant in the special undergraduate program of the Princeton's Woodrow Wilson School of Public and International Affairs. In my senior year, I was selected as a "Scholar of the Woodrow Wilson School." As such, I was relieved of all ordinary academic requirements and was able to pursue a course of study of my own design. I was elected to Princeton's Chapter of Phi Beta Kappa.

7.      I earned my J.D. degree at Yale Law School in 1978. While at Yale, I served as a member of the board of directors of its Moot Court Board.

8.      I took a leave of absence from Yale for the 1976-1977 academic year and pursued a course of Jewish studies in Israel. During my fall 1977 semester at Yale, I resided in New York City and pursued a specially designed intensive semester in Jewish law.

9.      After graduation from Yale, I again pursued rabbinic studies in Israel. In fall 1979, I entered the Rabbi Aaron Kotler Institute for Advanced Learning, also known as Beth Medrash Govoha ("BMG"), a rabbinic studies program in Lakewood, New Jersey. BMG is one of the world's premier institutions for the study of Jewish law. I was awarded a rabbinic degree

TE-1767

from BMG in 1982. I also separately received an advanced rabbinic ordination, known as *yoreh yoreh, yadin yadin*, from the late Rabbi Moses Feinstein, of blessed memory, who was one of the world's greatest Jewish law authorities. This advanced ordination indicates that the rabbinic authority issuing it believes that the recipient is qualified to serve as a judge in a civil dispute.

10.     I began teaching at the DePaul University College of Law in fall 1988 as an Assistant Professor. I was promoted to Associate Professor in 1992, received tenure in 1994, and became a Full Professor in 1995. I have taught courses in bankruptcy, bioethics and the law, commercial paper, commercial law survey, contracts, Jewish law, legal profession and secured transactions. I have authored or coauthored five books and over forty articles and chapters. In addition, I have authored or co-authored many annual supplements or updates. I have also served in many administrative committees, at both the College of Law and University levels. For example, during many years I served as a member of the DePaul College of Law's Curriculum Committee. At the University level I have served, for example, on the University's Board on Promotion and Tenure. In addition, I have received various awards for my teaching and scholarship. In summer 2002, I served as a visiting professor at Brooklyn Law School, located in Brooklyn, New York.

11.     My education, qualifications, publications and presentations are attached as **Attachment A**.

## INTRODUCTION TO JEWISH LAW

12.     Jewish law (or "Halakhah") is a religiously based system, and the religious beliefs of its adherents require them to obey its tenets.

13.     The principal body of Jewish law (known as Biblical law) was communicated in nonwritten form from G-d to the Jewish people through Moses. This communication had two parts. One part was intended to be, and was, committed to writing. This part is known as the "Written Torah" or the "Five Books of Moses."

14.     The second part of the communication from G-d was intended not to be written, but, instead, to be taught orally directly from teacher to student. This portion is known as the "Oral Torah." Together, the Written Torah and Oral Torah constitute the Torah.

15.     Orthodox Jews fundamentally agree that the Torah embodies the word and will of God and that it is authoritative. Therefore, one is religiously and morally obligated to follow its rules.

16.     Because of the persecution of Jews and the imposition of capital punishment upon those who taught Jewish law, early Jewish law authorities feared that the Torah, or parts of it, might be forgotten. Consequently, they decided that it was necessary - and permitted by Jewish law - to commit the Oral Torah to writing.

17.     The first major publication that contained parts of both the Written Torah and the

**TE-1768**

Oral Torah was the Mishnah, which was redacted around the year 180. It is divided into 63 subject areas.

18.     The Babylonian Talmud (the "Talmud") is the central literary source from which much of Jewish law/Halakhah is derived. The Talmud addresses 37 of the 63 subject areas of the Mishnah. As to each of these 37 subject areas, the Talmud consists of two parts. The first is the relevant Mishnah, and the second is known as the "Gemara." The Gemara is the legal analysis and elaboration of the teaching of the Mishnah, along with a discussion of additional legal issues that arise in connection with the Mishnah.

19.     There are many post-Talmudic written Jewish law treatises that are regarded as especially authoritative. One, known as the Mishneh Torah, was written by Maimonides between 1170 and 1180. This treatise comprehensively addressed all areas of Jewish law and was meticulously organized by topics.

20.     The Jewish Law code known as the Arba' ah Turim ("Tur"), written by Yaakov ben Asher (Rabbi Jacob) (1270-1340), was the first to organize Jewish Law into a four-part structure/division. It is limited to those issues of Jewish Law that are applicable in the current era, *i.e.*, in the period after the destruction of the holy Temple in Jerusalem. The foremost commentary on the Arba'ah Turim is known as the "Beit Yosef," which was written in the sixteenth century by Rabbi Joseph Karo.

21.     The Shulchan Aruch (literally meaning, "the Set Table", but known by most Jewish communities as the "Code of Jewish Law") was authored by Joseph Karo and is based on the four-part structure of the Arba' ah Turim. Rabbi Karo lived in the Middle East and wrote the Shulchan Aruch according to the perspectives of Middle Eastern (Sephardic) Jewish authorities. Soon after publication of the Shulchan Aruch, Rabbi Moses Isserles ("Rema"), who lived among Europe's Ashkenazic Jews, added his glosses to the Shulchan Aruch. These glosses are known as the "mappah," or tablecloth, that enhances Rabbi Karo's Set Table.

<u>THE RELIGIOUS SIGNIFICANCE OF SYSTEM OF JEWISH COURTS</u>

22.     In my opinion, there is a religious obligation to create a system of religious Jewish courts in which Jews can have their disputes adjudicated. The original source is the biblical verse, "Judges and court officers shall you place unto yourself in all your gates." (Deuteronomy 16:17). See J. David Bleich, CONTEMPORARY HALAKHIC PROBLEMS IV (New York: Yeshiva University Press, 1995) 3-4 (hereafter "BLEICH IV") (citing a number of early Jewish law authorities who rely on this verse).

23.     The obligation to create a system of religious Jewish courts is an extremely important religious duty. Id., at 4, n. 1. If there remains a biblical duty to appoint judges, there is also a biblical prohibition against appointing judges who lack adequate Torah knowledge. *Id.* This prohibition applies even if the person appointed possesses many fine personal attributes. See Maimonides, MISHNEH TORAH, Laws of Judges 3:8. See also BABYLONIAN TALMUD, Sanhedrin 7b (one who appoints an unqualified judge is as if he planted in Israel a

TE-1769

Case 7:07-cv-06304-KMK   Document 292   Filed 05/11/17   Page 5 of 25

tree used for idolatry).

24.     Moreover, there is a biblical prohibition that forbids a Jewish plaintiff to file suit against another Jew other than in a religious Jewish court. This arises from the verse, "And these are the ordinances which you shall set before them." (Exodus 21 : 1) In context, the word "them" is understood to refer to capable Jewish religious judges, and the implied message is that you should put these disputes before "them" and not before others, such as Gentile judges. See, e.g., BABYLONIAN TALMUD, Gitiin 88b; Rabbi Shlomo Ben Yitzchaki (known as Rashi; 1040-1105), COMMENTARY ON THE TORAH, Exodus 21 : 1; SHULHAN ARUKH, Hoshen Mishpat 26: I ; Maimonides (1 135-1204), MISHNEH TORAH, Laws of Court 26:7.

25.     Transgressing this law is a grave offense. A violator appears to have actively abandoned the holy laws and legal system that G-d specifically prescribed for the Jewish people, preferring instead, rules and procedures made by man.

26.     Jewish law authorities categorically condemn anyone who would violate this rule. Rabbi Shlomo Ben Yitzchaki (1040-1105), in his commentary on the Bible (Exodus 21 : 1) calls him an "Evildoer" who has "desecrated G-d's name." SHULHAN ARUKH, Hoshen Mishpat 26: 1 states that one who violates this rule is an Evildoer and a blasphemer. The Tanhuma, at Mishpatim 3, states: "For whoever abjures Jewish judges and goes before gentile [judges] has first denied the Holy One, blessed be He, and thereafter denied the Torah." See BLEICH IV, supra at 3.

27.     In some religious Jewish communities, Jewish courts operate much as they did in ancient times. In other such communities, there are important differences. The differences may depend on, among other things, the particular religious beliefs held by most people in the community and the heterogeneity of the community.

28.     Throughout most of Jewish history in the Diaspora, Jews lived in insular communities having some degree of juridical and governmental autonomy. In such a setting, each city had an official rabbinic court where disputes were adjudicated. In the contemporary United States, some Jewish groups, usually but not always Hasidic groups, have official rabbinic courts, and members of those communities litigate their disputes in these courts. These courts may also accept cases involving Jews who are unaffiliated with their groups. Other rabbinic courts, including some that are not affiliated with any Hasidic group, hear cases involving all sorts of Jewish litigants.

29.     Many secular law statutes provide for secular court enforcement of arbitration awards. Many rabbinic courts comply with the requirements of those statutes and, therefore, the rabbinic court awards are enforceable in secular court. If the losing party in a rabbinic court proceeding fails to comply with the court's decision, the court can, as a matter of Jewish law, authorize the prevailing party to enforce the rabbinic court decision in secular court. Under Jewish law, once a rabbinic court authorizes the prevailing party to go to secular court, it is permissible for that party to do so.

## THE RELIGIOUS SIGNIFICANCE OF RABBINICAL STUDY AND TEACHING AND BECOMING AND SERVING AS A RABBINICAL JUDGE

30.     Every Jewish male is biblically commanded to engage in rabbinic study - the study of Torah. The Torah commands him to "speak of them [the Torah's precepts] while you sit in your home, while you walk on the way, when you retire and when you arise." Deuteronomy 6:5-9. Moreover, it is of the utmost religious importance. The Babylonian Talmud, Sabbath 127a, states:

> These are the precepts whose fruits a person enjoys in This World but whose principal remains intact for him in the World to Come. They are: the honor due to father and mother, acts of kindness, early attendance at the house of study morning and evening, hospitality to guests, visiting the sick, providing for a bride, escorting the dead, absorption in prayer, bringing peace between man and his fellow — and the study of Torah is equivalent to them all. (Emphasis added).

31.     Similarly, Rabbi Maurice Lamm writes, "The study of Torah is Judaism's highest ideal. The rabbis gave it such a high priority that they declared, 'A Torah scholar of illegitimate birth takes precedence over a high priest ignoramus.'" See, e.g., Maurice Lamm, The Jewish Way in Love & Marriage (New York: Harper & Row, 1980) 101. In fact studying Torah is itself an intrinsically religious act. As Rabbi J. David Bleich writes, "[Torah] study is not merely a means but an end, and not merely an end among ends, but the highest and noblest of human aspirations. Study of Torah for its own sake is a sacramental act, the greatest of all mizvot [commandments]." See J. David Bleich, CONTEMPORARY HALAKHIC PROBLEMS (Ktav Publishing House, Inc.: New York, 1977) (hereafter "BLEICH I") xiii.

32.     Furthermore, Judaism teaches that the G-d and His Will are one and that every law in the Torah is G-d's Will:

> ...Torah study itself ... is a manifestation of complete attachment to Hashem and His Torah. Rav Chaim of Volozhin states in Nefesh Hachaim (Gate 4, ch. 6): "For [Hashem] and his will are one, as is written in the Zohar, and every law or halachah in the holy Torah is His will." See DORASH DOVID, SERIES I, SHUFRA D'MOADAH 147

33.     The study of Jewish law is especially important. According to Rabbi Judah Lowe (c. 1513-1609), known as the Maharal of Prague:

> [The] Gemara [Babylonian Talmud, Niddah 73a] conveys the exalted character of the Torah and, particularly the advantage obtained by one who reviews halachos [Jewish laws] .... The Gemara's lesson is that fundamental success in learning is dependent on the study of Halachah [Jewish law], that, to elaborate, halachah is the Torah's unswerving truth, veering neither to the left nor to the right." See MAHARAL OF PRAGUE, NESIVOS OLAM —NESIV HATORAH: AN APPRECIATION OF TORAH STUDY (Eliakim Willner, trans. and adaptor; Brooklyn, N.Y.: Mesorah Publications, Ltd., 1994) (hereafter, "Maharal") 87.

Case 7:20-cv-06158-KMK  Document 41-11  Filed 10/20/20  Page 7 of 25
Case 7:07-cv-06304-KMK  Document 1-6  Filed 11/1/16  Page 7 of 7

TE-1771

Case 7:07-cv-06304-KMK   Document 292   Filed 05/11/17   Page 7 of 25

34.    In addition, through the religious experience of studying Torah, a person is protected from sin. The Midrash on Psalms 119:10 states: "The evil yetzer [i.e., the evil inclination] has no power over against the Law [i.e., the Torah], and he who has the Law in his heart, over him the yetzer has no power." See MONTEFIORE, at 125. Similarly, the Babylonian Talmud, Berakhot 5a states:

> R. Levi b. Hama said in the name of R. Simeon b. Lakish: A man should always oppose the good impulse to the evil impulse, as it is said, "stir up (A.V. Stand in awe) and sin not" (Ps.IV,4). If he conquer it, well and good; but if not, let him occupy himself with Torah, as it goes on to say, "Commune with your heart.' See MONTEFIORE AT 125.

35.    There is no limit to the biblical obligation to learn Torah. One must learn Torah day and night. As Joshua 1:8 states, "This book of Torah shall not leave your mouth, and you shall meditate in it day and night." The Mishnah, an ancient Jewish law text redacted circa 188, declares: "These are the commandments that have no prescribed measure: the corner of a field which must be left for the poor], the first-fruit offering, the pilgrimage, acts of kindness, and Torah study." MISHNAH, Peah 1: 1, translated in SIDDUR at 17.

36.    Furthermore, one is supposed to learn Torah constantly. Its serious study is complex and demanding. If a person's chain of thought were interrupted, he might have to waste a great deal of time to get back to the same point in his analysis as he was before. As Meir Meiseles points out:

> The least neglect is followed by serious results. Resh Lakish said [Jerusalem Talmud, Berakhot 9): I found the following exposition written in Megillat Hassidim ("the scroll of the righteous"): "If you leave me one day — I shall leave you two days." Now the Torah is like two men who were travelling in opposite directions. They met at the same inn; but when they parted, and each one had travelled only one mile, the distance between them grew to two miles." See Meir Meiseles (contemporary), JUDAISM — THOUGHT AND LEGEND (Jerusalem, Israel: Feldheim Publishers, Ltd., 1964) 160-161.

37.    In addition, there is a concept of "bitul Torah" [the waste of Torah], which refers to any time in which one unjustifiably detracts from his Torah study. The sin of bitul Torah is very great. The Jerusalem Talmud, Hagigah 1:7 explains that it was because of bitul Torah that the First Holy Temple in Jerusalem was destroyed. It states: "The Holy One Blessed be He pardoned the sin of illicit relations and of the spilling of blood, but not that of the neglect of Torah study." See Rabbenu Jonah, GATES OF REPENTANCE (Jerusalem: Feldheim, 5736) (hereafter "GATES") 83.

38.    The sages indicate that even slight interruptions can are punishable. The Babylonian Talmud, Avodah Zarah 3b, states: "Anyone who interrupts his Torah study and engages in idle talk is fed burning coals." See also MIDRASH SHMUEL, supra, at 189. Some rabbis write that this even applies to someone who interrupts his study to listen to idle talk even though he himself does not say anything. See Jacob Meir Rosenbaum, EVEN BOHAN II, at 35 (citing authorities).

Case 7:20-cv-06158-KMK Document 41-11 Filed 10/20/20 Page 8 of 25
Case 7:07-cv-06304-KMK Document 292 Filed 05/11/17 Page 9 of 25

TE-1772

Case 7:07-cv-06304-KMK Document 292 Filed 05/11/17 Page 8 of 25

39. A Jewish male is biblically obligated to teach Torah to his male children. Deuteronomy 6:5-9 states:

> You shall love HASHEM, your G-d, with all your heart, with all your soul and with all your resources. Let these matters that I command you today be upon your heart. Teach them thoroughly to your children and speak of them while you sit in your home, while you walk on the way, when you retire and when you arise. Bind them as a sign upon your arm and let them be tefillin between your eyes. And write them on the doorposts of your house and upon your gates. See THE COMPLETE ARTSCROLL SIDDUR (Nosson Scherman, commentator, Brooklyn, N. Y: Mesorah Publications, Ltd., 1999) (hereafter "SIDDUR") 93

40. Similarly, Deuteronomy, 11:18-21 states:

> Place these words of Mine upon your heart and upon your soul; bind them for a sign upon your arm and let them be tefillin between your eyes. Teach them to your children, to discuss them, while you sit in your home, while you walk on the way, when you retire and when you arise. And write them on the doorposts of your house and upon your gates. In order to prolong your days and the days of your children upon the ground that HASHEM has sworn to your ancestors to give them, like the days of the heaven on the earth. See SIDDUR, at 93.

41. Indeed, male children are supposed to start learning Scripture when they are only five years old. See Pirkei Avot (The Ethics of the Fathers) chapter 5, Mishnah 25, in SIDDUR at 579. Jewish sources say that learning done while one is young is much more effective than learning when one is older:

> Elisha ben Avuya said: One who studies Torah as a child, to what can he be likened? - to ink written on fresh paper. And one who studies Torah as an old man, to what can be he likened? - to ink written on smudged paper. See SIDDUR, at 569. See also MIDRASH SHMUEL, supra, at 320 (what the young learns is successfully internalized and remains part of one's fiber).

42. In addition, Judaism considers the teaching of Torah to others as an extremely important religious act. The Babylonian Talmud, Sanhedrin 19b, states that whoever teaches someone Torah is considered as if he gave birth to him. Rabbi Eliyahu Dessler says even more:

> There can be no greater hessed [act of kindness] than teaching Torah. A person who looks after the physical needs of his fellow stands very high in the scale of Torah achievement. He has given life to a person in this world and "saving a life is equivalent to saving a whole world." But a person who teaches other people Torah has given them life in this world and in the next, and there can be no greater hessed than this. See Eliyahu E. Dessler, STRIVE FOR TRUTH V (Aryeh Carmell, trans.; New York: Feldheim Publishers, 2002) 2012.

Case 7:20-cv-06158-KMK Document 41-11 Filed 10/20/20 Page 9 of 25
Case 7:18-cv-11211-KMK Document 126-1 Filed 12/23/20 Page 10 of 25

TE-1773

Case 7:07-cv-06304-KMK   Document 292   Filed 05/11/17   Page 9 of 25

43.     Serving as a religious judge is a spiritually fulfilling act. Jewish sources explain that by serving as a judge and resolving disputes between people, a person is credited with becoming a partner with G-d in Creation itself. The Teaching of the Fathers quotes Rabban Shimon ben Gamliel, who teaches that the world stands on three things: justice, truth and peace. Pirkei Avot 1:18. Rabbenu Yona (c. 1180-1263) explains that these are the three things that enable the world to endure: By settling disputes between people, Dayanim (Jewish religious judges) enable the world to continue to exist, because if not courts and due process of law, anarchy would ensue.

44.     Moreover, the sages say that when one serves as a judge, one basks in the presence of G-d. For example, Exodus Rabbah 30:20 states: "When a judge sits in judgment . . . the Holy One, blessed be He, leaves the highermost heavens and causes His Shekhinah to rest at the judge's side." See BLEICH IV, supra, at 3. The sages state: "Anyone who judges a case according to the true intent of the law causes the Divine Presence to dwell among the Jewish nation." BABYLONIAN TALMUD, Sanhedrin 7a. Similarly, it says that anyone who does not judge a case according to the true intent of the law causes the Divine Presence to depart from the Jewish nation. Id.

## THE CONGREGATION RABBINICAL COLLEGE OF TARTIKOV, INC.'S COURSE OF RELIGIOUS STUDY

45.     It is my opinion that the plaintiff Congregation Rabbinical College of Tartikov, Inc.'s proposed program is excellent. (For purposes of this Declaration, whenever I refer to "plaintiff" in the singular, I refer to plaintiff Congregation Rabbinical College of Tartikov, Inc.) I believe that the length of the program is one of its most outstanding strengths. Serving as a religious judge involves tremendous responsibility, as is repeatedly emphasized throughout Jewish religious literature. For example, the Talmud quotes Rabbi Samuel bar Nahmani in the name of Rabbi Yohanan, "A judge should always think of himself as if he had a sword hanging over his head and Gehenna [i.e., hell] gaping under him...." BABYLONIAN TALMUD, Sanhedrin 7a, available at http://halakhah.com/pdf/nezikin/Sanhedrin.pdf.

46.     To perform his job properly, a Jewish judge must hurdle many obstacles. For instance, an incredibly vast and extensive wealth of rabbinic literature must be mastered. This literature, written in Hebrew and Babylonian Aramaic, is abstruse and both analytically and conceptually challenging. In addition, because some Jewish law doctrines impart religious significance to commercial customs and to particular portions of secular law, these subjects must also be studied. In order for rabbinic court judgments to be enforceable as arbitral awards in secular courts, rabbinic courts must comply with applicable secular arbitration statutes. Thus, judges must become familiar with these statutes. Furthermore, because Jewish law enjoins religious judges to encourage parties to reach voluntary compromises, prospective judges must receive training in mediation.

47.     Plaintiff's proposed course of study is longer than other, less comprehensive rabbinic programs, but there are important reasons for this. Plaintiff's proposed program is actually designed for students who intend to become "full-time" religious law judges

9

**TE-1774**

(dayyanim). Most United States rabbinic programs are intended to train pulpit rabbis, not Jewish law scholars. Even the advanced rabbinic studies programs in the United States with which I am familiar are designed to enable students to further develop their Jewish law skills, but not to make them thoroughly conversant with Jewish law. It is my opinion that most students participate in such programs because of the immense religious importance of rabbinic studies and the deeply religious experience of rabbinic study. They are not intending to have "careers" of being rabbinic judges. The prospective participants in Plaintiff's program intend to be rabbinic judges. It is my opinion that they would not otherwise make the incredible commitment that the program requires. Additionally, this lengthy period of study is necessary because of the complexity of the third and fourth sections of the Shulchan Arukh, which Plaintiff's proposed course of study comprehensively covers.

48.     It is important to note that most rabbinic courts that currently exist will only agree to hear a case if the parties explicitly relieve them of the responsibility for rendering a decision that is in strict accord with Jewish law. One of the reasons for this is the difficulty of reaching a correct decision. This can cause serious problems if one of the parties demands a decision according to strict Jewish law. My understanding is that the Plaintiff's program is designed to equip its graduates with the advanced degree of expertise that would enable them to render decisions according to strict Jewish law if the parties insist on this.

49.     Some of the prospective faculty of Plaintiff's proposed program are experienced members of a rabbinic court, the Beis Din L'Hoyra of Monsey. My understanding is that, as judges in that court, they have been willing to decide cases according to strict Jewish law, except, perhaps, as to the administration of religious oaths, and that they have the same expectation for the graduates of Plaintiff's proposed program.

50.     Another way in which Plaintiff's program is more demanding than most is in its comprehensiveness. The Shulchan Arukh, known as the Code of Jewish Law, is organized into four sections, Orch Hayyim, Yoreh De'ah, Hoshen Mishpat, and Even Ha- Ezer. Plaintiff's program is designed for students to master all four of these sections.

51.     The Shulchan Arukh contains the following four sections of Jewish law:

      a     Orach Chaim comprises laws about daily life, from arising in the morning to retiring to bed: the order of prayers and blessings; laws regarding meals; laws about worshipping in the synagogue; what to do on the Sabbath and holidays, and so on;

      b     Yoreh De 'ah comprises laws about dietary issues; laws of mourning, laws of family purity, laws about Israel, laws of religious conversion to Judaism, laws regarding the permissibility of the payment or collection of interest, and so on.

      c     Even Ha'ezer comprises laws of marriage, divorce, and so on.

      d     Chosen Mishpat comprises laws of finance, secured transactions, civil

10

TE-1775

wrongs, inheritance, loans, legal procedure, and so on.

52. In studying the Code of Jewish Law or the Shulcan Arukh, the students at Tartikov would not simply be studying the text of that multi-volume publication. They would be studying the broader concept of Jewish Law.

53. Referring to the study of he concept of "four books" or "four sections" of the Shulcan Arukh trivializes the magnitude of the massive amount of religious literature that these students would need to master. There are thousands of religious commentaries that must be read and understood in order to become fully knowledgeable in the Code of Jewish Law and to serve effectively as a rabbinical judge.

54. In addition, Torah knowledge is gained not merely from formal study, but also from observing and attending to Torah scholars. In fact, the Babylonian Talmud, tractate Berakhot 7b, states: "Attending to Torah [scholars] is even greater than studying from them." The intensity of Plaintiff's program and the planned on-campus housing provides the students invaluable opportunities to interact with and attend to their teachers.

55. Moreover, to learn to be a rabbinical judge requires on-site training. Plaintiff's program will include substantial opportunities, especially for advanced students, for their observation of--and, ultimately, their participation in--actual rabbinic court proceedings. This further distinguishes Plaintiff's proposed program from other rabbinic programs currently available in the United States.

56. Plaintiff's proposed program is both physically and intellectually grueling. Sunday through Thursday, a student may start as early as 6:00 a.m. and end as late as 10:30 p.m., with relatively short intervals for meals, prayers and perhaps a little rest. It also includes study sessions on Friday morning and on the Sabbath. There are various reasons why I believe that the students who will be engaged in Plaintiff's proposed program will be serious and dedicated. First, only the most committed individuals would be willing to undertake so daunting a task. Second, I have met and spoken with several of the individual plaintiffs, and they seemed to be quite sincerely convinced of the religious importance of studying Jewish law. Third, the program does not lead to a financially rewarding career; it is designed for someone who seeks religious, not materialistic, fulfillment.

## THE RELIGIOUS SIGNIFICANCE OF THE TYPICAL MARITAL AND FAMILY STATUS OF RABBINICAL STUDENTS.

57. Jewish law strongly encourages young men to marry early and to raise large families. Because of this encouragement, it would seem likely that many, if not all, of the young men who would matriculate to Plaintiff's intended rabbinical school would be married, and with one or more children, either at the time of their matriculation or relatively shortly thereafter.

58. Jewish males are biblically obligated to marry and endeavor to have children: "Each man is obligated to marry a woman in order to reproduce, and anyone who does not

11

TE-1776

engage in reproduction is like a murderer who diminishes the image of G-d and causes the Divine Presence to depart from the people of Israel." SHULCHAN ARUKH, Even HaEzer 1; BABYLONIAN TALMUD, Yevamot 63b-64a. In his gloss on this rule in Shulhan Arukh, Rabbi Moses Isserles (1520-1572) adds, "Whoever lacks a wife is without blessing and without Torah and is not called a man; once he marries his sins are erased." SHULHAN ARUKH, Even Ha-Ezer 1. The Talmud quotes Abba Hanan, in the name of Rabbi Yose, who says that a person who does not involve himself in reproduction deserves death. BABYLONIAN TALMUD, Yevamot 64a.

59.     The Shulhan Arukh states that a man should marry while he is young. It says that he fulfills the commandment properly if he marries at 18, see Pirkei Avot 5:25, but it would be even better if he married somewhat younger than that. SHULHAN ARUKH, Even HaEzer 3.

60.     The Five Books of Moses repeatedly emphasize the importance of marriage and human reproduction. G-d declared that it was not good for Adam to be alone, and, therefore, G-d created Eve to be Adam's mate. G-d told Adam and Eve, representing all of humankind, to "be fruitful and multiply." (Genesis 1:28). After the flood that consumed almost all humankind, G-d repeated this statement to Noah and his sons when they exited the Ark. (Genesis 9: 1, 7). Similarly, when Jacob entered the land of Israel, G-d said to him: "I am the Almighty G-d; be fruitful and multiply." (Genesis 35: 11).

61.     The Talmud underscores the importance of reproductive activity by stating that when a man dies and appears before the Heavenly Tribunal to be judged, one of the six questions he is asked is "Were you busy with being fruitful and multiplying?" See BABYLONIAN TALMUD, Shabbat 3 la. Jewish religious literature repeatedly stresses the importance of family and children.

62.     Judaism, as well as Jewish law, is based on the passing down of faith, laws, and traditions from father to son. The biblical commandment to study Torah is immediately accompanied by the duty to teach the laws of the Torah to one's children. A core element of the "Haggadah" (the "Telling") that is read at the religious celebration of Passover is a discussion of what one should say to four types of sons.

63.     Another reason why religious Jewish couples may have many children is that, as a general rule, Jewish law imposes conjugal duties upon husband and wife while forbidding them to engage in various birth control measures. See, e.g., Fred Rosner, Contraception in Jewish Law, TRADITION 12:2 (Fall 1971), pp. 90-103.

<u>THE IMPORTANCE OF THE RABBINICAL STUDENTS
LIVING CLOSE TO JEWISH SERVICES</u>

64.     Because of the reasons mentioned above, a typical Orthodox Jewish family is large. It may have children of various ages, who need to attend different religious schools. One's sons need to start their religious studies by age 5. For various reasons, including curricular differences, there are traditionally separate religious schools for boys and girls. Consequently, it

TE-1777

is essential for the intended students in Plaintiff's program to be able to live close to religious schools for their children. Otherwise, prospective participants in Plaintiff's program could be forced to compromise between the fulfillment of their religious duty to learn Torah and their religious duty to ensure that their children learn Torah.

65.     Orthodox Jews only eat kosher food. As a result, it is essential that they live within convenient distance of purveyors of kosher foods.

66.     Orthodox Jews need to abide by a fairly strict religious dress code. Because of issues of modesty, clothes that are "in-style" for secular women are simply not deemed religiously acceptable by many Orthodox Jews. Therefore, it is necessary for them to have reasonable access to clothing stores that specialize in serving an Orthodox Jewish clientele.

67.     Orthodox Jews are religiously obligated to go to a mikva, or a ritual bath.  It is essential that the students and their wives live close to a mikva. On Friday evening and during the day on Saturday, which is part of the Jewish Sabbath, all forms of motorized transportation are forbidden. It would not only be difficult, but in some cases completely infeasible for a student or his wife to walk to and from a mikva that is not near their home. The religious need for *mikvah* is based in the Talmud, as well as other Jewish sources.

<u>THE INTENSITY OF THE RABBINICAL STUDENTS RELIGIOUS STUDY
AND THE IMPORTANCE OF ON CAMPUS HOUSING
TO ACCOMMODATE SUCH STUDY AND RELIGIOUS LIFE</u>

68.     Not only is living within a community committed to Torah studies religiously important in a number of ways, it is also essential to the success of Plaintiff's rabbinic program.

69.     Furthermore, the sages emphatically stress that a person must live amongst Torah scholars. Pirkei Avot, Chapter 6, Mishnah 9, states:

Rabbi Yose ben Kisma said: One time as I was walking on the road a man met me and greeted me and I returned his greeting. He said to me: "From where do you come?" I replied: "I come from a great city of sages and scholars." He then said to me: "Rabbi, if you would be willing to live with us in our vicinity, I would give you a million golden dinars and precious stones and pearls." I replied: "Were you to give me all the silver, gold, precious stones, and pearls in the world, I would not live anywhere except in a place of Torah."

70.     Similarly, Pirkei Avot, Chapter 4, Mishnah 18 cites Rabbi Nehorai as saying, "Exile yourself to a place of Torah." Rabbi Moshe Almosnino (c. 1518-1579) commented on this Mishnah in his commentary, Pirkei Moshe, published in 1563. He said that by "a place of Torah," the Mishnah means a place that fundamentally prides itself on its study of Torah. He points out that the Mishnah does not say that one should necessarily go to the place where the biggest Torah scholar happens to reside. Instead, it says to go to a "place of Torah," to emphasize

13

TE-1778

that the goal of the people who live there is to learn:

> Torah, that the entire community was founded with this intention. The reason, Rabbi Almosnino explains, is that a person going to such a place will certainly immerse himself in Torah when he sees that everyone in that place is doing so.

71.    Providing on-campus housing is critical to the success of Plaintiff's rabbinic program in many ways. First, the unavailability of on-campus housing would make it very difficult to accommodate proper religious observance of the Sabbath. As already mentioned, during the Jewish Sabbath - which is from Friday night through Saturday night - all forms of motorized transportation are forbidden. Similarly, using all forms of electronic communication - e.g., phones - is forbidden. In light of these religious restrictions the lack of on-campus housing would force the rabbinic students to compromise on one or more of three very important ways in which to observe the Sabbath: (1) learning Torah; (2) engaging in conjugal relations; and (3) interacting with one's children, including teaching them Torah.

72.    A multitude of rabbinic sources state that the religious value of studying Torah on the Sabbath is much greater than on weekdays. See Shlomo ben Amram Cohen, MENUHAH SHLEIMAH III, at 48-49 (citing authorities). Indeed, the Jerusalem Talmud states that the Sabbath was given for the purpose of studying Torah. JERUSALEM TALMUD, Sabbath 9•.7.

73.    On the other hand, the Shulhan Arukh states that the time for rabbis to engage in conjugal relations is on the night of the Sabbath. SHULHAN ARUKH, Orch Hayyim 280: 1 . See also Maimonides, COMMENTARY ON THE MISHNAH, Nedarim 8:6. Unless the participants in the Plaintiff's program were able to live near each other and near the Plaintiff's planned facility, they might well be forced to forego either conjugal relations with their wives or rabbinical studies with their colleagues during the Sabbath.

74.    Moreover, participants in Plaintiff's program would be required to engage in a normal day's study on Sunday, and their male children who attend religious Jewish schools would typically have school on Sunday. The rabbinical program's daily schedule is so time-consuming and demanding that it would leave no time for family. Consequently, the Sabbath would be the only time during a typical week for participants in the Plaintiff's program to have any meaningful opportunity for engaging in the religiously important relationship with their children. Nevertheless, because of the Sabbath laws, unless the rabbinic students lived within walking distance of Plaintiff's rabbinic seminary, they would have to choose to give up one of these two important religious activities: spending part of the Sabbath with their children and spending part of the Sabbath pursuing their rabbinic studies with their colleagues and mentors.

75.    Another way in which on-campus housing is instrumentally important is that success in one's Torah studies depends heavily on immersing oneself in a community of Torah scholars. This is another message that is learned from the Mishnah mentioned before, Pirkei Avot, Chapter 4, Mishnah 18, that states: "Rabbi Nehorai say, 'Exile yourself to a place of Torah, and do not say that it [i.e., the Torah] will come after you, because it is through the give and take with your colleagues that your Torah knowledge will stay with you. Do not rely on your

14

wisdom." See MIDRASH SHMUEL, supra, at 301.

76.     The Mishnah may also mean that even if someone is wealthy and can hire a Torah teacher to come to teach him, if the person does not dwell in a community of Torah scholars, he will not succeed. Although having a teacher is important, interaction with and among many colleagues is much more essential. Id., at 302. Being in a Torah community of scholars is necessary not only to acquire Torah knowledge but to retain it. Id.

77.     By "a Torah community," I mean a community whose members live in immediate physical proximity with each other and who are dedicated to living a life according to Torah values. It is a spiritual community, rather than a materialistic one. Members of the community focus primarily upon their religious relationships and reponsibilities to one another, to the community as a whole, and to G-d. They seek to come closer to G-d, and they principally endeavor to do so through the study of Jewish law. It is through such study that they are able to fathom G-d's Will. A community of Torah scholars is a Torah community whose members are exceedingly dedicated to the study of Jewish law.

78.     In addition to learning from scholarly exchanges with colleagues and from lessons from teachers, one learns from watching, observing and attending to teachers. The Babylonian Talmud, Berakhot 7b, states: "Attending to Torah [scholars] is even greater than studying from them." Rabbi Nisan Wachtfogel, former Dean of Students at BMG, writes that there is no place to grow in Torah and religious commitment like in the yeshiva, where there is shimush [attendance on Torah scholars] as well as discourse with students. See Nisan Wachtfogel, KOVETZ SIHOS V (5762; Vaad to Publish the Mashgiah's Talks, 5762) 29.

79.     Much of one's academic studies are conceptual. One needs to translate the theoretical concepts to actual cases, cases that arise through human interactions. The number of cases that are expressly addressed in literature are finite, and the correct applications may depend on many factual variables. Students can most effectively learn how to act and how to rule in such cases by constantly observing what Torah scholars do in such situations - and by having the opportunity to speak with them to clarify their reasoning. This cannot be accomplished through a handful of observations. But it can be achieved through Plaintiff's program. Plaintiff's program calls, first, for the students, both the beginning students and the much more advanced students (who are themselves Torah scholars and teachers), to live together, on campus, throughout the duration of the rabbinical program. In addition, the intensity of the Plaintiff's program plus its

TE-1780

emphasis on students' observation of and participation in actual rabbinic court proceedings in a courtroom on campus, will enable students to learn how to conduct themselves as religious judges.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on:   May 11, 2017

Chicago, IL.

Steven H. Resnicoff

Case 18-865, Document 119-1, 07/11/2018, 2342580, Page99 of 107

TE-1781

# Attachment "A"

# Attachment "A"

TE-1782

## DECLARANT'S EDUCATION, QUALIFICATIONS, PUBLICATIONS, AND PRESENTATIONS

1.      I have published numerous Jewish law articles and chapters in a variety of venues, from rabbinic journals to books published by the Oxford University Press. These have addressed diverse topics, such as anti-terrorism measures, bankruptcy, bioethics, business ethics, estate planning, and legal ethics.

2.      I authored the book, Understanding Jewish Law, published in 2012 by LexisNexis, a major law school book publisher.

3.      A number of my presentations and writings have focused specifically on the operation of Jewish courts and the enforcement of Jewish court awards in secular courts.

4.      The American Association of Law Schools (AALS) has sections on specific areas of law. The AALS has an annual conference at which all, or most, of these sections (either separately or in conjunction with one or more other sections) sponsors an academic program. The AALS created a section on Jewish Law which had its inaugural program at the AALS convention in 1992. I was invited to deliver the inaugural presentation based on an article that I had published in the Seton Hall Law Review article. I served as the Chair of the AALS Section on Jewish Law in 1998-1999. In various years, I have also served as the Section's Chair-elect, Secretary, Treasurer, and as a member of its Executive Committee.

5.      Throughout my years teaching at DePaul, I have made presentations regarding Jewish law and the various interrelationships between Jewish law and secular law at many programs at which credits for Continuing Legal Education have been awarded. I have also addressed these subjects at programs at a number of law schools and at international scholarly conferences.

6.      For a number of years, I have been an active member of the Jewish Law Association ("JLA"), an international organization that promotes the study of Jewish Law, especially in English. I was the Chair of the JLA's Executive Board from 2002 to 2004. At other times, I have served as the chair of its Publication Committee, a member of its Executive Committee, and as editor of its eNewsletter.

7.      I have taught many different Jewish law topics in various forums. In addition to teaching Jewish law to law students at DePaul, I have taught a variety of Jewish law courses at Spertus College of Jewish Law, now known as the Spertus Institute for Jewish Learning and Leadership. Some of these courses were part of a master's program, and others were part of a doctoral program. In addition, I was one of two thesis advisors for one of Spertus' successful doctoral candidates. In summer 2012, I was a faculty member in a Graduate Certificate Program in Jewish Community Leadership, co-sponsored by Northwestern University and Spertus. I taught the module on leadership ethics.

8.      I am the Chair of the DePaul University College of Law's Center for Jewish Law

TE-1783

& Judaic Studies (JLJS). Between Fall 2007 and Fall 2014, I served as one of two Co-Chairpersons of JLJS. In connection with my activities with JLJS, I have given various presentations regarding Jewish law, often in programs involving CLE credit. I have also been intimately involved in planning the programming of many additional JLJS programs.

9.      Over the years, I have reviewed a number of Jewish law articles and one Jewish law book for various publishers. In addition, at the request of several law schools and universities in the United States and Israel, I have written reviews of the work of candidates being considered for promotion and/or tenure.

10.     As to my experience as a legal practitioner, I was a principal in Gerszberg & Resnicoff, a law firm in Lakewood, New Jersey from 1987 to 1988. Previously, from 1984 to 1987, I served as an associate in the Lakewood, New Jersey, office of Selesky, Kolsky & Gerszberg from 1984-1987. In 1983-1984, I worked as an associate at the Baltimore, Maryland, office of the firm then known as Venable, Baetjer & Howard and now known as Venable LLP.

11.     A list of my publications since 2004 is set out in Attachment 3 to this Declaration.

12.     A list of my published works of secular law scholarship is attached to this Declaration.

13.     I have made many presentations on law topics, including both secular law subjects and Jewish law. I have set out a list of the Jewish law presentations I have made since 2004 in that attachment to this document. (That listing does not include presentations that solely concerned secular law.)

## SELECTED PUBLICATIONS SINCE 2004

i. Sole Author, UNDERSTANDING JEWISH LAW (LexisNexis, 2012);

ii. Co-Author (with Professor Donna Litman), Jewish and American Inheritance Law: Commonalities, Clashes and Estate Planning Consequences, in L. Moscovits (ed.), JEWISH LAW ASSOCIATION STUDIES XXII (2012);

iii. Author, Jewish Law and the Tragedy of Sexual Abuse of Children The Dilemma Within the Orthodox Jewish Community, 13:2 RUTGERS JOURNAL OF LAW & RELIGION (2012);

iv. Author, Jewish and American Bankruptcy Law: Their Similarities, Differences and Interactions, 19:2 AMERICAN BANKRUPTCY INSTITUTE LAW REVIEW (Winter 2011);

v. Author, Shooting Down Suicide Airplanes - What's Law Got 10 Do With It? 10 ISSUES IN AVIATION LAW & POLICY 281 (Spring 201 1);

vi. Author, Da 'at Torah & Censorship, in L. Moscovits (ed.), JEWISH LAW

**TE-1784**

ASSOCIATION STUDIES XX (2010);

vii. Author, Autonomy in Jewish Law in Theory and in Practice, 24 JOURNAL OF LAW AND RELIGION 507 (2008-09);

viii. Author, May Plaintiffs Enjoy a Double Recovery? The "Collateral Source Rule " and Jewish Law, in J. Fleishman (ed.), JEWISH LAW ASSOCIATION STUDIES XVIII (2008);

ix. Author, Keeping One's Word in Commercial & Non-Commercial Contexts, in E. Dorff (ed.), JEWISH LAW ASSOCIATION STUDIES XVI (2007);

x. Author, Supplying Human Body Parts - a Jewish Law Perspective, 55 DEPAUL LAW REVIEW 851 (2006);

xi. Author, Jewish Law and Socially Responsible Corporate Conduct, 1 1 FORDHAM JOURNAL OF CORPORATE & FINANCIAL LAW 681 (2006);

xii. Author, Contemporary halakhic problems, chapter 29 in Nicholas de Lange and Miri Freud-Kandel (eds.), MODERN JUDAISM: AN OXFORD GUIDE (Oxford: Oxford University Press, 2005);

xiii. Author, The Legal and Halachic Ramifications of Brain Death, in Fred Rosner and Robert Schulman (eds.), MEDICINE AND JEWISH LAW III (Brooklyn, NY: Yashar Books, Inc., 2005);

xiv. Author, Ends and Means in Jewish Law: Lying to Achieve Economic Justice, JEWISH LAW ANNUAL XV (London: Taylor & Francis, 2004);

xv. I published several brief reviews of Jewish law books during this time;

xvi. For a number of years during this period, I served as the editor of the e-newsletter of the Jewish Law Association, an international organization dedicated to the promotion of the study of Jewish Law, especially in English. In serving as editor, I wrote a number of items on Jewish law topics, including case law regarding the enforceability of rabbinic court judgments;

xvii. In addition, a number of my older articles were "published" on the internet, including at jlaw.com;

xviii. Author, Illinois' New Legal Ethics Rules: A Disappointing Travail, 9 DEPAUL JOURNAL OF BUSINESS AND COMMERCIAL LAW 29 (FALL 2010);

xix. Author, Fraudulent Transfer Law in Illinois, in Robert M. Fishman et al. (eds.), SECURED TRANSACTIONS 2007 EDITION (Illinois Institute for Continuing Legal Education, 2007). I had authored a chapter on the same topic in the 2001 edition of this book prior to enactment in 2005 of major changes to the Bankruptcy Code;

xx. Author, Lying and Lawyering: An Honest Perspective in Keith W. Krasemann and

Patricia H. Werhane, (eds.), CONTEMPORARY ISSUES IN BUSINESS ETHICS: THE CALLISTA WICKLANDER LECTURES (University Press, 2006). This chapter was essentially reprinted from an earlier edition of the DEPAUL UNIVERSITY ACADEMIC AFFAIRS QUARTERLY;

xxi. Co-Author (with Prof. Wayne Lewis), NEGOTIABLE INSTRUMENTS AND OTHER PAYMENT SYSTEMS: PROBLEMS AND MATERIALS (LexisNexis Co., 2004);

xxii. Co-Author (with Prof. Wayne Lewis), TEACHER'S MANUAL TO NEGOTIABLE INSTRUMENTS AND OTHER PAYMENT SYSTEMS: PROBLEMS AND MATERIALS (LexisNexis co., 2004);

xxiii. Co-Author (with Prof. Wayne Lewis), 2004 Cumulative Supplement to Wayne K. Lewis and Steven H. Resnicoff, THE NEW LAW OF NEGOTIABLE INSTRUMENTS (Michie Company, 1996).

### SECULAR LAW PUBLICATIONS

xviii. Author, Illinois' New Legal Ethics Rules: A Disappointing Travail, 9 DEPAUL JOURNAL OF BUSINESS AND COMMERCIAL LAW 29 (FALL 2010);

xix. Author, Fraudulent Transfer Law in Illinois, in Robert M. Fishman et al. (eds.), SECURED TRANSACTIONS 2007 EDITION (Illinois Institute for Continuing Legal Education, 2007). I had authored a chapter on the same topic in the 2001 edition of this book prior to enactment in 2005 of major changes to the Bankruptcy Code;

xx. Author, Lying and Lawyering: An Honest Perspective in Keith W. Krasemann and Patricia H. Werhane, (eds.), CONTEMPORARY ISSUES IN BUSINESS ETHICS: THE CALLISTA WICKLANDER LECTURES (University Press, 2006). This chapter was essentially reprinted from an earlier edition of the DEPAUL UNIVERSITY ACADEMIC AFFAIRS QUARTERLY;

xxi. Co-Author (with Prof. Wayne Lewis), NEGOTIABLE INSTRUMENTS AND OTHER PAYMENT SYSTEMS: PROBLEMS AND MATERIALS (LexisNexis Co., 2004);

xxii. Co-Author (with Prof. Wayne Lewis), TEACHER'S MANUAL TO NEGOTIABLE INSTRUMENTS AND OTHER PAYMENT SYSTEMS: PROBLEMS AND MATERIALS (LexisNexis co., 2004);

xxiii. Co-Author (with Prof. Wayne Lewis), 2004 Cumulative Supplement to Wayne K. Lewis and Steven H. Resnicoff, THE NEW LAW OF NEGOTIABLE INSTRUMENTS (Michie Company, 1996).

### JEWISH LAW PRESENTATIONS

xxiv. Presenter, The Causes and Cures of Unethical Business Practices A Jewish Perspective, at The Henry Kaufman Conference on Religious Traditions and Business Behavior

TE-1786

(2013), sponsored by the University of Maryland's Robert H. Smith School of Business, October 3 1, 2013;

xxv. Panel Member, Conference on "Tikkun Olam" sponsored by the DePaul University College of Law Center for Jewish Law & Judaic Studies (JLJS), October 24, 2013;

xxvi. Panel Member, The Circumcision Debate: Medical and Legal Implications, at Judaism, Health and Healing: A Chicago Community Resource Conference, April 14, 2013 (conference co-sponsored by the DePaul University College of Law Center for Jewish Law & Judaic Studies, the Spertus Institute for Jewish Learning and Leadership and the University of Illinois at Chicago College of Medicine);

xxvii. Presenter, Congregation Yehuda Moshe's Night of Knowledge," November 10, 2012;

xxviii. Sole Speaker, Program sponsored by JLJS at DePaul University on September 12, 2012, entitled, Understanding Jewish Law.

xxix. Keynote Speaker, Regional Yom Iyun —The Many Faces of Abuse: Jewish and Clinical Perspectives, sponsored by the Chicago/Midwest Jewish Chaplains Group, in partnership with the Jewish Healing Network of Chicago, the National Association of Jewish Chaplains and the Chicago Board of Rabbis, August 29, 2012;

xxx. Presenter, Jewish Law Association Conference, Yale University, August 2, 2012. Topic: May One Kill Some Innocents to Save Others;

xxxi. Presenter, CLE Program sponsored by JLJS at DePaul University entitled, "A Comparative Analysis of Law through the Examination of Biblical, Talmudic and Scholarly Texts." Topic: Jewish Ethics and Legal Ethics: Comparisons and Contrasts, May 30, 2012;

xxxii. Presenter, CLE Program sponsored by JLJS at DePaul University entitled, "A Comparative Analysis of Law through the Examination of Biblical, Talmudic and Scholarly Texts." Topic: Reporting Child Sexual Abuse to Secular Authorities - Jewish law Perspectives," May 30, 2012;

xxxiii. Sole Presenter, Professionalism CLE Program sponsored by JLJS at Congregation KINS, West Rogers Park, Chicago, on December 18, 2011. Topic: Is Law a Suitable Career for a Good Jewish Boy or Girl?;

xxxiv. Presenter at Third Session of Program entitled, Judaism in Professional Life November 1 7, 2011, at the Illinois Holocaust Museum and Education Center, and sponsored by Spertus Institute for Jewish Studies. Topic: Financial & Business Ethics: What's Judaism Got to Do With It? ;

xxxv. Panel Member at Symposium entitled, Religion and Bankruptcy: Perspectives Thereon and Treatment Therein, sponsored by the St. John's University School of Law's Centers for Bankruptcy Studies and for Law and Religion, held at the St. John's University School of

TE-1787

Law, September 16, 2011. Topic: Jewish and American Bankruptcy Law: Their Similarities, Differences and Interactions;

xxxvi. Presenter, International Conference entitled, Intellectual Property in Jewish Law, sponsored by the Yad HaRav Herzog Institution and JMB, Factor & Co., in Jerusalem, Israel, June 26, 2011. Topic: Halakhic Issues involved in Embryonic Stem Cell Research; xxxvii. Commencement Speaker, Hebrew Theological College, June 20, 2011 ;

xxxviii. Panel member, Northwestern University College of Law, Economics of Biotechnology: The Human Gene Patenting Debate, sponsored by Northwestern University College of Law Journal of Technology and Intellectual Property as part of its Sixth Annual Symposium, March 4, 2011 ;

xxxix. One of two speakers, January 20, 2011, CLE program sponsored by DePaul College of Law Center for Jewish Law & Judaic Studies (JLJS). Topic: Common Problems in the Representation of Jewish Clients;

xl. One of two speakers, December 8, 2010, CLE program sponsored by JLJS in Deerfield, IL. Topic: Jewish Estate Planning and the Estate ofFeinberg;

xli. One of two speakers, Keynote Program for Conference entitled, Founding A Nation/Constituting A People: American and Judaic Perspectives, May 1 5, 2010 sponsored by JLJS and funded by the Jack Miller Center;

xlii. Sole Presenter, February 1 7, 2010, CLE program sponsored by JLJS, at DePaul. Topic: Double Dipping: A Comparison of American and Jewish Approaches;

xliii. Sole Presenter, program at the Northwestern University Law School sponsored by the Jewish Law Students Association, March 8, 2010. Topic: Jewish Law and Legal Ethics;

xliv. Presenter, February 7, 2010, program entitled, Jewish Family Law, the Agunah and General Issues in Jewish Law, sponsored by the Fordham University School of Law Conference. Topic: Responding to Sexual Abuse of Children Jewish Law Issues;

xlv. Presenter (one of two presenters), January 27, 2010, CLE program co-sponsored by JLJS and DePaul College of Law Health Law Institute, January 27, 2010. Topic: Issues in Genetic Engineering: Jewish and American Legal Perspectives;

xlvi. Sole Presenter, November 4, 2009, CLE program sponsored by JLJS, at DePaul. Topic: Debtor Collection and Bankruptcy A Comparison of Jewish and American Law;

xlvii. Presenter (one of two), March 24, 2009, CLE program sponsored by JLJS. Topic: Ethical Issues in Jewish and American Jurisprudence;

xlviii. Panel member, November 13, 2008, Conference sponsored by the Jewish Students Association of John Marshall Law School, Chicago, November 13, 2008. Topic: Estate of

TE-1788

Feinberg: The Enforceability Q/ "the Jewish Clause " in Wills;

xlix. Panel Chair, October 26, 2008, Twelfth Annual Conference of the Midwest Jewish Studies Association, co-sponsored by the DePaul Center for Jewish Law & Judaic Studies. Panel topic: New Approaches to Jewish Law;

l. Speaker, October 26, 2008, Twelfth Annual Conference of the Midwest Jewish Studies Association, co-sponsored by the DePaul Center for Jewish Law & Judaic Studies. Topic: Killing People to Save Lives Does Jewish Law Allow ü?;

li. Speaker, October 23-25, entitled, Speaking of Law and Religion, sponsored by Hamline University School of Law Journal of Law and Religion. Topic: Autonomy in Jewish Law — in Theory and in Practice;

lii. Speaker, Judaica Fest 2008, July 2008, Joint Conference of the Jewish Law Association and the British Jewish Studies Association, at the University of Manchester, UK. Topic: Da 'at Torah (Rabbinic Authority) and Censorship;

liii. Speaker, July 2006, Jewish Law Association's 2006 Conference, Bar-Ilan University. Topic: May Plaintiffs Enjoy a Double Recovery? The "Collateral Source Rule " and Jewish Law;

liv. Speaker, December 6, 2005, at a CLE program in Seattle, Washington sponsored by the Kollel of Seattle. Topics: (1) Bankruptcy Law - American, Israeli and Jewish Law: Perspectives on Bankruptcy Law's "Fresh Start" Policy; and (2) Whistleblowing versus Confidentiality: The Responsibilities ofLawyers under Jewish and Secular Law;

lv. Presenter, March 4, 2005, DePaul University Law Review Symposium entitled, Precious Commodities: The Supply and Demand ofBody Parts. Topic: Supplying Human Body Parts - a Jewish Law Perspective;

lvi. Speaker, November 1 6, 2004, CLE program at the law offices of Vinson & Elkins, Houston, Texas. Topic: Bankruptcy Law - American, Israeli and Jewish Law Perspectives on Bankruptcy Laws, A Fresh Start Policy;

lvii. Speaker, November 16, 2004, CLE entitled, Halachic Estate Planning Seminar at the Jewish Community Center, Houston, Texas. Topic: Where There 's a Will, There 's a Halacha way,

lviii. Speaker, August 4, 2004, Jewish Law Association's 2004 Boston Conference, at Boston University. Topic: Keeping One's Word in Commercial & NonCommercial Contexts;

lix. Speaker, June 9, 2004, CLE program, in St. Louis, Missouri. Topic: Jewish Law and the Corporate Paradigm;

lx. Panel Member, Sanctuary May 23, 2004 Television Telecast WLS ABC 7. Topic: Jewish Law and the Modern World;

TE-1789

lxi. Speaker, May 3, 2004, Conference sponsored by the Kollel of Ottawa Choshen Mishpat Conference, Ottawa, Canada. Topic: Jewish Business Ethics;

lxii. Speaker, February 23, 2004, Fordham School of Law Conference entitled, Religious Values and Corporate Decision Making. Topic: Does Corporate Decision Making Allow Room for Religious Values?).