Per Curiam

# SUPREME COURT OF THE UNITED STATES

## PEYMAN PAKDEL, ET UX. *v.* CITY AND COUNTY OF SAN FRANCISCO, CALIFORNIA, ET AL.

### ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 20–1212.  Decided June 28, 2021

PER CURIAM.

When a plaintiff alleges a regulatory taking in violation of the Fifth Amendment, a federal court should not consider the claim before the government has reached a "final" decision. *Suitum* v. *Tahoe Regional Planning Agency*, 520 U. S. 725, 737 (1997). After all, until the government makes up its mind, a court will be hard pressed to determine whether the plaintiff has suffered a constitutional violation. *See id.,* at 734; *Horne* v. *Department of Agriculture*, 569 U. S. 513, 525 (2013). In the decision below, however, the Ninth Circuit required petitioners to show not only that the San Francisco Department of Public Works had firmly rejected their request for a property-law exemption (which they did show), but *also* that they had complied with the agency's administrative procedures for seeking relief. Because the latter requirement is at odds with "the settled rule . . . that exhaustion of state remedies is *not* a prerequisite to an action under 42 U. S. C. §1983," *Knick* v. *Township of Scott*, 588 U. S. ___, ___ (2019) (slip op., at 2) (brackets and internal quotation marks omitted), we vacate and remand.

I

Petitioners are a married couple who partially own a multiunit residential building in San Francisco. When petitioners purchased their interest in the property, the building was organized as a tenancy-in-common. Under that kind of arrangement, all owners technically have the right to pos-

sess and use the entire property, but in practice often con-
tract among themselves to divide the premises into individ-
ual residences.  Owners also frequently seek to convert
tenancy-in-common interests into modern condominium-
style arrangements, which allow individual ownership of
certain parts of the building.  When petitioners purchased
their interest in the property, for example, they signed a
contract with the other owners to take all available steps to
pursue such a conversion.

Until 2013, the odds of conversion were slim because San
Francisco employed a lottery system that accepted only 200
applications per year.  When that approach resulted in a
predictable backlog, however, the city adopted a new pro-
gram that allowed owners to seek conversion subject to a
filing fee and several conditions.  One of these was that non-
occupant owners who rented out their units had to offer
their tenants a lifetime lease.

Although petitioners had a renter living in their unit,
they and their co-owners sought conversion.  As part of the
process, they agreed that they would offer a lifetime lease
to their tenant.  The city then approved the conversion.
But, a few months later, petitioners requested that the city
either excuse them from executing the lifetime lease or com-
pensate them for the lease.  The city refused both requests,
informing petitioners that "failure to execute the lifetime
lease violated the [program] and could result in an enforce-
ment action."  Brief for Respondents 9.

Petitioners sued in federal court under §1983.  Among
other things, they alleged that the lifetime-lease require-
ment was an unconstitutional regulatory taking.  But the
District Court rejected this claim without reaching the mer-
its.  2017 WL 6403074, *2–*4 (ND Cal, Nov. 20, 2017).  In-
stead, it relied on this Court's since-disavowed prudential
rule that certain takings actions are not "ripe" for federal
resolution until the plaintiff "seek[s] compensation through

Per Curiam

the procedures the State has provided for doing so." *Williamson County Regional Planning Comm'n* v. *Hamilton Bank of Johnson City*, 473 U. S. 172, 194 (1985).  Because petitioners had not first brought "a state court inverse condemnation proceeding," the District Court dismissed their claims.  2017 WL 6403074, *4.

While petitioners' appeal was pending before the Ninth Circuit, this Court repudiated *Williamson County*'s requirement that a plaintiff must seek compensation in state court. See *Knick*, 588 U. S., at ___–___ (slip op., at 19–23).  We explained that "[t]he Fifth Amendment right to full compensation arises at the time of the taking" and that "[t]he availability of any particular compensation remedy, such as an inverse condemnation claim under state law, cannot infringe or restrict the property owner's federal constitutional claim."  *Id.,* at ___–___ (slip op., at 7–8).  Any other approach, we reasoned, would conflict with "[t]he general rule . . . that plaintiffs may bring constitutional claims under §1983 without first bringing any sort of state lawsuit."  *Id.,* at ___ (slip op., at 11) (internal quotation marks omitted).

Rather than remand petitioners' claims in light of *Knick*, a divided panel of the Ninth Circuit simply affirmed. Noting that *Knick* left untouched *Williamson County*'s alternative holding that plaintiffs may challenge only "final" government decisions, *Knick*, 588 U. S., at ___ (slip op., at 5), the panel concluded that petitioners' regulatory "takings claim remain[ed] unripe because they never obtained a final decision regarding the application of the Lifetime Lease Requirement to their Unit."  952 F. 3d 1157, 1163 (2020).*  Although the city had twice denied their

──────────

*The Ninth Circuit rejected several of petitioners' alternative theories on the merits.  See, *e.g.,* 952 F. 3d 1157, 1162, n. 4 (2020) (considering whether "the Lifetime Lease Requirement effects an exaction, a physical taking, [or] a private taking").  On remand, the Ninth Circuit may give further consideration to these claims in light of our recent decision in *Cedar Point Nursery* v. *Hassid*, *ante*, p. ___.

requests for the exemption—and in fact the "relevant agency c[ould] no longer grant" relief—the panel reasoned that this decision was not truly "final" because petitioners had made a belated request for an exemption at the end of the administrative process instead of timely seeking one "through the prescribed procedures." *Id.,* at 1166–1167 (explaining that petitioners waited "six months after [they] had obtained final approval of their conversion . . . and seven months after they had committed to offering a lifetime lease"). In other words, a conclusive decision is not really "final" if the plaintiff did not give the agency the "opportunity to exercise its 'flexibility or discretion'" in reaching the decision. *Id.,* at 1167–1168.

Judge Bea dissented, explaining that the "'finality'" requirement looks only to whether "'the initial decisionmaker has arrived at a definitive position on the issue.'" *Id.,* at 1170. In his view, an additional demand that plaintiffs "follo[w] the decisionmaker's administrative procedures" would "ris[k] 'establish[ing] an exhaustion requirement for §1983 takings claims,' something the law does not allow." *Ibid.* And when the Ninth Circuit declined to rehear the case en banc, Judge Collins dissented along the same lines. He expressed concern that "the panel's unprecedented decision sharply depart[ed] from settled law and directly contravene[d] . . . *Knick*" by "impos[ing] an impermissible exhaustion requirement." 977 F. 3d 928, 929, 934 (2020).

## II

We, too, think that the Ninth Circuit's view of finality is incorrect. The finality requirement is relatively modest. All a plaintiff must show is that "there [is] no question . . . about how the 'regulations at issue apply to the particular land in question.'" *Suitum,* 520 U. S., at 739 (brackets omitted).

In this case, there is no question about the city's position:

Per Curiam

Petitioners must "execute the lifetime lease" or face an "enforcement action." Brief for Respondents 9. And there is no question that the government's "definitive position on the issue [has] inflict[ed] an actual, concrete injury" of requiring petitioners to choose between surrendering possession of their property or facing the wrath of the government. *Williamson County*, 473 U. S., at 193.

The rationales for the finality requirement underscore that nothing more than *de facto* finality is necessary. This requirement ensures that a plaintiff has actually "been injured by the Government's action" and is not prematurely suing over a hypothetical harm. *Horne*, 569 U. S., at 525. Along the same lines, because a plaintiff who asserts a regulatory taking must prove that the government "regulation has gone 'too far,'" the court must first "kno[w] how far the regulation goes." *MacDonald, Sommer & Frates* v. *Yolo County*, 477 U. S. 340, 348 (1986). Once the government is committed to a position, however, these potential ambiguities evaporate and the dispute is ripe for judicial resolution.

The Ninth Circuit's contrary approach—that a conclusive decision is not "final" unless the plaintiff *also* complied with administrative processes in obtaining that decision—is inconsistent with the ordinary operation of civil-rights suits. Petitioners brought their takings claim under §1983, which "guarantees 'a federal forum for claims of unconstitutional treatment at the hands of state officials.'" *Knick*, 588 U. S., at ___ (slip op., at 2). That guarantee includes "the settled rule" that "exhaustion of state remedies is *not* a prerequisite to an action under . . . §1983." *Ibid.* (internal quotation marks omitted). In fact, one of the reasons *Knick* gave for rejecting *Williamson County*'s state-compensation requirement is that this rule had "effectively established an exhaustion requirement for §1983 takings claims." *Knick*, 588 U. S., at ___ (slip op., at 12).

The Ninth Circuit's demand that a plaintiff seek "an exemption through the prescribed [state] procedures," 952

F. 3d, at 1167, plainly requires exhaustion. In fact, this
rule mirrors our administrative-exhaustion doctrine, which
"provides that no one is entitled to judicial relief for a sup-
posed or threatened injury until the prescribed administra-
tive remedy has been exhausted." *Woodford* v. *Ngo*, 548
U. S. 81, 88–89 (2006) (internal quotation marks omitted).
As we have often explained, this doctrine requires "*proper*
exhaustion"—that is, "compliance with an agency's dead-
lines and other critical procedural rules." *Id.,* at 90 (empha-
sis added). Otherwise, parties who would "prefer to proceed
directly to federal court" might fail to raise their grievances
in a timely fashion and thus deprive "the agency [of] a fair
and full opportunity to adjudicate their claims." *Id.,* at 89–
90. Or, in the words of the Ninth Circuit below, parties
might "make an end run . . . by sitting on their hands until
every applicable deadline has expired before lodging a
token exemption request that they know the relevant
agency can no longer grant." 952 F. 3d, at 1166.

Whatever policy virtues this doctrine might have, admin-
istrative "exhaustion of state remedies" is not a prerequisite
for a takings claim when the government has reached a con-
clusive position. *Knick*, 588 U. S., at ___ (slip op., at 2). To
be sure, we have indicated that a plaintiff's failure to
properly pursue administrative procedures may render a
claim unripe *if* avenues still remain for the government to
clarify or change its decision. See, *e.g., Williamson County*,
473 U. S., at 192–194 ("The Commission's refusal to ap-
prove the preliminary plat . . . leaves open the possibility
that [the plaintiff] may develop the subdivision according to
the plat after obtaining the variances"); *Knick*, 588 U. S., at
___ (slip op., at 5) ("[T]he developer [in *Williamson County*]
still had an opportunity to seek a variance from the appeals
board"); cf. *Palazzolo* v. *Rhode Island*, 533 U. S. 606, 624–
625 (2001) (dismissing accusations that the plaintiff was
"employing a hide the ball strategy" when "submission of

Per Curiam

[a] proposal would not have clarified the extent of development permitted . . . , which is the inquiry required under our ripeness decisions"). But, contrary to the Ninth Circuit's view, administrative missteps do not defeat ripeness once the government has adopted its final position. See *Williamson County*, 473 U. S., at 192–193 (distinguishing its "finality requirement" from traditional administrative "exhaust[ion]"). It may very well be, as Judge Bea observed, that misconduct during the administrative process is relevant to "evaluating the *merits* of the . . . clai[m]" or the measure of damages. 952 F. 3d, at 1170, n. 2 (dissenting opinion); cf. *Palazzolo*, 533 U. S., at 625. For the limited purpose of ripeness, however, ordinary finality is sufficient.

Of course, Congress always has the option of imposing a strict administrative-exhaustion requirement—just as it has done for certain civil-rights claims filed by prisoners. See 42 U. S. C. §1997e(a); *Ngo*, 548 U. S., at 84–85 ("Before 1980, prisoners asserting constitutional claims had no obligation to exhaust administrative remedies"). But it has not done so for takings plaintiffs. Given that the Fifth Amendment enjoys "full-fledged constitutional status," the Ninth Circuit had no basis to relegate petitioners' claim "'to the status of a poor relation' among the provisions of the Bill of Rights." *Knick*, 588 U. S., at ___ (slip op., at 6).

*        *        *

For the foregoing reasons, we grant the petition for a writ of certiorari, vacate the judgment of the Ninth Circuit, and remand the case for proceedings consistent with this opinion.

*It is so ordered.*